
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 3:22- 00282 |
| | ) | |
| v. | ) | 18 U.S.C. § 371 |
| | ) | 18 U.S.C. § 666(a)(1)(A) |
| [1] GLEN CASADA | ) | 18 U.S.C. § 666(a)(1)(B) |
| [2] CADE COTHREN | ) | 18 U.S.C. § 666(a)(2) |
| | ) | 18 U.S.C. § 1342 |
| | ) | 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 1346 |
| | ) | 18 U.S.C. § 1956 |
| | ) | 18 U.S.C. § 1957 |
| | ) | 18 U.S.C. § 2 |

# INDICTMENT

THE GRAND JURY CHARGES:

## **BACKGROUND ALLEGATIONS**

At all times material to this Indictment unless otherwise indicated:

1.      The Constitution of the State of Tennessee ("the State") established that the legislative authority of the State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives.

2.      The Tennessee House of Representatives ("Tennessee House") consisted of approximately ninety-nine members apportioned among counties and electoral districts. Representatives served two-year terms. The Speaker of the House was the presiding officer of the Tennessee House.

3.      **GLEN CASADA** was a member of the Tennessee House, representing District 63, which included part of Williamson County, Tennessee. **CASADA** was first elected to the Tennessee House in or around 2003 and was reelected to serve as a Representative in each

subsequent General Assembly. **CASADA** served as Speaker of the Tennessee House from in or around January 2019 until in or around August 2019. In or around August 2019, **CASADA** resigned as Speaker after allegations became public regarding his then Chief of Staff, **CADE COTHREN**, but **CASADA** remained as a member of the Tennessee House.

4. Individual 4 was a member of the Tennessee House, representing District 26, which included part of Hamilton County, Tennessee. Individual 4 was first elected to the Tennessee House in or around November 2018 and was reelected in or around November 2020.

5. Individual 4 owned and operated a political consulting company called Company 1. Company 1 provided political consulting, mail, and project management services. Company 1 held Bank Account x0738 at Financial Institution 2.

6. **CASADA** owned and operated a political consulting company called Company 2. **CASADA** started Company 2 in or around October 2019. Company 2 held Bank Account x4447 at Financial Institution 2.

7. As Representatives, **CASADA** and Individual 4 each held an office of trust under the Constitution of the State of Tennessee and owed a fiduciary duty to provide honest services to the State and its citizens. As members of the State of Tennessee's 111th General Assembly, on or about January 8, 2019, **CASADA** and Individual 4 each swore that they would "not propose or assent to any bill, vote or resolution, which shall appear to me injurious to the people, or consent to any act or thing, whatever, that shall have a tendency to lessen or abridge their rights and privileges."

8. The Tennessee House adopted Permanent Rules of Order for the 111th General Assembly. The Rules included an Ethics Code, which stated that "Representatives should avoid conduct that even appears to violate the trust that the people have placed in them." Conduct

violating the Ethics Code included: "Actions that destroy a representative's independence of judgment as a legislator"; "Actions that are an abuse of the representative's official position, including, but not limited to, placing undue influence upon any state department, agency, court or governmental subdivision"; and "Actions that are a personal interest in conflict with the proper discharge of the representative's duties." The Tennessee House adopted the Rules of Order under **CASADA**'s name as Speaker, and, while he served in this role, **CASADA** was responsible for preserving them. As Speaker, **CASADA** was also responsible for appointing members of the House Ethics Committee.

9.     **COTHREN** was a businessman and former Chief of Staff to **CASADA** when **CASADA** was Tennessee House Speaker. In 2019, multiple news forums published allegations that **COTHREN** had engaged in inappropriate conduct. On or about May 3, 2019, **COTHREN** resigned his position as Chief of Staff.

10.     In or around November 2019, **COTHREN** established Phoenix Solutions, LLC, with **CASADA** and Individual 4's knowledge and support. Phoenix Solutions provided constituent mail services to members of the Tennessee General Assembly and to political campaigns for State offices. Phoenix Solutions held Bank Account x3886 at Financial Institution 1 and Bank Account x9665 at Financial Institution 3.

11.     The State allocated Tennessee Representatives $3,000 annually to fund postage and printing of items to be sent to the legislators' constituents (the "Mailer Program"). According to Tennessee House guidelines, Representatives were permitted to use Mailer Program funds to design and mail legislative update mailers and legislative surveys to their constituents. Representatives were permitted to use campaign funds to offset additional expenses beyond the $3,000 allocated under the Mailer Program.

3

12. The Tennessee House Speaker's Office had the authority to approve or deny a vendor to provide services or any mailing funded by the Mailer Program.

13. The Office of Legislative Administration ("OLA") managed the operation of the Mailer Program in consultation with the Senate and House Speakers. OLA's Director of Legislation, in consultation with the Senate and House Speakers and their Offices, was responsible for approving invoices related to the Mailer Program and managing disbursements of State funds to vendors.

14. In each of the calendar years 2019, 2020, and 2021, the State of Tennessee received more than $10,000 in federal benefits.

**COUNT ONE**
**18 U.S.C. § 371**
**(Conspiracy)**

15. Paragraphs 1 through 14 are incorporated and realleged as if fully set forth herein.

**I.     Objects of the Conspiracy**

16. Beginning in or around October 2019 and continuing until in or around January 2021, in the Middle District of Tennessee and elsewhere, **CASADA** and **COTHREN** did knowingly conspire and agree with each other and with other individuals known and unknown to the Grand Jury, to commit the following offenses against the United States:

a.     **Theft Concerning Programs Receiving Federal Funds:** that is, for **CASADA** and Individual 4, agents of Tennessee, a State which during each of calendar years 2019, 2020, and 2021 received federal benefits in excess of $10,000, and together with and aided and abetted by **COTHREN**, and others known and unknown to the Grand Jury, to embezzle, steal, obtain by fraud, and otherwise without authority knowingly convert to the use of any person other than the rightful owner and intentionally misapply, property that is valued at $5,000 or more, and was

owned by, and was under the care, custody, and control of the State of Tennessee, in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2;

b.  **Bribery and Kickbacks Concerning Programs Receiving Federal Funds:** that is, for **CASADA** and Individual 4, agents of Tennessee, a State which during each of calendar years 2019, 2020, and 2021 received federal benefits in excess of $10,000, aided and abetted by others known and unknown to the Grand Jury, to corruptly solicit, demand, accept, and agree to accept for their own benefit, things of value from **COTHREN**, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Tennessee valued at $5,000 or more, that is, payments of State funds to Phoenix Solutions, both directly and through Company 1 and Company 2, for mailer services, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2;

c.  **Bribery and Kickbacks Concerning Programs Receiving Federal Funds:** that is, for **COTHREN**, aided and abetted by others known and unknown to the Grand Jury, to corruptly give, offer, and agree to give things of value to **CASADA** and Individual 4, agents of Tennessee, a State which during each of calendar years 2019, 2020, and 2021 received federal benefits in excess of $10,000, intending to influence and reward **CASADA** and Individual 4 in connection with a business, transaction, and series of transactions of the State of Tennessee valued at $5,000 or more, that is, payments of State funds to Phoenix Solutions, both directly and through Company 1 and Company 2, for mailer services in violation of Title 18, United States Code, Sections 666(a)(2) and 2; and

d.  **Honest-Services Wire Fraud:** that is, for **CASADA**, **COTHREN**, and Individual 4, and others known and unknown to the Grand Jury, to devise and intend to devise a scheme and artifice to defraud and to deprive Tennessee and the citizens of Tennessee of their right to the

honest services of a public official, namely, the honest services of **CASADA** and Individual 4, members of the Tennessee House of Representatives and elected state officials, through bribery and kickbacks, in violation of Title 18, United States Code, Sections 1343 and 1346.

## II.     The Purposes of the Conspiracy

17.     It was a purpose of the conspiracy for **CASADA**, **COTHREN**, and Individual 4 to enrich themselves by embezzling, stealing, obtaining by fraud, and otherwise without authority knowingly converting to the use of any person other than the rightful owner and intentionally misapplying, property and money that was owned by, and was under the care, custody, and control of the State of Tennessee, that is, Mailer Program funds.

18.     It was a further purpose of the conspiracy for **CASADA**, **COTHREN**, and Individual 4 to enrich themselves by exploiting **CASADA** and Individual 4's official positions as legislators to obtain State approval of Phoenix Solutions as a Mailer Program vendor and to obtain State funds for Phoenix Solutions, Company 1, and Company 2, and to share in the proceeds of those fraudulently induced disbursements.

19.     It was a further purpose of the conspiracy for **CASADA** and Individual 4 to enrich themselves by obtaining bribes and kickbacks from **COTHREN** in exchange for securing the approval of Phoenix Solutions as a Mailer Program vendor and for causing State payments to be made to Phoenix Solutions, Company 1, and Company 2 for mailer services provided by Phoenix Solutions.

20.     It was a further purpose of the conspiracy for **COTHREN** to enrich himself by corruptly securing Mailer Program funds from the State, a portion of which **COTHREN** kept for himself, by paying **CASADA** and Individual 4 bribes and kickbacks.

21.     It was a further purpose of the conspiracy to conceal from the State and its citizens **COTHREN**'s involvement in Phoenix Solutions and the fact that he kicked back a portion of the company's profits to **CASADA** and Individual 4 due to the Defendants' and Individual 4's expectations that Phoenix Solutions would not be approved by the State to be a Mailer Program vendor or hired by individual members of the Tennessee General Assembly if **COTHREN**'s operational involvement and financial interests in the business and the kickbacks to **CASADA** and Individual 4 were disclosed.

### III.     The Manner and Means of the Conspiracy

22.     The manner and means by which the Defendants carried out the scheme included, but were not limited to, the following:

23.     The conspirators would and did tell others, including members of the Tennessee General Assembly, the House Speaker's Office, and the OLA, that Phoenix Solutions was run by an individual named "Matthew Phoenix." The conspirators claimed that Matthew Phoenix was an experienced political consultant who had worked for Consulting Firm 1, a real company based in Washington, D.C. In truth and in fact, **COTHREN** ran Phoenix Solutions and **CASADA**, **COTHREN**, and Individual 4 secretly profited from it. The conspirators knew that Matthew Phoenix was a fictitious person and was, in truth and in fact, **COTHREN**. The conspirators also knew that **COTHREN** had never worked for Consulting Firm 1.

24.     The conspirators would and did conceal **COTHREN**'s involvement in Phoenix Solutions from the State and members of the Tennessee General Assembly due to the expectation that Phoenix Solutions would not be approved by the Tennessee House Speaker's Office, acting on behalf of the State, or hired as a vendor by individual members if **COTHREN**'s involvement was disclosed. They also would and did conceal the fact that **COTHREN** kicked back a portion

of the profits from the State and members of the Tennessee General Assembly to Individual 4 and **CASADA** due to the expectation that Phoenix Solutions would not be approved by the Tennessee House Speaker's Office, acting on behalf of the State, or hired as a vendor by individual members if **COTHREN**'s operational involvement and financial interests in the business and the kickbacks to Individual 4 and **CASADA** were disclosed.

25. The conspirators would and did further conceal their involvement in Phoenix Solutions by submitting sham invoices to the State in the names of Company 1 and Company 2 for the purpose of secretly funneling money from the State to Phoenix Solutions through the bank accounts of Company 1 and Company 2.

26. **CASADA** and Individual 4 would and did receive kickbacks from **COTHREN** in exchange for using their positions as members of the Tennessee House of Representatives to perform official acts, including pressuring the Tennessee House Speaker's Office and other State officials to approve Phoenix Solutions as a Mailer Program vendor and to disburse State funds to Phoenix Solutions, Company 1, and Company 2; advising and pressuring other members of the Tennessee House of Representatives to use Phoenix Solutions, Company 1, and Company 2 as their Mailer Program vendor and to disburse State funds to Phoenix Solutions, Company 1, and Company 2; and choosing to use Phoenix Solutions, Company 1, and Company 2 for **CASADA** and Individual 4's mailings to their constituents under the Mailer Program.

## IV. Acts in Furtherance of the Scheme

27. In furtherance of the conspiracy described in Count 1 and to effect the objects of the conspiracy, the Defendants named therein and other individuals, both known and unknown to the Grand Jury, performed or caused the performance of one or more of the following overt acts, among others, in the Middle District of Tennessee and elsewhere on or about the following dates:

28.     In or around November 2019, **COTHREN** set up an email account for Matthew Phoenix, matthew@powerofphoenix.com, which **COTHREN** used to conduct business on behalf of Phoenix Solutions.

29.     In or around November 2019, **COTHREN** incorporated Phoenix Solutions as a limited liability company (LLC) in New Mexico. **COTHREN** set up a United States Postal Service post office box for Phoenix Solutions there and forwarded the mail received by that post office box to his home address in Nashville. **COTHREN** later explained to Individual 4 that he established the post office box in New Mexico because that state allows the anonymous registration of LLCs.

30.     On or about November 11, 2019, **COTHREN** wrote Individual 4 a text message explaining that "using a registered agent is of course what allows us to mask identities."

31.     On or about November 19, 2019, **COTHREN** texted **CASADA** a link to the website he "built for the new company. Phoenix solutions." **COTHREN** texted **CASADA** again saying, "but just remember that you have zero connection to it and don't even know that much other than they've done work for you and are very good." **CASADA** responded, "I like the message!"

32.     On or about November 22, 2019, **COTHREN** opened Bank Account x3886 at Financial Institution 1 in the name of Phoenix Solutions, LLC. **COTHREN** was listed as the duly designated Chief Manager, as well as the President of Phoenix Solutions.

33.     On or about December 18, 2019, Individual 4 emailed **COTHREN**. Referencing a potential future conversation related to Phoenix Solutions with a Political Party 1 employee regarding campaign mailers for General Assembly incumbents, Individual 4 told **COTHREN** that he "may have to assume the role of Matthew again." **COTHREN** replied to Individual 4,

"Matthew, reporting for duty!" and included a graphic interchange format (".gif") picture of a salute from Harrison Ford's character Han Solo in the movie Star Wars.

34.     On or about December 20, 2019, **CASADA** texted **COTHREN**, "I think this is starting off well I'm pleased!" **COTHREN** agreed, but later cautioned, "we just have to make sure no one knows it's me involved." Later in the conversation, **CASADA** asked **COTHREN**, "we can discuss on the 30th but since the caucus has won't [sic] spend money on members companies and we want no one knowing your [sic] Phoenix how do we get around that to doing [caucus] mail[?]" **COTHREN** responded, "no one needs to know whose company it is." **CASADA** later said, "I just hope they don't ask the representatives from Phoenix to come and make his case to do caucus mail[.]" **COTHREN** responded, "they live in New Mexico. Will have to get on the phone for it and I could disguise my voice if I has [sic] to."

35.     On or about January 4, 2020, Individual 4 submitted an invoice to the State of Tennessee from Phoenix Solutions for $3,426.23 for payment from Individual 4's Mailer Program account. On or about February 6, 2020, the State issued a check for $3,259.20 to Phoenix Solutions as payment for Individual 4's invoice.

36.     On or about January 6, 2020, **CASADA** submitted an invoice to the State of Tennessee from Company 1 for $3,480.60 for payment from his Mailer Program funds. On or about February 28, 2020, the State issued a check for $10,969.12 to Company 1 as payment for **CASADA**'s invoice and two other invoices. Individual 4 signed and deposited the check into Company 1's Financial Institution 2 Account x0738 on or about March 7. On March 8, Individual 4 drafted and signed a $10,969.12 check from Company 1's Financial Institution 2 Account x0738, paid to the order of Phoenix Solutions. In the memo line, Individual 4 wrote, "Mail—

[Representative 1], Casada, [Representative 2]." On March 10, Phoenix Solutions Financial Institution 1 Account x3886 deposited the check. **COTHREN** endorsed the deposit.

37.     In or around January 2020, an employee of the Tennessee House Speaker's Office informed Individual 4 that the Speaker's Office needed to work directly with the third-party vendor, which was a change in the existing Mailer Program guidelines. Individual 4 informed **COTHREN**. **COTHREN** was notified that the State could not pay Phoenix Solutions without an Internal Revenue Service Form W-9 on file. In response, **COTHREN**, assuming the identity of Matthew Phoenix to disguise his true identity, sent a W-9 signed by "Matthew Phoenix" from the matthew@powerofphoenix.com email address to the Tennessee House Majority Caucus Advisor for the purpose of filing it with the State.

38.     On or about January 24, 2020, as part of the agreement for Individual 4 and **CASADA** to cause and expedite State payments to Phoenix Solutions in exchange for bribes and kickbacks from **COTHREN**, Individual 4 and **CASADA** began a series of efforts to pressure other State officials to pay and expedite payment of invoices to Phoenix Solutions and Companies 1 and 2. On or about January 24, 2020, Individual 4 emailed **COTHREN**, "We'll start with this...Matthew...you might expect some type of call, email." Below, Individual 4 copied an email chain between Individual 4, the Acting Chief of Staff to the House Speaker, and the OLA's Director of Legislation. In the email chain, Individual 4 asked the officials about the status of Mailer Program payments to Phoenix Solutions and why there was an issue with processing them. The Acting Chief of Staff wrote Individual 4, "I'm on it." Individual 4 replied, "Don't crush her, but [the Director of Legislation has] been telling this vendor that the check's on the way for about two weeks." Individual 4 falsely added, "It's guys from [Consulting Firm 1] who did mail two

years ago that left and started their own gig...tired of doing the DC/Trump stuff. Thanks." Individual 4 then forwarded the email chain to **COTHREN**, adding the message, "Shhhhhhhhhh."

39.     On or about February 5, 2020, **CASADA** texted Individual 4, requesting that Individual 4 call him, and writing that he "wanted to know if we needed to meet with [the Director of Legislation] to try to push reimbursement along."

40.     On or about February 7, 2020, **COTHREN** texted Individual 4 about outstanding invoices that had been submitted to the State, writing, "Waiting on state payment (between you, glen, Phoenix)" and listed 11 different House members, including **CASADA** and Individual 4, for a "TOTAL DUE FROM STATE: $34,684.40."

41.     On or about February 10, 2020, Individual 4 texted **COTHREN**, "Went by mailbox early this morning and no$. Have appt tomorrow at 5 with [the Director of Legislation]. She'd best have some answers." On or about February 11, 2020, Individual 4 met with the Director of Legislation. On or about February 11, **CASADA** texted Individual 4, "Just curious what did you find out from [the Director of Legislation] today?" Individual 4 texted **CASADA**, calling the Director of Legislation an offensive term. **CASADA** responded, "agreed!"

42.     On February 12, 2020, **COTHREN** texted Individual 4, "Glen went to [the Director of Legislation]'s office. They told him his w9 had also been rejected and that's why he hasn't gotten payment."

43.     On or about April 2, 2020, **COTHREN** sent an email to **CASADA** and Individual 4. The email stated, "Friends, Here's our up-to-date printing spreadsheet. All of these checks have been collected and deposited. All bills related to these print jobs have also been paid. So, let me know what address is best for you and I will cut checks for each of you?" **COTHREN** provided a breakdown of total profit earned from each client. **CASADA**, **COTHREN**, and Individual 4

shared the profits, with **COTHREN** earning 30%. **CASADA** and Individual 4 each earned $4,143.64, which was 25% of the business. **COTHREN** wrote that the remaining 20% of the profit was "left in business." **COTHREN** also discussed ways to cut Phoenix Solutions' future costs.

44.     On or about April 4, 2020, **CASADA** endorsed and deposited check number 133, dated April 3, 2020, in the amount of $4,143.64, from Phoenix Solutions' Financial Institution 1 Account x3886 into a personal bank account. **COTHREN** signed the check in his given name and wrote "Consulting" on the memo line.

45.     On or about April 14, 2020, Individual 4 endorsed and deposited check number 134, dated April 3, 2020, in the amount of $4,143.64, from Phoenix Solutions' Financial Institution 1 Account x3886 into a bank account associated with her consulting firm, Company 1. **COTHREN** signed the check in his given name and wrote "Consulting" on the memo line.

46.     On or about May 20, 2020, Individual 4 discussed Phoenix Solutions with a member of the Political Party 1 Tennessee House Caucus. Individual 4 described Phoenix Solutions as her preferred survey mailer company. Individual 4 falsely said that Phoenix Solutions was owned and operated by Matthew Phoenix, an experienced political consultant with whom Individual 4 did business when Individual 4 used Washington, D.C.-based Consulting Firm 1 for political work. Individual 4 falsely said that Matthew Phoenix and his associate, "Candice," got tired of living in the Washington, D.C. area and decided to move back home to New Mexico, where Phoenix started Phoenix Solutions. Individual 4 falsely said that Individual 4 used Phoenix Solutions because of the quality of its work.

47.     On or about June 16, 2020, **COTHREN** emailed as "Matthew" with a fictitious person, "Candice," another alleged employee of Phoenix Solutions. The purpose of the email exchange was to falsely make it appear as if two employees of Phoenix Solutions were having an

exchange about the need to secure payment on outstanding Mailer Program invoices that the State had not yet paid. **COTHREN**, using the matthew@powerofphoenix.com email account, then forwarded the exchange to Individual 4.

48.　　On or about June 22, 2020, Individual 4 emailed the Director of Legislation, copying the Acting Chief of Staff to the House Speaker, to complain about delays in Mailer Program payments from the State to Phoenix Solutions. Individual 4 forwarded them the June 16, 2020, email exchange between "Candice" and "Matthew" complaining about the delayed payments. Above that email chain, Individual 4 wrote, "[Director of Legislation], I was cc'd on this last week. . . . It would be either illegal or unethical to move to print without knowing payment was coming, so the bulk permit number is provided on the invoice. Simpler, asking a firm to be liable for the cost with the printing completed before knowing payment may or may not be approved is suspect. Is there something going on?" Enclosed within Individual 4's email were invoices from Phoenix Solutions for legislative mailers on behalf of two Representatives, for $4,547.50 and $5,537. The State ultimately paid these invoices.

49.　　On or about August 10, 2020, Individual 4 attended a meeting of the Political Party 1 House campaign committee. Present at the meeting were several Tennessee Representatives, officials from the Speaker's Office, and a committee consultant. Individual 4 repeated the same false statements regarding Phoenix Solutions that Individual 4 had made to the Caucus member on or about May 20, 2020. Individual 4 also falsely told the committee members that Individual 4 did not make any money from Phoenix Solutions.

50.　　In or around October 2020, **COTHREN** texted **CASADA** about an issue with a payment to a vendor that **CASADA** was going to handle. **COTHREN** told **CASADA**, "he doesn't

know me by Cade, only Matthew Phoenix," and later reminded **CASADA**, "Remember I am Matthew haha."

51.     From on or about June 1, 2020, through on or about December 1, 2020, Phoenix Solutions took on more varied projects, but continued to receive payments from the State-funded Mailer Program and campaign accounts of members of the General Assembly. During that timeframe, Phoenix Solutions' Financial Institution 1 Account x3886 received revenue of approximately $158,165, excluding payments from campaign accounts associated with **CASADA** and Individual 4.

52.     From on or about January 1, 2020, through on or about December 31, 2020, Phoenix Solutions, Company 1, and Company 2 received approximately $51,947 from the State in payments associated with the Mailer Program.

53.     On or about September 10, 2020, Individual 4 endorsed and deposited check number 152, dated September 1, 2020, in the amount of $12,003.16, from Phoenix Solutions' Financial Institution 1 Account x3886 into a bank account associated with her consulting firm, Company 1. **COTHREN** signed the check in his given name and wrote "Consulting" on the memo line.

54.     On or about September 25, 2020, **CASADA** endorsed and deposited check number 155, dated September 21, 2020, in the amount of $500, from Phoenix Solutions' Financial Institution 1 Account x3886 into a bank account associated with Company 2. **COTHREN** signed the check in his given name and wrote "[Representative 3] Mailer" on the memo line.

55.     On or about November 28, 2020, **CASADA** endorsed and deposited check number 167, dated November 25, 2020, in the amount of $2,500, from Phoenix Solutions' Financial

Institution 1 Account x3886 into a personal bank account. **COTHREN** signed the check in his given name and wrote "Consulting" on the memo line.

56.     On or about November 30, 2020, **CASADA** texted **COTHREN** "what was the $2500 for from Phoenix?" **COTHREN** responded "that was the split profit from your mailers." In another text, **COTHREN** asked, "not bad, right?" and **CASADA** responded, "Not bad. Thank you!"

57.     On or about December 17, 2020, Individual 4 endorsed and deposited check number 170, dated December 16, 2020, in the amount of $12,116.96, from Phoenix Solutions' Financial Institution 1 Account x3886 into a bank account associated with Company 1. **COTHREN** signed the check in his given name and wrote "Consulting" on the memo line.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### 18 U.S.C. §§ 666(a)(1)(A), 2
### (Theft Concerning Programs Receiving Federal Funds)

58.     Paragraphs 1 through 14, and 17 through 57 are incorporated and realleged as if fully set forth herein.

59.     In each of the calendar years 2019, 2020, and 2021, the State of Tennessee received in excess of $10,000 in benefits from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

60.     **CASADA** and Individual 4 were at all relevant times agents of the State of Tennessee whose duties included those of an elected Representative of the State of Tennessee.

61.     In consecutive one-year periods, beginning in or around October 2019 and continuing until in or around January 2021, in the Middle District of Tennessee and elsewhere, **CASADA**, aided and abetted by **COTHREN** and Individual 4, and others known and unknown to the Grand Jury, embezzled, stole, obtained by fraud, without authority knowingly converted to the

use of any person other than the rightful owner, and intentionally misapplied property worth $5,000 or more and owned by, under the care of, under the custody of, and under the control of the State of Tennessee, in each one-year period, that is: **CASADA**, being an agent of the State of Tennessee, aided and abetted by **COTHREN** and Individual 4, and others known and unknown to the Grand Jury, fraudulently obtained money from the State of Tennessee by falsifying the true owners and operators of Phoenix Solutions and retaining the proceeds of fraudulently induced disbursements from the State to Phoenix Solutions, Company 1, and Company 2 for the Defendants' and Individual 4's own use and benefit.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

### COUNT THREE
### 18 U.S.C. §§ 666(a)(1)(B), 2
### (Bribery and Kickbacks Concerning Programs Receiving Federal Funds)

62.     Paragraphs 1 through 14, 17 through 57, and 59 through 60 are incorporated and realleged as if fully set forth herein.

63.     In each of the calendar years 2019, 2020, and 2021, the State of Tennessee received in excess of $10,000 from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

64.     **CASADA** and Individual 4 were at all relevant times agents of the State of Tennessee whose duties included those of an elected Representative of the State of Tennessee.

65.     In consecutive one-year periods, beginning in or around October 2019 and until in or around January 2021, in the Middle District of Tennessee and elsewhere, **CASADA**, aided and abetted by **COTHREN** and Individual 4, and others known and unknown to the Grand Jury, did corruptly solicit and demand for **CASADA**, **COTHREN**, and Individual 4's own benefit, and accept and agree to accept, things of value from **COTHREN**, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of

Tennessee involving $5,000 or more in each one-year period, that is, payments of State funds to Phoenix Solutions, both direct and through Company 1 and Company 2 for mailer services.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT FOUR
### 18 U.S.C. §§ 666(a)(2), 2
### (Bribery and Kickbacks Concerning Programs Receiving Federal Funds)

66.     Paragraphs 1 through 14, 17 through 57, 59 through 60, and 63 through 64 are incorporated and realleged as if fully set forth herein.

67.     In each of the calendar years 2019, 2020, and 2021, the State of Tennessee received in excess of $10,000 from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

68.     **CASADA** and Individual 4 were at all relevant times agents of the State of Tennessee whose duties included those of an elected Representative of the State of Tennessee.

69.     In consecutive one-year periods, beginning in or around October 2019 and until in or around January 2021, in the Middle District of Tennessee and elsewhere, **COTHREN**, aided and abetted by **CASADA** and Individual 4, and others known and unknown to the Grand Jury, did corruptly give, offer, and agree to give things of value to **CASADA** and Individual 4, intending to influence and reward **CASADA** and Individual 4 in connection with a business, transaction, and series of transactions of the State of Tennessee involving $5,000 or more in each one-year period, that is, payments of State funds to Phoenix Solutions, both direct and through Company 1 and Company 2 for mailer services.

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## COUNTS FIVE THROUGH TEN
## 18 U.S.C. §§ 1343, 1346, 2
## (Honest Services Wire Fraud)

70.     Paragraphs 1 through 14, 17 through 57, 59 through 60, 63 through 64, and 67 through 68 are incorporated and realleged as if fully set forth herein.

71.     Beginning in or around October 2019 and continuing until in or around January 2021, in the Middle District of Tennessee and elsewhere, **CASADA** and **COTHREN**, aided and abetted by each other and Individual 4 and others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud and deprive Tennessee and the citizens of Tennessee of their right to the honest services of a public official, namely, the honest services of **CASADA** and Individual 4, members of the Tennessee House of Representatives, elected state officials, through bribery and kickbacks.

72.     On or about each of the dates set forth below, in the Middle District of Tennessee and elsewhere, **CASADA** and **COTHREN**, aided and abetted by each other and Individual 4, and others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communications in and affecting interstate commerce the following writings, signs, signals, pictures, and sounds:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 5 | January 15, 2020 | Email from matthew@powerofphoenix.com to the Tennessee House Majority Caucus Advisor containing a PDF of an Internal Revenue Service Form W-9 signed by "Matthew Phoenix" |
| 6 | January 24, 2020 | Email from Individual 4 to House Speaker's Acting Chief of Staff reading: "Don't crush her, but [the Director of Legislation has] been telling this vendor that the check's on the way for about two weeks. It's guys from [Consulting Firm 1] who did mail two years ago that left and started their own gig...tired of doing the DC/Trump stuff. Thanks." |

| 7 | February 5, 2020 | Apple iMessage from **CASADA** to Individual 4 reading: "wanted to know if we needed to meet with [the Director of Legislation] to try to push reimbursement along." |
|---|---|---|
| 8 | February 10, 2020 | Apple iMessage from Individual 4 to **COTHREN** reading: "Went by mailbox early this morning and no$. Have appt tomorrow at 5 with [the Director of Legislation]. She'd best have some answers." |
| 9 | February 11, 2020 | Apple iMessage from **CASADA** to Individual 4 reading: "Just curious what did you find out from [the Director of Legislation] today?" |
| 10 | June 22, 2020 | Email from Individual 4 to the Director of Legislation reading: "[Director of Legislation], I was cc'd on this last week . . . . It would be either illegal or unethical to move to print without knowing payment was coming, so the bulk permit number is provided on the invoice. Simpler, asking a firm to be liable for the cost with the printing completed before knowing payment may or may not be approved is suspect. Is there something going on?" |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNT ELEVEN
### 18 U.S.C. §§ 1342, 2
### (Use of a Fictitious Name to Carry Out A Fraud)

73.     Paragraphs 1 through 14, 17 through 57, 59 through 60, 63 through 64, 67 through 68, and 72 are incorporated and realleged as if fully set forth herein.

74.     From in or around November 2019 through in or around January 2021, in the Middle District of Tennessee and elsewhere, for the purpose of conducting, promoting and carrying on by means of the United States Postal Service an unlawful business, that is, the fraudulent operation of Phoenix Solutions, **COTHREN**, aided and abetted by **CASADA**, did use and assume, and request to be addressed by, a fictitious, false, and assumed name, and a name other than his own proper name, that is "Matthew Phoenix."

All in violation of Title 18, United States Code, Sections 1342 and 2.

75.     Paragraphs 1 through 14, 17 through 57, 59 through 60, 63 through 64, 67 through 68, and 72 are incorporated and realleged as if fully set forth herein.

76.     From in or around November 2019 through in or around January 2021, in the Middle District of Tennessee and elsewhere, **CASADA** and **COTHREN** did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, to wit: to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, federal programs theft and bribery, in violation of Title 18, United States Code, Section 666, and honest services wire fraud, in violation of Title 18, United States Code, Section 1343 and 1346, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, federal programs theft and bribery, in violation of Title 18, United States Code, Section 666, and honest services wire fraud, in violation of Title 18, United States Code, Section 1343 and 1346, in violation of Title 18, United States Code, Section 1957.

## The Manner and Means of the Conspiracy

77.     The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

a.      Depositing checks issued by the State of Tennessee into Company 1, Financial Institution 2 Account x0738, and Company 2, Financial Institution 2 Account x4447.

b.      Transferring the proceeds of those checks from Company 1, Financial Institution 2 Account x0738, and Company 2, Financial Institution 2 Account x4447, to Phoenix Solutions, Financial Institution 1 Account x3886 or to **COTHREN** in his personal capacity to deposit into Phoenix Solutions, Financial Institution 1 Account x3886.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS THIRTEEN THROUGH EIGHTEEN
### 18 U.S.C. §§ 1956(a)(1)(B)(i), 2
### (Money Laundering)

78.     Paragraphs 1 through 14, 17 through 57, 59 through 60, 63 through 64, 67 through 68, 72, and 77 are incorporated and realleged as if fully set forth herein.

79.     On or about the dates listed below, in the Middle District of Tennessee, and elsewhere, **CASADA** and **COTHREN**, aided and abetted by each other and Individual 4, and others known and unknown to the Grand Jury, knowing that the property involved in the financial transactions listed below represented the proceeds of some form of unlawful activity, knowingly and intentionally conducted and caused to be conducted the financial transactions designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, that is, federal programs theft and bribery, in violation of Title 18, United States Code, Section 666, and honest services wire fraud, in violation of Title 18, United States Code, Section 1343 and 1346, and each transaction involved the use of a financial institution engaged in and the activities of which affected interstate commerce.

| Count | Approximate Date | Description | Amount |
|-------|-----------------|-------------|--------|
| 13 | March 5, 2020 | Deposit into Company 2, Financial Institution 2 Account x4447, check 000629428 issued by State of Tennessee | $3,817.92 |
| 14 | March 7, 2020 | Deposit into Company 1, Financial Institution 2 Account x0738, check 0006300449 issued by State of Tennessee | $10,969.12 |
| 15 | March 9, 2020 | Deposit into Company 2, Financial Institution 2 Account x4447, check 0006311468 issued by State of Tennessee | $1,512.81 |
| 16 | April 1, 2020 | Deposit into Company 2, Financial Institution 2 Account x4447, check 0006338058 issued by State of Tennessee | $2,202.23 |
| 17 | April 1, 2020 | Deposit into Company 2, Financial Institution 2 Account x4447, check 000633492 issued by State of Tennessee | $1,909.15 |
| 18 | May 18, 2020 | Deposit into Company 2, Financial Institution 2 Account x4447, check 0006395901 issued by State of Tennessee | $2,996.99 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS NINETEEN AND TWENTY
### 18 U.S.C. §§ 1957, 2
### (Money Laundering)

80.     Paragraphs 1 through 14, 17 through 55, 57 through 58, 61 through 62, 65 through 66, 70, and 75 are incorporated and realleged as if fully set forth herein.

81.     On or about the dates listed below, in the Middle District of Tennessee, and elsewhere, **CASADA** and **COTHREN**, aided and abetted by each other and Individual 4, and others known and unknown to the Grand Jury, did knowingly engage in monetary transactions in criminally derived property of a value greater than $10,000 which was derived from specified unlawful activity, that is, federal programs theft and bribery, in violation of Title 18, United States Code, Section 666, and honest services wire fraud, in violation of Title 18, United States Code, Section 1343 and 1346, to wit, on or about the dates alleged below, Individual 4 transferred funds from a bank account held by Company 1 to a bank account held by Phoenix Solutions and

controlled by **COTHREN**, and **COTHREN** transferred funds from a bank account held by Phoenix Solutions to a bank account held by Company 1 and controlled by Individual 4, in the amounts set forth below.

| Count | Approximate Date | Description | Amount |
|-------|------------------|-------------|--------|
| 19 | March 8, 2020 | Check Transfer from Company 1, Financial Institution 2 Account x0738, to Phoenix Solutions, Financial Institution 1 Account x3886. | $10,969.12 |
| 20 | September 10, 2020 | Check Transfer from Phoenix Solutions, Financial Institution 1 Account x3886, to Company 1, Financial Institution 2 Account x0738. | $12,003.16 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE ALLEGATIONS

1.     The allegations contained in this Indictment are re-alleged and incorporated by reference as if fully set forth in support of this forfeiture.

2.     Upon conviction of Counts Two and Three of this Indictment, **GLEN CASADA** and **CADE COTHREN** shall forfeit to the United States any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, as a result of such offense, pursuant to Title 18, United States Code, Section 982(a)(3). The property subject to forfeiture includes, but is not limited to, a money judgment representing the value of the gross proceeds traceable to any offense of conviction.

3.     Upon conviction of any of Counts One and Four, and Counts Five through Ten, **CASADA** and **COTHREN** shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, pursuant to Title 18, United States Code, Section 981(a)(1)(c) by Title 28, United States Code, Section 2461. The property subject to forfeiture includes, but is not limited to, money judgments representing the value of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense of conviction.

4.     Upon conviction of any of Counts Twelve through Twenty of this Indictment, **CASADA** and **COTHREN** shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property involved in such offense, pursuant to Title 18, United States Code, Section 982(a)(1). The property to be forfeited, includes but is not limited to, money judgments representing the value of any property, real or personal, involved in or otherwise traceable to property involved in any offense of conviction.

5.     If any of the above-described forfeitable property, as a result of any act or omission of **CASADA** and **COTHREN**:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the Court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of **CASADA** and **COTHREN**, up to the value of the property listed above as being subject to forfeiture.

A TRUE BILL

███████████████████████

FOREPERSON

MARK H. WILDASIN
UNITED STATES ATTORNEY
MIDDLE DISTRICT OF TENNESSEE

AMANDA J. KLOPF
ASSISTANT UNITED STATES ATTORNEY

COREY R. AMUNDSON
CHIEF, PUBLIC INTEGRITY SECTION
U.S. DEPARTMENT OF JUSTICE

JOHN P. TADDEI
TRIAL ATTORNEY
PUBLIC INTEGRITY SECTION
U.S. DEPARTMENT OF JUSTICE