**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:22-cr-00282** |
| | ) | **JUDGE RICHARDSON** |
| | ) | |
| **GLEN CASADA and** | ) | |
| **CADE COTHREN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## GLEN CASADA'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

On August 22, 2022, the Grand Jury sitting in the Middle District of Tennessee returned the above referenced Indictment. The Indictment purports to accuse Casada, either directly or as an aider and abettor, of the following federal crimes:

Count 1: Conspiracy to violate 18 U.S.C. §666 (theft of federal program funds, bribery/kickbacks concerning federal program funds) and Honest-services wire fraud;

Counts 2-4: Substantive violations of 18 U.S.C. §666 (theft and bribery/kickback of federal program funds);

Counts 5-10: Substantive violations of 18 U.S.C. §1343, 1346 (Honest-services wire fraud)

Count 11: Use of a fictitious name to carry out a fraud;

Count 12: Conspiracy to violate the Money Laundering statute; and

Counts 13-20: Substantive Money Laundering counts.

The Indictment focuses on the activities of Phoenix Solutions, a company that the Indictment alleges was in the business of providing constituent mail services to General Assembly members and political campaigns. (DE 3, PageID 13). The Indictment does not,

1

and cannot, allege that any individual who utilized the services of Phoenix Solutions did not receive exactly what they bargained for - mailers sent to constituents. Nor can the Indictment allege that Phoenix Solutions failed to do exactly what it was represented to do—produce mailers for constituent mailings. Instead, the Indictment seeks to criminalize alleged non-disclosure of ownership and/or conflicts of interest in an attempt to impermissibly broaden the scope of both applicable Federal criminal law and Government prosecutorial authority.

## I.    Standard of Review

Rule 12 of the Federal Rules of Criminal Procedure authorizes a defendant to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12 (b)(2). "[A]t any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." Rule 12 (b)(3)(B). This Court lacks jurisdiction when an indictment fails to sufficiently allege a federal crime, as this indictment fails to do.

Rule 7(c) of the Federal Rules of Criminal Procedure provides, in part, that "[t]he indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c) (emphasis added). In addition, "[f]or each count, the indictment . . . must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." *Id*. The wording of Rule 7 imposes "two requirements: the statement of the essential facts and the citation of the statute. They are separate requirements and not

2

a restatement of one another." *United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012). As a result, "a deficiency in an indictment's factual allegations of the elements of an offense is not cured by the fact that the relevant count cited the statute that [the defendant] is alleged to have violated." *Id.*

Further, because an indictment accuses a citizen of a felony offense, it invokes fundamental Constitutional protections including the accused's (1) Fifth Amendment rights to: (a) be prosecuted by grand jury indictment and (b) be free from double jeopardy; and (2) Sixth Amendment right to be informed of the nature of the accusation against him so that he can present a defense.

The Fifth Amendment guarantees that a citizen has the right not to face a prosecution initiated solely at a prosecutor's behest. *United States v. Robinson*, 367 F.3d 278, 287 (5th Cir. 2004). Accordingly, when a prosecutor fails to persuade a grand jury to make essential factual findings regarding each and every element of a charged offense, a count alleging that offense is fatally defective, and proceeding with prosecution violates the defendant's Fifth Amendment rights. *See, e.g., United States v. Carll*, 105 U.S. 611, 613 (1881).

With respect to the Sixth Amendment, the Constitution demands that a person accused of a crime "be informed of the nature and cause of the accusation ...." *Russell v. United States*, 369 U.S. 749, 760-61 (1962). In *Russell,* the Supreme Court held that an indictment is sufficient only if it "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet.'" *Id.* at 763-64 (citations omitted). "The failure of an indictment to detail each element of the charged offense generally constitutes a fatal defect." *United States v. Keith*, 605 F.2d

3

462, 464 (9th Cir. 1979) (failure to allege elements results in reversal of conviction) (emphasis added).

Thus, a criminal indictment performs two functions of utmost importance: (i) protecting a citizen from being charged with the commission of a felony without the protection of an independent and knowledgeable grand jury review, and (ii) providing a defendant with specific notice of the crime that will proceed to trial. Accordingly, the Supreme Court has emphasized that the performance of this function is not to be compromised. *Russell,* 369 U.S. at 763. To ensure this, the Supreme Court long ago clarified that a mere recitation of the text of a criminal statute is insufficient to guarantee that a Grand Jury has served its function. That is, "facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment." *United States v. Cruikshank*, 92 U.S. 542, 558 (1875). These principles have been applied by federal courts across the country to require factual allegations as to each element of the charged offense rather than a conclusory statement or mere citation to the statute. See *United States v. Du Bo*, 186 F.3d 1177 (9th Cir. 1999); *United States v. Hooker*, 841 F.2d 1225 (4th Cir. 1988); *United States v. Scott*, 993 F.2d 1520, 1521 (11th Cir. 1993); *United States v. Schmitz*, 634 F.3d 1247, 1261 (11th Cir. 2011); *United States v. Cecil*, 608 F.2d 1294, 1297 (9th Cir. 1979); *United States v. Curtis*, 506 F.2d 985, 990 (10th Cir. 1974); *United States v. Berlin*, 472 F.2d 1002, 1007 (2d Cir. 1973).

If indictments that did not specifically allege the required elements were permitted, "a defendant could be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him." *Russell*, 369 U.S. at 770. "To allow a prosecutor or court to make a subsequent guess as to what was in the minds of the grand

jury at the time they returned the indictment would deprive the defendant of a basic protection that the grand jury was designed to secure, because a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him." *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979). As a result, the Supreme Court has held for more than a century that "the general, and with few exceptions, . . . the universal, rule, on this subject, is that all the material facts and circumstances embraced in the definition of the offense must be stated, or the indictment will be defective. No essential element of the crime can be omitted without destroying the whole pleading. The omission cannot be supplied by intendment or implication, and the charge must be made directly, and not inferentially, or by way of recital." See *United States v. Hess*, 124 U.S. 483, 486 (1888). And an indictment's failure to sufficiently allege "the charged offense is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment." *United States v. Omer*, 395 F.3d 1087, 1089 (9th Cir. 2005) (per curiam) (holding that no showing of prejudice is required), cert. denied, 549 U.S. 1174 (2007).

The Fifth Amendment guarantee to an indictment only by a grand jury requires a prosecutor to persuade the Grand Jury to issue a written finding of at least one essential fact to support a finding of probable cause to believe that the prosecutor can prove each element of the charged offense. The Sixth Amendment amplifies this right by requiring, for purposes of due process, the indictment to sufficiently allege the crime in a manner enabling the defendant to defend against it at trial.

## II. **_Theft of Federal Funds, 18 U.S.C. § 666 (Counts 2-4)_**

The Theft of Federal Funds statute, 18 U.S.C. § 666, contains three (3) distinct crimes under its subsections. The Government charges Casada under all three (3) subsections. <u>Indictment</u>, Counts 2, 3, and 4.

18 U.S.C. §666 provides in pertinent part:

**(a)** Whoever, if the circumstance described in subsection (b) of this section exists--

    **(1)** being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof--

        **(A)** embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that-

            **(i)** is valued at $5,000 or more, and

            **(ii)** is owned by, or is under the care, custody, or control of such organization, government, or agency; or

        **(B)** corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

    **(2)** corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

**(b)** The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

**(c)** This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

Critical to the viability of each of these Counts are the limitations built into Section 666. The statutory language limits the applicability of these sections by proscribing monetary prerequisites on the amount of the transaction at issue in the Indictment and, importantly, how to value that threshold. These Congressionally enacted and Sixth Circuit governed restrictions mandate the dismissal of Counts 2, 3, and 4 of the Indictment.

The first limitation is that the transaction at issue must be valued at $5,000 or more. Each statutory subsection carries this $5,000 requirement. *See* 18 U.S.C. §§ (a)(1)(A)(i); (a)(1)(B); (a)(2). The Sixth Circuit reframed this limitation by describing that "the acceptance of 'anything of value' [received by the defendant] must itself be shown to be connected with a transaction 'involving anything of value of $5,000 or more." *United States v. Mills*, 140 F.3d at 632. This common element, known as the "transaction element," analyzes the transaction made in connection with the alleged misconduct, placing a monetary threshold on the underlying transaction associated with the alleged "bribe" or "kickback" that must be satisfied before the government can sustain a cause of action under this statute. *Id.* at 632–33. The 6th Circuit interprets the statutory language to evidence Congress's intent that "not every such misdeed should be subjected to federal oversight and punishment." *Id.* at 632. "To differentiate between those cases to be handled in the federal system and those cases to be prosecuted in state court, Congress imposed monetary valuation thresholds on the governments and agencies subject to federal bribery laws and to the specific acts sought to be criminalized." *Id.* at 634.

The second limitation further restricts the first, as Congress excepted certain payments from being included in the valuation of the transaction to determine if the $5,000 threshold has been met. Section 666(c) provides that "[t]his section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). The Sixth Circuit interprets this language to establish Congress's intent "to exclude from the reach of the federal statute those individuals and those transactions that involved only the payment of bona fide salaries, wages, fees, and other compensation." *Mills*, 140 F.3d at 634. This approach distinguishes the actions and value received in the *procurement of the transaction* from *the actual transaction itself*. *Mills*, 140 F.3d at 633.

The indictment must allege that the defendant solicited, demanded, accepted, or agreed to accept anything of value from another to procure (*i.e.,* alleged illegality in the procurement process) a transaction, and *that transaction* is valued at $5,000 or more *excluding* money that is paid for bona fide sums paid in the usual course of business. *Mills*, 140 F.3d at 633–34. Therefore, any transaction for payment for a bona fide service in the usual course of business cannot be used to satisfy the $5,000 threshold even if associated with a "bribe" or "kickback." This exception applies to all offenses within Section 666. *Id.* at 633; *United States v. Mann*, No. 97-6179, 1999 WL 17647, at *2 (6th Cir. Jan. 4, 1999).

Thus, the final inquiry in determining whether the $5,000 threshold is met involves analyzing if the Indictment alleges a transaction was worth $5,000 or more *after* excluding sums that meet this exception. Courts within the Sixth Circuit are instructed to determine whether the transaction is bona fide by analyzing if the payments made from the government were for necessary services that were actually performed. *Mills*, 140 F.3d

632–34. This analysis is a question of law that is ripe for a motion to dismiss. *Mann*, 1999 WL 17647, at *1–2; *Mills*, 140 F.3d at 632–34.

In *Mills*, the indictment alleged that the defendants, employees at the county sheriff's department, took money in exchange for hiring specific applicants for open employment spots with the sheriff's department. *Id.* at 631. The district court held, and the Sixth Circuit affirmed, that the indictment should be dismissed because it failed to allege a violation of Section 666 due to the exception for payment of bona fide services, removing the salaries of the deputies from the valuation of the transactional element. *Id.* at 632–34. Without those salaries, the indictment did not meet the $5,000 threshold. *Id.* The Sixth Circuit reasoned,

> [u]nfortunately for the government, the indictment does not allege that the jobs in question were unnecessary or that the individuals who obtained those employment positions did not responsibly fulfill the duties associated with their employment. In the absence of such allegations, the government has no support for its claims that the salaries paid to the deputy sheriffs were not properly earned "in the usual course of business."

*Id.* at 633–34.

Similarly, in *Mann* the Sixth Circuit focused on whether the position awarded was real and necessary, and the corresponding compensation was properly earned to analyze the $5,000 transactional threshold. There, the defendant was a principal at a local public school, but he was only certified under Kentucky law to be a teacher. *Mann*, 1999 WL 17647, at *1. The government charged the defendant under Section 666, alleging that any salary he received in excess of a teacher's salary was theft of federal funds paid to the school district. *Id.* The Sixth Circuit affirmed the district court's dismissal of the theft counts in the indictment by finding that the payments to the defendant were bona fide because the principal position was "a real and necessary one" and the defendant

*performed his duties*, even if performed "in contravention of state regulations." *Id*. at *3. This definition of bona fide lowered the amount of the "transaction" below the required $5,000 threshold. *Id*.

Here, Counts 2, 3, and 4 should be dismissed under the plain language of the statute charged and established Sixth Circuit law. The Indictment alleges that Casada fraudulently induced payments of State funds involving $5,000 or more from the State to Phoenix Solutions, directly and through Company 1 and Company 2. (Indictment, DE 3, ¶¶ 61, 65, 69). These payments were made pursuant to the Mailer Program, which the Indictment admits is a legislatively created program that allots $3,000 of funds annually "to fund postage and printing of items to be sent to the legislators' constituents," and also permits reimbursements for expenses beyond the $3,000 allocation. (Indictment, DE 3, ¶ 11). The allegations in the Indictment establish the Mailer Program as real and necessary from its legislative enactment and its governance by the Tennessee House guidelines, and therefore the transactions associated with them are made "in the usual course of business." (Indictment, DE 3, ¶ 11); 18 U.S.C. § 666(c).

The Indictment itself also alleges that Phoenix Solutions, Company 1 and Company 2 performed the type of work permitted by the Mailer Program and makes *no* allegation that the entities failed to perform any service paid. "Company 1 provided political consulting, mail, and project management services," Company 2 was a "political consulting company," and "Phoenix Solutions provided constituent mail services to members of the Tennessee General Assembly and to political campaigns for State offices." (Indictment, DE 3, ¶¶ 5, 6, 10). There are *no* allegations that the companies failed to perform the services. *See Mills*, (distinguishing bona fide services from others when the work is actually performed and "properly earned.").

Correspondingly, there are no allegations of actual loss from Defendants' alleged conduct. "A scheme to defraud includes any plan or course of action by which someone intends to . . . deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Anming Hu*, No. 3:20-CR-21-TAV-DCP, 2021 WL 4130515, at * 14 (E.D. Tenn. Sep. 9, 2021). The lack of allegations that the representatives failed to receive the benefit of their bargain or were unjustly overcharged, and instead the consistent allegations that the State received the services sought and continued to use these companies throughout 2020, when the only alleged actions by the co-conspirators were related to paying for *services rendered* further validates that the companies were performing the duties and *earning* the payments.

The Indictment alleges that the State paid $51,947 for mailer services to businesses that provide such services, and those businesses provided the services in exchange for the payment from the State. Pursuant to established Sixth Circuit law, such payments qualify as bona fide "compensation paid, or expenses paid or reimbursed, in the usual course of business" which was actually earned by these companies for the performance of real and necessary services to invoke the exception and exclude those payment from the valuation of the transactional element. Without these payments, the Government cannot meet the $5,000 transactional threshold and Counts 2-4 should be dismissed.

The Indictment is the Government's attempt to make alleged illegality in the procurement process and non-disclosure of potential conflicts of interest federal crimes when neither rise to such a level. The Sixth Circuit has affirmatively established that the focus under Section 666, and its exception, is on the amount and legitimacy of the transaction, which, here, is undisputedly excepted by the performance of actual, necessary services and the related bona fide payments. Despite the Indictment's focus on

Casada's non-disclosure of his or his alleged co-conspirator's interest in Phoenix Solutions, the United States Supreme Court has clearly established that such conduct does not constitute a federal crime. *United States v. Kelly*, 140 S. Ct. 1565, 1571 (2020) (holding that federal criminal statutes do not "authorize[] federal prosecutors to 'set standards of disclosure and good government for local and state officials,'" but instead leave alleged public corruption to be policed by the States).

Similarly, in May of this year, the Supreme Court declined to broadly interpret federal criminal statutes in a way that would improperly expand the federal court's jurisdiction. In *Ciminelli*, the defendant was convicted of federal wire fraud based on the "right to control theory" in that he deprived the victims of intangible potentially valuable economic information necessary to make economic decisions." 134 S.Ct. 1121, 1126–28 (2023). The Supreme Court reversed the conviction, parsing the statutory language to reason that the "scheme or artifice to defraud" must be of "money or property," and therefore the defendant's conviction for fraud to deprive of an intangible "right to control," was improper. *Id*. The Supreme Court reasoned that to interpret otherwise would improperly expand federal criminal statutes beyond the text to where "almost any deceptive act could be criminal" and that federal criminal statutes are not vehicles for the federal government to "enforce its view of integrity in broad swaths of state and local policymaking." *Id.*

These cases support the dismissal of the Section 666 Counts. Like the fraud statutes, the statutory language and progeny of Sixth Circuit case law limit the statutory language of Section 666 from application to every instance of misappropriation of federal funds—but only those that satisfy the valuation threshold. Like *Ciminelli*'s statutory analysis, the Sixth Circuit interprets Section 666's $5,000 valuation threshold to limit the

*transaction.* To hold otherwise would make nearly any deceptive act, non-disclosure, or bribe a federal crime, which is not the intent of Congress nor a reasonable interpretation of the statutory language. Excluding the payments to Phoenix Solutions because they were *alleged* as legitimate, bona fide payments and expense reimbursements for a State program harmonizes the plain language of Section 666, *Mills* and its progeny, and the Supreme Court's most recent decision on an analogous issue. The Indictment alleges a scheme of secrecy, but the law is clear that non-disclosed affiliation with a company *who actually performed necessary services* is not a federal crime.

### III.   Honest Services Wire Fraud/18 U.S.C. § 1343, 1346 (Counts 5-10)

Counts 5-10 of the Indictment accuse Casada of committing "honest services wire fraud," in violation of 18 U.S.C. §1343, 1346.  In order to prevail on these Counts, the Government must adequately allege to a Grand Jury and then prove beyond a reasonable doubt to a jury the elements of the wire fraud statute, 18 U.S.C. § 1343, which provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

Wire fraud, whether stand-alone or underlying an honest services fraud allegation as is the case at bar, requires adequate allegations and proof that the "scheme or artifice to defraud" another included a "*material* misrepresentation or concealment of *material* fact." *Neder v. United States*, 527 U.S. 1(1999) (emphasis added); 6th Circ. Pattern Jury Instruction 10.02.  A misrepresentation or concealment is "material" if it has a natural

tendency to influence or is capable of influencing the decision of a person of ordinary prudence and comprehension. *Id.* "[U]niform understanding of the 'materiality concept' in the federal courts" is "that a concealment or misrepresentation is material if it has a natural tendency to influence, or was capable of influencing, the decision of the [decisionmaker] to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (internal quotation and citation omitted) (emphasis added). Under any understanding of the concept*, materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192–93 (2016) (emphasis added).[1] Because "guilt depends so crucially upon such a specific identification of fact, [the Supreme Court has] uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *Russell v. United States*, 369 U.S. 749, 764 (1962).

Here, the Indictment never alleges facts sufficient to demonstrate that any of the alleged misrepresentations were material to the recipient; or even imply that Casada's actions were "material" misrepresentations to the recipient[2].

§ 1346 defines "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." *United States v. Yu Zhou*, No. 2:19-CR-163(1), 2020 WL 708391, at *5–6 (S.D. Ohio Feb. 12, 2020). The United States Supreme Court has narrowed the scope of "honest services" fraud prosecutions. To commit honest services mail or wire fraud, the scheme at issue must involve bribery or

---

[1] While the matter at issue in Universal Health Servs. was materiality in a False Claims Act context, the Court clarified that the definition, and therefore corresponding analysis, of materiality, is the same in false claims act cases as criminal fraud statutes. *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, (2016).
[2] Other than the preamble "at all times material to this Indictment," the word "material" never appears in the Indictment at all.

kickbacks. *See Skilling v. United States*, 561 U.S. 358, 409-10 (2010). That, in turn, requires proof that the bribe/kickback was solicited in return for an "official act" within the meaning of *McDonnell,* 136 S.Ct. 2355 (2016). *United States v. Lee*, 919 F.3d 340, 355-56 (6th Cir. 2019).

In defining the "official acts" required to properly allege and prove a violation of the "Honest Services Fraud" statute, the *McDonnell* court provided that an "official act" is a decision or action on a question, matter, cause, suit, proceeding or controversy. The question, matter, cause, suit, proceeding or controversy <u>*must involve a formal exercise*</u> <u>*of governmental power that is similar in nature to a lawsuit before a court, a*</u> <u>*determination before an agency, or a hearing before a committee*</u>. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

### A. **The Indictment fails to sufficiently allege materiality.**

The Indictment does not allege that any misrepresentation or omission was material to *the recipient* of the alleged misrepresentation or omission. While the Indictment alleges various theories of criminal liability, at its basic form it accuses Casada, either directly or via his alleged conspiracy with Cade Cothren and Individual 4, with concealing the alleged co-conspirators involvement in Phoenix Solutions from the

State of Tennessee and/or individual members of the General Assembly. As such, in order to properly allege an "Honest Services wire fraud", the Indictment must set out facts and allege that the alleged misrepresentation or concealment was material to the State of Tennessee and/or individual members of the General Assembly. It fails to do so.

Indeed, materiality is only referenced (indirectly) twice in the indictment. Paragraph 21 alleges:

> It was a further purpose of the conspiracy to conceal from the State and its citizens COTHREN's involvement in Phoenix Solutions and the fact that he kicked back a portion of the company's profits to CASADA and Individual 4 due to the Defendants' and Individual 4's expectations that Phoenix Solutions would not be approved by the State to be a Mailer Program vendor or hired by individual members of the Tennessee General Assembly if COTHREN's operational involvement and financial in the business and the kickbacks to CASADA and Individual 4 were disclosed.

Paragraph 24 alleges:

> The conspirators would and did conceal COTHREN's involvement in Phoenix Solutions from the State and members of the Tennessee General Assembly due to the expectation that Phoenix Solutions would not be approved by the Tennessee House Speaker's office, acting on behalf of the State, or hired as a vendor by individual members if COTHREN's involvement was disclosed. They also would and did conceal the fact that COTHREN kicked back a portion of the profits from the State and members of the Tennessee General Assembly to Individual 4 and CASADA due to the expectation that Phoenix Solutions would not be approved by the Tennessee House Speaker's office, acting on behalf of the State, or hired as a vendor by individual members if COTHREN's operational involvement and financial interests in the business and the kickbacks to Individual 4 and CASADA were disclosed.

Both paragraphs speak to the expectations *of the Defendants* that either the State and/or the members of the General Assembly would balk at approving or hiring Phoenix Solutions had they known of the alleged conspirators' respective involvement. However, as outlined above, "expectations of the defendants," while possibly probative of intent, are not pertinent to the materiality analysis. Materiality does not focus on the mindset of the

Defendants but instead "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192–93 (2016), in this case the State of Tennessee and/or the individual members of the General Assembly. To adequately allege materiality, the Indictment must allege that the State of Tennessee would not have approved Phoenix Solutions as a mail program vendor, and/or that individual members of the General Assembly would not have used Phoenix Solutions, had the Defendants' involvement been known. The Indictment simply fails to make adequate allegations. Instead, the Indictment alleges that the companies were legitimate, the services they were tasked to render were necessary, and they provided such services as requested for which payment was due. The Government cannot ask the Court to assume or infer materiality on the part of the decisionmakers when they have not alleged facts sufficient to support that it existed.

### B.  The Indictment fails to sufficiently allege "Official Acts"

While the Indictment makes multiple allegations of acts[3] allegedly undertaken to advance the accused scheme to defraud, ranging from cashing checks to communicating amongst themselves, paragraph 26 summarizes the "official acts" to advance the Honest Services wire fraud allegation.   Paragraph 26 provides in full:

> CASADA and Individual 4 would and did receive kickbacks from Cothren in exchange for using their positions as members of the Tennessee House of Representatives to perform official acts, including pressuring the Tennessee House Speaker's Office and other State officials to approve Phoenix Solutions as a Mailer Program vendor and to disburse funds to Phoenix Solutions, Company 1, and Company 2; advising and pressuring other members of the Tennessee House of Representatives to use Phoenix Solutions, Company 1, and Company 2 as their Mailer Program vendor and

---

[3] Most of the "acts" alleged in the Indictment appear to be "overt acts" as required to prove Conspiracy.

to disburse State funds to Phoenix Solutions, Company 1, and Company 2 as their Mailer Program vendor and to disburse State funds to Phoenix Solutions, Company 1, and company 2; and choosing to use Phoenix Solutions, Company 1, and Company 2 for CASADA and Individual 4's mailings to their constituents under the Mailer Program.

As the Supreme Court in *McDonnell* clarified, for an act to be an "official act" the question, matter, cause, suit, proceeding or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. While pressuring another public official is sufficient, the pressure must be for the purpose of inducing another public official to make an "official act." Stated another way, the official act must have bearing on some issue where there is dispute or formal action, as opposed to ministerial or administrative functions of the Government.

The alleged "official acts" of the Defendants are fairly summarized as i) pressuring the Speaker's Office to approve Phoenix Solutions as a mail vendor and to pay funds to Phoenix Solutions, Company 1 and Company 2 after work was performed; ii) pressuring members of the General Assembly to use Phoenix Solutions, Company 1 and/or Company 2 and to pay funds to said companies after work was performed; and iii) using their own companies for their own mailers.

The Indictment describes the Mailer program, its functions, and its processes. (Indictment, DE 3, p. 11-13). As is plain from the language of the Indictment, the Mailer program is a benign, non-controversial governmental service wherein legislators are permitted to hire vendors to send mailings to constituents, using up to $3,000. The Indictment fails to describe any "question, matter, cause, suit, proceeding or controversy" that involves a "formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a

18

committee." Indeed, the Indictment fails to allege any question, matter, cause, suit or proceeding whatsoever, much less significant enough to implicate an "official act."

In order to adequately allege that attempts to obtain approval from the Speaker's Office to be a vendor in the mailing program constitutes an "official act," the Indictment must describe or allege that the approval process is sufficiently significant under the *McDonnell* standard ("question, matter, cause, suit, proceeding or controversy" that involves a "formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."). The Indictment fails to do so; instead, it simply alleges that the Speaker's Office had authority to approve or deny vendor requests to provide mailer program services. (Indictment, DE 3, p. 12). There is no allegation or statement of what is required to gain Speaker's Office approval, be it a vetting process, a staff review, or otherwise. The Indictment is silent as to whether obtaining this "approval" rises to the level of a question or controversy akin to a formal exercise of Government power similar in nature to a lawsuit.

Similarly, the Indictment is silent regarding the "official act" undertaken by legislators in using Phoenix Solutions and/or the Defendant's companies to create mailers. The Government invites the Court to assume that the act of hiring a company to produce mailers via a legitimate government program created to do exactly that is an "official act." However, there is no allegation that the legislators referenced in the Indictment chose Phoenix Solutions, Company 1 or Company 2 to the detriment of another company, or that the legislators underwent some process in deciding to send mailers or select the companies who would be involved. The Indictment does allege that Individual 4 recommended Phoenix Solutions to other members while misrepresenting the ownership of Phoenix Solutions (Indictment, DE 3, p. 46, 49), but offers no statement

or allegation that the simple act of hiring Phoenix Solutions to perform mailer services is of sufficient weight to constitute an "official act."

Finally, the payment of invoices for services rendered is a purely administrative and ministerial task which cannot constitute an "official act" under United States Supreme Court precedence. As outlined in detail above, there is no allegation that the Mailer Program is illegitimate, that the companies were unable or unqualified to perform the work, or that the work was not performed, was substandard, or was deficient in any manner.

### C. Prosecution of the type of Honest Services Fraud pursued through the Indictment is barred by Supreme Court precedent.

In May 2023, the United States Supreme Court ruled that "right to control" theories cannot form the basis of federal fraud prosecutions. *Ciminelli v. United States*, 143 S. Ct. 1121 (2023). The present matter, wherein Casada and his alleged co-conspirators are accused of concealing their interests in various companies to induce the State and members of the General Assembly to use money from the Mailer Program to hire said companies by depriving them of information necessary to make discretionary economic decisions, is precisely the "right to control" theory that the Supreme Court recently rejected.

In the *Ciminelli* indictment and at trial, the Government relied solely on the Second Circuit's right-to-control theory of wire fraud, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions. *Ciminelli v. United States*, 143 S. Ct. 1121, 1122 (2023). As developed by the

Second Circuit, the now debunked right-to-control theory held that, "[s]ince a defining feature of most property is the right to control the asset in question," "the property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets." *United States v. Lebedev*, 932 F.3d 40, 48 (2019) (alterations omitted). Thus, a "cognizable harm occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *United States v. Binday*, 804 F.3d 558, 570 (C.A.2 2015) (alterations omitted); *Ciminelli v. United States*, 143 S. Ct. 1121, 1127 (2023).

The Defendants/co-conspirators are accused, in essence, of depriving the State of Tennessee and members of the General Assembly the right to control its assets, i.e. mailer program funds, by depriving them of information necessary to make discretionary economic decisions, i.e. spending mailer program funds to hire Phoenix Solutions, directly or indirectly. Indeed, in *Ciminelli*, the Government alleges that Mr. Ciminelli paid Mr. Howe, who in turn ensured that Mr. Ciminelli received construction bids. In the present matter, the Government alleges that Phoenix Solutions paid Casada and Individual 4, who in turn ensured that Phoenix Solutions received Mailer Program funds. The *Ciminelli* facts pattern and the present fact pattern are parallel.

In its rejection of the right to control theory, the Supreme Court stated:

- The right-to-control theory cannot be squared with the text of the federal fraud statutes, which are "limited in scope to the protection of property rights." *McNally*, 483 U.S. at 360, 107 S.Ct. 2875. The so-called "right to control" is not an interest that had "long been recognized as property" when the wire fraud statute was enacted. *Carpenter v. United States*, 484 U.S. 19, 26, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *Ciminelli v. United States*, 143 S. Ct. 1121, 1127 (2023).

- The right-to-control theory vastly expands federal jurisdiction without statutory authorization. Because the theory treats mere information as the protected interest, almost any deceptive act could be criminal. See, *e.g.*, *United States v. Viloski*, 557 F. App'x 28 (2nd Cir. 2014) (affirming right-to-control conviction based on an employee's undisclosed conflict of interest). The theory thus makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law—in flat contradiction with our caution that, "[a]bsent [a] clear statement by Congress," courts should "not read the mail [and wire] fraud statute[s] to place under federal superintendence a vast array of conduct traditionally policed by the States." *Cleveland*, 531 U.S. at 27, 121 S.Ct. 365; *Ciminelli v. United States*, 143 S. Ct. 1121, 1128 (2023).

The present prosecution travels under the now debunked "right to control" theory and must therefore be dismissed.


## IV.     **The Remaining Counts**

The remaining counts of the Indictment are all derivative of either the §666 allegations, the honest services/wire fraud allegations, or both.

**Count 1** alleges Conspiracy in violation of 18 U.S.C. §371.  The Sixth Circuit distinguishes between conspiracies under the offense clause and conspiracies under the defraud clause of 18 U.S.C. § 371. *United States v. Khalife*, 106 F.3d 1300 (6th Cir. 1997); *United States v. Kraig,* 99 F.3d 1361 (6th Cir. 1996).  The distinction is important because a conspiracy charged under the defraud clause does not require that the Government prove that "the conspirators were aware of the criminality of their objective," *United States v. Khalife,* 106 F.3d 1300, 1303 (6th Cir.1997) (quoting *United States v. Collins,* 78

F.3d 1021, 1038 (6th Cir.1996)); *United States v. Tipton,* 269 F. App'x 551, 555 (6th Cir. 2008), whereas conspiracy under the offense clause does.

The Indictment makes clear that the conspiracy alleged is under the "offense clause," and that the underlying offenses are violations of the federal program fraud statute (18 U.S.C. §666) and the honest-services wire fraud statutes. (Indictment, DE 3, p. 16). As such, the essential elements are:

(A) First, that two or more persons conspired, or agreed, to commit the crime of program theft/bribery/kickback and honest-services fraud;

(B) Second, that the defendant knowingly and voluntarily joined the conspiracy; and

(C) Third, that a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

6th Circuit Pattern Instruction 3.01.

As described above, the underlying crimes that are the "objects of the conspiracy"— § 666 and honest-services wire fraud—are not adequately alleged as crimes in the Indictment. It is elemental that to allege a criminal conspiracy to commit a specific crime, the Government must adequately allege the crime.

While the Sixth Circuit has held that it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy in limited circumstances, those circumstances do not exist here. Sixth Circuit precedence does not require the allegation of the essential elements only *when an indictment charges conspiracy to commit an offense "in which the conspiracy is the gist of the crime.*" (emphasis added). *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 175 (6th Cir. 1992)(quoting *United States v. Reynolds*, 762 F.2d 489, 494 (6th Cir. 1985)).

It is clear from a plain reading of the Indictment as a whole and the conspiracy count individually that the "gist of the crime" is the substantive offenses, not the conspiracy.

**Count 11** alleges that Casada aided and abetted Cothren's use of a fictitious name, specifically "Matthew Phoenix," to carry out a fraud. Paragraph 74 outlines the pertinent allegations, stating:

> From in or around November 2019 through in or around January 2021, in the Middle District of Tennessee and elsewhere, for the purpose of conducting, promoting and carrying on by means of the United States Postal Service an unlawful business, that is, the fraudulent operation of Phoenix Solutions, COTHEN, aided and abetted by CASADA, did use and assume, and request to be addressed by, a fictitious, false and assumed name, and a name other than his own proper name, that is "Matthew Phoenix."

The Indictment makes clear that the Government must adequately allege and prove Cothren used the U.S. Postal Service to conduct, promote, or carry on an "unlawful business," that the unlawful business is the "fraudulent" operation of Phoenix Solutions, and that Casada aided or abetted him.

The Government does not adequately allege that Phoenix Solutions was "unlawful" or "fraudulent," as described in detail above. Additionally, the Government states no fact to support that Casada aided and/or abetted Cothren's alleged use of a fictitious name via the U.S. Postal Service. It merely cursorily concludes that Casada "aided and abetted" Cothren. A naked allegation without any supporting facts is insufficient.

**Counts 12-20** allege various money laundering offenses. Specifically, Count 12 accuses Casada of violating 18 U.S.C. §1956(h) (money laundering conspiracy), Counts 13-18 alleges violations of 18 U.S.C. §1956(a)(1)(B)(i) ("concealment" money laundering), and Counts 19-20 alleges violation of 18 U.S.C. §1957 ("transactional" money laundering).

Each of the money laundering statutes referenced share the same qualifying element: that the money that is being "laundered" be derived from a "specified unlawful activity." 18 U.S.C. §1956(a)(1)(B)(i) provides:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact **involves the proceeds of specified unlawful activity**--
> (B) knowing that the transaction is designed in whole or in part--
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of **the proceeds of specified unlawful activity.**

18 U.S.C. §1957(a) provides:

> Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and **is derived from specified unlawful activity**, shall be punished as provided in subsection (b).

§1956(c)(7) provides a laundry list of statutory violations that qualify as predicate "specified unlawful activity." As such, adequately alleging the "specific unlawful activity" is required, as it is an element of the statute. The 6th Circuit Pattern Jury Instructions support this conclusion. *See* 6th Circ. Pattern Instruction 11.02[4].

---

(A) [4] First, that the defendant [conducted] [attempted to conduct] a financial transaction.

(B) Second, that the financial transaction involved property that represented the proceeds of [*insert the specified unlawful activity from § 1956(c)(7)*].

(C) Third, that the defendant knew that the property involved in the financial transaction represented the proceeds from some form of unlawful activity.

(D) Fourth, that the defendant knew that the transaction was designed in whole or in part

-- [to conceal or disguise the [nature] [location] [source] [ownership] [control] of the proceeds of [insert the specified unlawful activity from § 1956(c)(7)]]

-- [to avoid a transaction reporting requirement under state or federal law].

The Indictment alleges the "specified unlawful activity" as federal program theft/bribery in violation of §666 and honest-services wire fraud in violation of §1343, 1346. (Indictment, DE 3, pp. 76, 79, 81). While §1956(c)(7) identifies §666 as a qualifying specified unlawful activity, neither §1343 nor §1346 are so identified. See 18 U.S.C. § 1956(c)(7)(D). Thus, honest-services wire fraud is not properly alleged as a specified unlawful activity because it is not included in the statutory definition. Regardless, both the properly identified specific unlawful activity and the improperly identified specific unlawful activity have been inadequately alleged, as outlined in detail above. Just as before, it is axiomatic that if the Government's Indictment rests upon allegations of theft and fraud, if the theft and the fraud are insufficient as a matter of law, the remaining claims reliant upon those charges are also insufficient.

## V.    **CONCLUSION**

For the reasons outlined above, Glen Casada respectfully requests that this Court issue an Order DISMISSING WITH PREJUDICE the present Indictment.

Respectfully submitted,

*/s/ Jonathan P. Farmer*
Edward M. Yarbrough (BPR #004097)
Jonathan P. Farmer (BPR #020749)
Chase Fann (BPR #036794)
511 Union St, Suite 1000
Nashville, TN 37219
(P) 615-238-6300
eyarbrough@spencerfane.com
jfarmer@spencerfane.com
cfann@spencerfane.com

Counsel for Glen Casada

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following:

Amanda Klopf
John Taddei
Assistant US Attorneys
US Attorney Office - Middle District
719 Church St. Suite 3300
Nashville, TN 37203
Amanda.klopf@usdoj.gov
John.Taddei@usdoj.gov

*/s/ Jonathan P. Farmer*
Jonathan P. Farmer