UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:22-cr-00282 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| [1] GLEN CASADA | ) | |
| [2] CADE COTHREN | ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE OPPOSING
DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT**

In 2019 and 2020, defendant Glen Casada, while a member of the Tennessee House of Representatives, and defendant Cade Cothren engaged in a scheme to defraud the State of Tennessee. Cothren, with Casada's knowledge and support, created a company called Phoenix Solutions, LLC, for the purpose of profiting off a State-funded program used by legislators to send correspondence to their constituents. Seeking to hide his and Casada's affiliation with Phoenix Solutions, Cothren created a fake person—Matthew Phoenix—and held him up to be the company's owner and operator in a falsified tax form and other fraudulent paperwork submitted to the State and in correspondence with State employees and legislators. To facilitate the company's success, Cothren enlisted Casada and another State Representative to use their official positions to ensure disbursement of State funds to Phoenix Solutions and cause other legislators to direct program funds to the company. To further the scheme, the conspirators used sham invoices to secretly and fraudulently funnel State money to Phoenix Solutions through the bank accounts of consulting firms that the two legislators controlled. In return for causing and expediting State payments to Phoenix Solutions, both direct and secretly through the consulting firms, Cothren paid Casada and the other Representative more than $35,000 in bribes and kickbacks.

The defendants now move to dismiss the Indictment, claiming that the charges it brings

merely "seek to criminalize business activities that were private—not public—in nature and completely lawful," Doc. No. 66 at 37 (mem. in support) ("Cothren Mem."), as well as "alleged non-disclosure of ownership and or/conflicts of interest," Doc. No. 60 at 2 (mem. in support) ("Casada Mem."). The defendants assert the Indictment fails to adequately state a single charge against them. They are wrong on all fronts. In fact, the Indictment alleges a scheme involving fraud, bribery, theft, and money laundering, in which Casada, Cothren, and their coconspirator leveraged elected office for private profit, while using lies and concealment as means to accomplish their criminal goals. For the reasons that follow, the defendants' motions to dismiss, Doc. Nos. 59, 65, should be denied.

## BACKGROUND

In August 2022, a federal grand jury returned a 20-count Indictment charging the defendants with offenses related to their scheme to defraud the State of Tennessee. *See* Doc. No. 3 ("Indictment"). As alleged in the Indictment and relevant to the arguments contained in the defendants' motions to dismiss, in 2019, 2020, and 2021, the State of Tennessee received more than $10,000 in federal benefits. *Id.* ¶¶ 14, 59, 63, 67. In 2019, Casada served in the Tennessee General Assembly as a member of the Tennessee House of Representatives. *Id.* ¶ 3. For about eight months that year, he was the Speaker of the House. *Id.* Cothren was a businessman who served as Casada's chief of staff until, in May 2019, he was forced to resign based on allegations of misconduct. *Id.* ¶ 9. A few months later, Casada also resigned his post as Speaker based on those allegations, but remained a House member. *Id.* ¶ 3.

In November 2019, Cothren, with the knowledge and support of Casada and another Representative identified in the Indictment as Individual 4, established a company called Phoenix

2

Solutions, LLC, with the goal of providing constituent mail services to members of the General Assembly and, eventually, to political campaigns for State offices. *Id.* ¶ 10. Every year, the State of Tennessee allocated each House member $3,000 to design, print, and mail legislative updates, surveys, and other approved materials to their constituents (the "Mailer Program"). *Id.* ¶ 11.[1] The General Assembly's Office of Legislative Administration and its Director of Legislation managed the Mailer Program in consultation with the Senate and House Speakers. *Id.* ¶ 13. Among the Director's responsibilities related to the Mailer Program were the approval of invoices and the management of disbursements of State funds to vendors. *Id.* Ultimately, the Speaker's Office had the authority to approve or deny a vendor to provide services of any mailer funded by the Mailer Program. *Id.* ¶ 12.

Beginning around October 2019, Casada, Cothren, and Individual 4 conspired to profit off the Mailer Program. *Id.* ¶¶ 16–17. A key element of the plan was to exploit Casada and Individual 4's official positions as legislators to perform and cause official acts, including pressuring State officials to approve Phoenix Solutions as a Mailer Program vendor; pressuring State officials to cause and, when necessary, expedite payment of State funds to Phoenix Solutions, as well as to two consulting companies controlled by Individual 4 ("Company 1") and Casada

---

[1] Cothren repeatedly challenges the characterization of the Mailer Program as a "program." *See, e.g.*, Cothren Mem. 3, 5, 7–8, 12, 18, 27. He says that "no such 'Mailer Program' exists" and suggests that the Indictment's use of the word "program" is meant to bolster its allegations of federal programs theft and bribery. *Id.* at 3 (emphasis omitted). Cothren prefers the term "Postage and Printing Allowance," and he describes the policies he claims govern the allowance at length. *See id.* at 4–5. He even attaches a copy of those policies to his response, Doc. No. 66-1, despite the fact that, at this stage of the proceedings, his motion must raise questions of law, not fact. *See* pp. 6–7, *infra* (Legal Standard). Regardless, whether or not those mailer policies amount to a "program" is immaterial. As is clear from the discussion below, none of the crimes the Indictment charges have as an element that the object of a defendant's scheme be a "program." The Indictment and this filing use the term merely for sake of simplicity.

3

("Company 2"); advising and pressuring other House members to use Phoenix Solutions, Company 1, and Company 2 for State-funded Mailer Program work; and choosing to use Phoenix Solutions, Company 1, and Company 2 for Casada and Individual 4's State-funded Mailer Program work.  *Id.* ¶¶ 18, 19, 26, 38.  In exchange, Cothren would pay Casada and Individual 4 bribes and kickbacks in the form of Phoenix Solutions' profits.  *Id.* ¶¶ 18–19.

To facilitate the success of the scheme, the conspirators concealed Cothren's involvement in Phoenix Solutions and the fact that he kicked back a portion of the company's profits to Casada and Individual 4.  *Id.* ¶ 21.  They understood that, if anyone knew about the kickbacks or Cothren's involvement, Phoenix Solutions would not be approved by the State to be a Mailer Program vendor or hired by individual members of the Tennessee General Assembly.  *Id.* ¶¶ 21, 24.  In one text message, for instance, Cothen told Casada, "we just have to make sure no one knows it's me involved."  *Id.* ¶ 34.  In another exchange, Casada wrote Cothren, "we want no one knowing your [sic] Phoenix."  *Id.*  Cothren reassured Casada, "no one needs to know whose company it is."  *Id.*

Instead, the conspirators told State officials that Phoenix Solutions was run by a man named Matthew Phoenix, who they falsely held out to be an experienced political consultant.  *Id.* ¶ 23. Cothren created an email for this fake persona—matthew@powerofphoenix.com—which he used to conduct company business.  *Id.* ¶ 28.  He also incorporated Phoenix Solutions in New Mexico and set up a company post office box there because that state allows for the anonymous registration of limited liability companies.  *Id.* ¶¶ 29–30.  Cothren also submitted a falsified tax form in Matthew Phoenix's name to the State, which the State required to be on file in order to pay Mailer Program vendors.  *Id.* ¶ 37.

4

The scheme worked. Casada and Individual 4 pitched Phoenix Solutions to their colleagues, falsely stating that Matthew Phoenix and his fictitious associate "Candice" were experienced political consultants previously affiliated with a real Washington, D.C.-based consulting firm who had done good work in the past. *Id.* ¶¶ 46, 49; *see also id.* ¶ 31. A number of fellow legislators accepted the recommendation and hired Phoenix Solutions to perform State-funded mailer work. *See id.* ¶¶ 36, 40, 48, 51. When the State was slow to pay for work that Phoenix Solutions had done, Casada and Individual 4 pressured State officials to make payments. *Id.* ¶¶ 38–42, 47–48.

Meanwhile, Casada and Individual 4 were careful to hide both their personal interest in Phoenix Solutions and the extent of the State-funded work that the company was doing. They denied making any money from Phoenix Solutions. *Id.* ¶ 49; *see also id.* ¶ 34. They submitted sham invoices to the State in the names of Company 1 and Company 2 for the purpose of secretly funneling money from the State to Phoenix Solutions through the bank accounts of Company 1 and Company 2. *Id.*; *see also id.* ¶¶ 36, 79, 81. Those sham invoices caused the State to disburse more than $23,000 to Company 1 and Company 2 based on false representations that those companies were actually performing Mailer Program work. *Id.* ¶¶ 36, 77, 79.

Over the course of 2020, Phoenix Solutions, Company 1, and Company 2 received approximately $51,947 from the State in payments related to the Mailer Program and approximately $158,165 in total revenue. *Id.* ¶¶ 51, 52. During the same time period, Cothren paid Casada and Individual 4 more than $35,000 in bribes and kickbacks. *Id.* ¶¶ 43–45, 53–57.

Based on these allegations, the Indictment charges Casada and Cothren with 20 crimes: one count of conspiring to commit federal programs theft, federal programs bribery, and honest

services wire fraud, in violation of 18 U.S.C. § 371 (Count 1); three counts of federal programs theft and bribery, in violation of 18 U.S.C. §§ 666 and 2 (Count 2–4); six counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2 (Counts 5–10); one count of using a fictitious name to carry out a fraud, in violation of 18 U.S.C. §§ 1342 and 2 (Count 11); and nine counts of money laundering conspiracy and money laundering, in violation of 18 U.S.C. §§ 1956, 1957, and 2 (Counts 12–20).[2]

## LEGAL STANDARD

The defendants move to dismiss the Indictment, claiming that it fails to state a single offense. Casada Mem. 26; Cothren Mem. 37. An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It is "generally sufficient if it fully, directly, and expressly sets forth all the elements necessary to constitute the offense intended to be punished." *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007) (cleaned up) (citation omitted). More specifically, an indictment must: (1) lay out the elements of the charged offenses and fairly inform the defendant of those charges; and (2) be specific enough to allow the defendant to assert double jeopardy in a later proceeding. *Id.*

A pretrial motion to dismiss an indictment is appropriate only if it "can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B)(v). In other words, the motion must "raise[] questions of law rather than fact." *United States v. Ali*, 557 F.3d 715, 719 (6th Cir. 2009). A court evaluating a motion to dismiss should therefore "read the indictment as a whole, accept

---

[2] In March 2022, Robin Smith pleaded guilty to honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, for her role in this scheme. *See* Plea Agreement, Doc. No. 15, *United States v. Smith*, No. 3:22-cr-00078 (M.D. Tenn. filed Mar. 8, 2022) (Richardson, J.).

6

the factual allegations as true, and construe those allegations in a practical sense with all of the necessary implications." *United States v. Reed*, 77 F.3d 139, 140 n.1 (6th Cir. 1996) (en banc) (citation omitted). At bottom, "[a]n indictment is to be construed liberally in favor of its sufficiency." *United States v. Lee*, 919 F.3d 340, 349 (6th Cir. 2019) (citation omitted).

## ARGUMENT

The defendants' motions principally challenge the legal sufficiency of the counts of the Indictment charging federal programs theft and bribery (Counts 2–4), and honest services wire fraud (Counts 5–10). Casada Mem. 6–22; Cothren Mem. 6–35. The defendants say that the remaining counts fail because they are "derivative" of those charges. Casada Mem. 22; Cothren Mem. 35–37. As described below, the defendants' arguments against Counts 2–10 are based on misinterpretations of the elements of § 666 and, for § 1346, the different forms of wire fraud that Congress has established, as well as a failure to read the Indictment as a whole and accept the factual allegations as true. Because the defendants' challenges to Counts 2–10 fail, and they do not offer any additional compelling reasons to dismiss the remaining counts, the Court should deny their motions to dismiss.

### I.     The Indictment properly alleges that the defendants committed federal programs theft and bribery.

The defendants challenge the Indictment's federal programs theft and bribery charges (Counts 2–4). They both argue that the Indictment fails to allege facts satisfying certain monetary threshold requirements built into those offenses. *See* Cothren Mem. 7–17; Casada Mem. 6–13. Cothren also says that the federal programs theft charge (Count 2) is deficient because the Indictment does not allege any loss of money or property. Cothren Mem. 17–25. Finally, Cothren attacks the federal programs bribery charges (Counts 3–4) for the Indictment's supposed

7

failure to allege the crime's agency and corrupt intent elements. *See id.* at 25–28. None of these arguments have merit.

### A. The Indictment alleges facts sufficient to establish the required monetary thresholds for federal programs theft and bribery.

The statute criminalizing federal programs theft and bribery, 18 U.S.C. § 666, lays out two monetary thresholds. First, § 666 applies only when the theft or bribery involves an agent of an entity that "receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). Second, there must be an illicit transaction worth $5,000 or more. *See id.* § 666(a); *see also United States v. Hills*, 27 F.4th 1155, 1181–82 (6th Cir. 2022) (stating elements of § 666(a)(1)(B)). Cothren attacks the Indictment as insufficient with respect to both thresholds, while Casada attacks only the second. *See* Cothren Mem. 7–17; Casada Mem. 6–13. Their claims miss the mark.

#### i. The Indictment sufficiently alleges § 666's $10,000 federal benefits element.

The Indictment states that the conspirators' scheme defrauded the State of Tennessee, and that in each calendar year of the scheme "the State of Tennessee received more than $10,000 in federal benefits." Indictment ¶ 14; *see id.* ¶¶ 59, 63, 67. That is enough to adequately allege § 666's federal funds element for Counts 2–4.

Cothren contends that the Indictment must also explain how the scheme "touch[ed] federally funded assets." *See* Cothren Mem. 9. That is wrong. "[A]ny argument that the government must establish an affirmative connection between the theft and federal funds has been repeatedly and squarely rejected." *United States v. Bowling*, 952 F.3d 861, 867 (7th Cir. 2020); *see, e.g.*, *Sabri v. United States*, 541 U.S. 600, 605 (2004) ("readily dispos[ing]" of the position

8

that "the statute must require proof of connection with federal money as an element of the offense"); *Salinas v. United States*, 522 U.S. 52, 56–57 (1997) (finding the "expansive, unqualified language" of § 666 "does not support the interpretation that federal funds must be affected to violate" the statute); *id.* at 57 ("The prohibition is not confined to a business or transaction which affects federal funds."); *Hills*, 27 F.4th at 1182 n.12 (stating that "the argument that it was necessary to show impairment to the federal funds . . . is foreclosed by *Sabri*"); Seventh Circuit Pattern Jury Instructions (Criminal) 18 U.S.C. § 666(a)(2) comm. cmt. (2022) ("The government is not required to prove that the bribe or other payment affected the federal funds received by the organization or agency.").

Cothren bases his contrary argument largely on a misreading of *Fischer v. United States*, 529 U.S. 667 (2000). Cothren Mem. 11–13. As the Sixth Circuit has recognized, even before *Sabri* made the parameters of the federal funds element clear, "the question in *Fischer* turned on a somewhat different issue, on whether to characterize certain forms of federal aid as 'benefits.'" *United States v. Suarez*, 263 F.3d 468, 490 (6th Cir. 2001). "Indeed, the *Fischer* Court never addressed the precise question raised by the instant appeal, *i.e.*, whether the alleged theft or bribery must touch upon the recipient agency's federal funding." *Id.* (internal quotation marks and citation omitted)). Another case *Cothren* cites for support—*United States v. Foley*, 73 F.3d 484 (2d Cir. 1996)—was overruled by *Salinas* and *Sabri*, *supra*. *See United States v. Zimmermann*, 509 F.3d 920, 926 (8th Cir. 2007) (explaining that the Supreme Court's decisions in *Sabri* and *Salinas* rejected *Foley*'s reading of § 666). Perplexingly, some of the cases Cothren cites to support his position directly contradict it. *See, e.g.*, *Suarez*, 263 F.3d at 490 ("the statute does not require the government to demonstrate the federal character of the stolen property" (citation and

9

internal quotation marks omitted)); *United States v. Madison*, 226 F. App'x 535, 547 (6th Cir. 2007) (unpublished) ("A defendant under 18 U.S.C. § 666 need not be shown to have actually stolen any of the federal funds given to the 'federal recipient' or even that his malfeasance affected those federal funds." (citation omitted)).  Nowhere does Cothren cite *Sabri*, the longstanding controlling precedent on this question.

Cothren makes several derivative arguments that all fail for the reasons stated above.  He claims that the mailer funds involved in the conspirators' scheme did not belong to the State of Tennessee.  *See* Cothren Mem. 7–9.  Citing a policy manual that he claims governs the Mailer Program, Cothren asserts that the $3,000 postage and printing allowance "loses any arguable connection" to the State "as soon as those funds are allocated to the individual Members," at which point the allowance "becomes the property of [the member's] district." *Id.* at 8.  Because the alleged theft and bribery scheme targeted funds that did not belong to Tennessee, Cothren suggests, "there is no conceivable relationship between those funds and any federal benefits or interest." *Id.* at 9.  Again, *Sabri* and its progeny have rejected this argument.  *Hills*, 27 F.4th at 1182 n.12.

Even if they had not, Cothren's argument raises a fact issue that is an inappropriate basis for a motion to dismiss.  He looks to evidence outside the Indictment—a policy manual related to the Mailer Program—for support that the mailer funds did not belong to the State.  Cothren Mem. 7–8.  The defendant's factual allegations regarding the meaning of evidence precludes pretrial dismissal.  *See United States v. Neill*, No. 2:21-CR-4, 2021 WL 3912796, at *3 (M.D. Tenn. Sept. 1, 2021) (Richardson, J.) (explaining that a district court may decide "as a matter of law" that "the defendant's conduct[] did not constitute the criminal violation(s) alleged in the indictment, provided that: (a) the district court's decision is based on undisputed extrinsic evidence and

10

undisputed operative facts; and (b) the trial court's conclusions do not invade the province of the ultimate finder of fact." (citing *United States v. Levin*, 973 F.2d 463, 465–67 (6th Cir. 1992))). Whether the government can satisfy its burden of showing that the State of Tennessee received benefits in excess of $10,000 under a Federal program is a question for the jury. *Bowling*, 952 F.3d at 867 ("Any failure of proof on the federal-funding element goes to the merits, not the district court's authority to hear the case.").

In any event, Cothren's characterization of his own proffered evidence is inaccurate. Nowhere does the policy manual that he attaches to his motion say what he claims it does—that the $3,000 allowance belonged to State representatives rather than the State itself. *See generally* Doc. No. 66-1 at 8–10. On the contrary, the manual places numerous limitations on legislators' use of those funds, *see id.*, indicating that the State owned the funds but let legislators spend them on mailing and postage so long as the legislators abided by its conditions. The manual even specifically states that, at least for printing services, the State was the one who paid the bills—not the legislators. *See id.* at 9 ("Members may request authorization for the printing of newsletters, surveys, questionnaires and other written constituent communications. . . . Upon approval, the authorization and written materials will be forward to the Office of Legislative Administration for processing for payment."). That is consistent with the Indictment's allegation that State officials were "responsible for approving invoices related to the Mailer Program and managing disbursements of State funds to vendors." Indictment ¶ 13; *see also id.* ¶¶ 35–36, 48 (describing instances of the State paying Mailer Program invoices). The mailer policy is thus like the travel policy Cothren also attached to his motion: both regulate the use of State money to cover certain costs that legislators incur while conducting official business on behalf of the State. *See* Doc. No.

11

66-1 at 7–10. Neither policy transfers ownership of any State funds.

Cothren advances a variation of his federal-funding challenge in a footnote. He says that, even if the State of Tennessee received more than $10,000 in federal funding, its legislature received no federal funds. Cothren Mem. 8 n.4. The implication is that Casada and Individual 4 are agents only of the State legislature, so the Indictment cannot properly allege that they were agents of an entity that received more than $10,000 in federal benefits. Cothren cites two inapposite Eleventh Circuit cases on this point. *See United States v. Doran*, 854 F.3d 1312, 1315 (11th Cir. 2017) (reversing conviction when a professor embezzled from a student investment fund because, even though the affiliated university had received over $10,000 in federal money, the fund was a legally independent entity that had received no federal money); *United States v. McLean*, 802 F.3d 1228, 1234–45 (11th Cir. 2015) (affirming district court's grant of acquittal when the defendant—a city commissioner and development agency board member—accepted bribes in exchange for help obtaining a development agency grant because, although the city received over $10,000 in federal funds, the development agency was a separate legal entity that did not). Significantly, however, neither case dealt with a corrupt state legislator, while the instant Indictment alleges two.

Under § 666's text, state legislators are agents of their entire state—not just the state legislature. The statute applies to federal programs thefts and bribes involving, among others, "agent[s] . . . of a State." 18 U.S.C. § 666(a). And the statute defines "agent" to include a "representative." *Id.* § 666(d)(1). As the Eleventh Circuit recently explained, multiple courts of appeals have "flatly rejected" the argument that a state representative is only an agent of the state legislature and not the state as a whole. *United States v. Roberson*, 998 F.3d 1237, 1249 (11th

12

Cir. 2021). For that reason, at least three court of appeals have also rejected the argument that a state legislator is immunized from § 666's reach so long as his state legislature does not directly receive federal funding. *See Roberson*, 998 F.3d at 1249–50; *United States v. Willis*, 844 F.3d 155, 165–67 (3d Cir. 2016); *United States v. Fernandez*, 722 F.3d 1, 9 (1st Cir. 2013). Indeed, "if a state legislator is not an agent of the state for purposes of section 666, it is unclear who would be." *Roberson*, 998 F.3d at 1249. The Indictment thus properly alleged that Casada and Individual 4 were agents of the State of Tennessee. *See* Indictment ¶¶ 60, 64, 68.

> ii. The Indictment adequately states that the defendants violated § 666's transactional element.

Both defendants assert that the Indictment fails to allege § 666's transactional element, which requires that the illicit transaction be worth $5,000 or more. Casada Mem. 6–13; Cothren Mem. 13–15. That element's language differs slightly depending on the statutory subsection. For violations of subsection (a)(1)(A), which the Indictment charges as federal programs theft in Count 2, the government must show that the property the defendant obtained "is valued at $5,000 or more." *Id.* § 666(a)(1)(A)(i). Subsections (a)(1)(B) and (a)(2), which the Indictment charges as federal programs bribery in Counts 3 and 4, use broader language. To prove a violation of those subsections, the government must demonstrate that the defendant intended for the illicit transaction to influence or reward an agent "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." *Id.* § 666(a)(1)(B), (a)(2). Therefore, while subsection (a)(1)(A)'s transactional element aims to ensure that the public official's ill-gotten gains are worth at least $5,000, subsections (a)(1)(B) and (a)(2) sweep in conduct "involving anything of value" worth more than $5,000.

13

Notably, under any of § 666's subsections, the government can prove the transactional element by aggregating all relevant transactions that occurred within a one-year period. *See* 18 U.S.C. § 666(a)(1)(B), (a)(2) (describing the $5,000 threshold as applying to "any business, transaction, or *series of transactions*" (emphasis added)); *United States v. Sanderson*, 966 F.2d 184, 189 (6th Cir. 1992) (explaining, while affirming a conviction under § 666(a)(1)(A), that "under section 666, where multiple conversions are part of a single scheme, it seems appropriate to aggregate the value of property stolen in order to reach the $5,000 minimum required for prosecution").

The defendants rely on the statute's safe harbor provision, 18 U.S.C. § 666(c). Casada Mem. 8–11; Cothren Mem. 13–15. That provision reads, "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). According to Casada, the provision's effect is that "any transaction for payment for a bona fide service in the usual course of business cannot be used to satisfy the $5,000 threshold even if associated with a 'bribe' or 'kickback.'" Casada Mem. 8. The defendants' argument is that because *someone* performed the mailer work that the State paid Phoenix Solutions, Company 1, and Company 2 to do, the money the State paid the companies was bona fide compensation for that work. *Id.* at 10–11; Cothren Mem. 13. The defendants therefore claim that none of the $51,947 the companies received from the State can count toward § 666's $5,000 threshold. *Id.* They conclude that "[w]ithout these payments, the Government cannot meet the $5,000 transactional threshold." Casada Mem. 11; *see* Cothren Mem. 13.

As described on pp. 16–24, *infra*, the defendants overstate the reach of § 666's safe harbor

14

provision and the Sixth Circuit cases that have interpreted it.[3]  But more fundamentally, the defendants ignore the kickbacks that Cothren paid to Casada and Individual 4, that their value was well beyond the $5,000 threshold, and that those transactions were completely separate from those in which the State initially dispensed funds to Phoenix Solutions.  For Count 2, the kickbacks constitute the "property" that Casada and Individual 4 are alleged to have fraudulently obtained in violation of § 666(a)(1)(A)(i).  *See* Indictment ¶ 61.  For the purposes of Counts 3 and 4, which charge subsections (a)(1)(B) and (a)(2), bribe amounts are one of the surest measures of whether an illicit transaction was worth at least $5,000.  *See Hills*, 27 F.4th at 1182 ("Although 18 U.S.C. § 666(c) exempts bona fide salary or compensation paid in the usual course of business, the value of the pertinent transaction is determined by the amount solicited."); *see also, e.g.*, Fifth Circuit Pattern Jury Instructions (Criminal) § 2.33B note (2019) ("The transactional element may be satisfied by looking to the amount of the bribe; thus, if the amount of the bribe is $5,000 or greater, the jury can reasonably conclude that the transactional element is satisfied." (citing *United States v. Richard*, 775 F.3d 287, 294 (5th Cir. 2014)); *United States v. Allinson*, 27 F.4th 913, 921 (3d Cir. 2022) (explaining that the amount of a bribe may "prove the value of the transaction" even

---

[3] As a threshold matter, the Sixth Circuit has held that the safe harbor provision applies to the transactional element, but other circuits have held that it does not.  *Compare United States v. Mills*, 140 F.3d 630, 633 (6th Cir. 1998), *with United States v. Robinson*, 663 F.3d 265, 272 (7th Cir. 2011), *and United States v. Marmolejo*, 89 F.3d 1185, 1190 n.5 (5th Cir. 1996).  The Seventh Circuit noted that "[t]he Sixth Circuit's reading of § 666(c) in *Mills* is hard to square with the statutory text, which uses the language of an exception, not the language of a limitation on the proofs."  *Robinson*, 663 F.3d at 272.  It does not appear that any court of appeals has adopted the Sixth Circuit's extension of § 666(c) to the transactional element.  As further addressed *infra*, several courts have criticized *Mills*'s reasoning as contrary to the statutory text and legislative purpose of § 666.  In any event, because *Mills* has not been overruled, we assume that it requires this Court to hold that § 666(c) applies to the transactional element.

15

"where parties seek to exchange tangible assets").

A fundamental principle of bribery law is that a transaction must be "worth at least what the bribe-giver was willing to pay for it." *Robinson*, 663 F.3d at 275 (collecting cases supporting the proposition that "the amount of the bribe may suffice as a proxy for value; at least it provides a floor for the valuation question"). Here, the Indictment alleges that Phoenix Solutions paid Casada and Individual 4 at least $35,407.40 in kickback payments—well above § 666's $5,000 transactional threshold. *See* Indictment ¶¶ 43–45 (alleging that Casada and Individual 4 each received a kickback of $4,143.64); *id.* ¶ 53 (alleging a $12,003.16 kickback to Individual 4's consulting firm, Company 1); *id.* ¶ 54 (alleging a $500 kickback to Casada's consulting firm, Company 2); *id.* ¶¶ 55-56 (alleging a $2,500 kickback to Casada); *id.* ¶ 57 (alleging a $12,116.96 kickback to Company 1).

The defendants' claim that the safe harbor provision excludes the profits of their scheme from the transactional element calculation rests inaptly on two cases. In *United States v. Mills*, 140 F.3d 630 (6th Cir. 1998), the Sixth Circuit determined that the salaries of deputy sheriffs who obtained their jobs through bribery did not count toward § 666(a)(1)(B)'s requirement that the illicit transaction involve something of value worth at least $5,000. *Id.* at 633–34. It reasoned that the salaries were bona fide—and thus should be excluded from consideration under the safe harbor provision—because the deputy sheriffs held real jobs and performed the duties associated with those jobs. *Id.* Similarly, in *United States v. Mann*, 172 F.3d 50, 1999 WL 17647 (6th Cir. 1999) (unpublished), the panel held that a school principal's salary was bona fide compensation that could not be considered in a prosecution under § 666 because, even though the principal was not properly certified, he still "performed the duties of his job." *Id.* at *3.

16

But neither *Mills* nor *Mann* involved the kind of fraud or kickback scheme the Indictment alleges Cothren and Casada engaged in here, nor one in which the value of the bribes involved exceeded $5,000. In *Mann*, there was no bribe, kickback, or even dishonesty at all. Every year after the principal started the job, the state department of education notified his school district that he lacked the certification to be a principal. 1999 WL 17647, at *1. Because the school district kept paying him for his work anyway, the court had little trouble concluding that the salary he earned was bona fide. *See id.* at *3 ("He was paid 'in the usual course of business' despite the fact that his employer had knowledge of his lack of certification.").

In *Mills*, the court drew a sharp line between the bribes the deputy sheriffs paid to get the job and the salaries they earned afterward, reasoning that the dishonest transaction that got them the job did not taint the money they later earned for their legitimate work. *See* 140 F.3d at 633 (distinguishing "the salaries to be paid to the deputy sheriffs for actual performance of necessary governmental duties" and "the money required to secure the positions in the first place"); *see also United States v. Bryant*, 556 F. Supp. 2d 378, 428 (D.N.J. 2008) ("The allegations at issue in *Mills* were consistent with the possibility that, once the bribers were hired, the salary at issue was paid only for legitimate work, leaving the procurement process as the only reason to claim their salary was not 'bona fide.'"). Consequently, the Sixth Circuit looked to the value of the only remaining dishonest transaction alleged—the bribes—to assess the transactional element. *See Mills*, 140 F.3d at 633 (stating that without those legitimately earned salaries, "the only guide to determining the true values of the transactions is the money required to secure the positions in the first place"). *Id.* Because the Indictment "clearly and specifically assign[ed] values ranging from $3,500 to $3,930 for those jobs," and "those amounts are below the $5,000 statutory floor," the court of

17

appeals held that the Indictment failed to allege the transactional element.   *Id.* at 634.

In this case, the Indictment clearly and specifically alleges kickbacks totaling $35,407.40. Indictment ¶¶ 43–45, 53–57; *cf. Cantor v. United States*, 205 F.3d 1321, 2000 WL 232176, at *1 (2d Cir. 2000) (unpublished) (rejecting a § 2255 petition based on *Mills* in part because "[i]f the bribes themselves had been worth more than $5,000, we have no doubt that Mills's conviction would have been affirmed").   If anything, the total amount of kickbacks generated in this case is a more accurate measure of the scheme's value than a bribe amount negotiated before a public official performs his side of a corrupt bargain.   In the latter case, the value might not pan out as the parties expected.   *Cf. Robinson*, 663 F.3d at 276 (observing that the defendant's payment of "far less" than the initially agreed-upon bribe amount "weakened" the government's argument that the bribe amount was proof of the benefit's value).   Here, by contrast, the kickbacks were the profits that the scheme generated for the conspirators.   *See, e.g.*, Indictment ¶¶ 21, 43, 56.

Moreover, as a textual matter, the defendants cannot use § 666's safe harbor provision to disqualify the kickbacks that Casada and Individual 4 received from counting toward the transactional threshold because it was not "bona fide" compensation.   The term "'bona fide salary . . . in the ordinary course of business,' is fixed compensation for services obtained without fraud or deceit and in the normal routine of a business."   *United States v. Walsh*, 156 F. Supp. 3d 374, 384–85 (E.D.N.Y. 2016); *see also United States v. George*, 841 F.3d 55, 62 (1st Cir. 2016) ("'[B]ona fide salary' means salary actually earned in good faith for work done for the employer.").   It does not include "salary payments . . . paid to [a public official] as the *quid* in a *quid pro quo* bribery arrangement."   *Bryant*, 556 F. Supp. 2d at 427 (distinguishing *Mills* and *Mann* based on those facts).   Otherwise, a corrupt public official "would only have to structure his loot as salary

18

to evade prosecution." *George*, 841 F.3d at 62.

If the term "bona fide" carries any weight, the safe harbor provision cannot apply to kickbacks that Casada and Individual 4 received only because they deceived and pressured the State and their fellow legislators into doing business with them and Cothren. *See Walsh*, 156 F. Supp. 3d at 386 ("[I]f . . . Section 666(c) provides refuge for any defendant who receives salary or wages regardless of whether his salary or wages were obtained through fraudulent means, then Congress would have no need to specify that the statute did not cover 'bona fide salary,' which . . . implies that an employee's salary was obtained without fraud or deceit.").

The First Circuit came to a similar conclusion in *United States v. Cornier-Ortiz*, 361 F.3d 29 (1st Cir. 2004). In that case, the defendant—the general manager of a company that operated public housing projects—hired the brother of a housing authority official to prepare vouchers to obtain federal funding. *Id.* at 34. As it turned out, however, the housing authority official was the one who prepared the vouchers—the defendant hired the brother only to avoid conflict-of-interest rules. *Id.* At trial, "the government made no effort to prove that the underlying work paid for . . . was not done" but instead aimed "to prove that the work was done by someone who could not lawfully do it." *Id.* at 34–35. The defendant asserted on appeal that the payments he made were not prosecutable because they were "legitimate compensation paid in the usual course of business and thus fell within the § 666(c) exception." *Id.*

The court of appeals rejected the argument. It explained that "[t]he jury could easily have concluded" the payments the defendant made for voucher work "were not bona fide because the . . . conflict of interest rules prohibited [the housing authority official] from participating in

19

such a scheme." *Id.* at 36.[4] As the court plainly put it, "A scheme designed to evade conflict of interest rules is hardly legitimate or acceptable." *Id.* It did not matter, the court went on, "[t]hat the payments were made for a legitimate purpose—to hire a[n] . . . expert to obtain funding for maintenance work that was indeed done." *Id.* The payments were still "intentionally misapplied" under § 666(a)(1)(A) through the use of "sham contracts that skirted conflict of interest rules and allowed [the defendant's company] to receive preferential treatment and other benefits." *Id.* The court therefore refused to characterize the payments as bona fide. *Id.* at 37.

This Court should reach the same conclusion with respect to the kickbacks that Casada and Individual 4 received. As in *Cornier-Ortiz*, one of the purposes of the conspiracy in this case was to conceal who was performing work so the conspirators could profit. The Indictment alleges that Casada, Cothren, and Individual 4 concocted the scheme because they expected "that Phoenix Solutions would not be approved by the State to be a Mailer Program vendor or hired by individual members of the Tennessee General Assembly if Cothren's operational involvement and financial interests in the business and the kickbacks to Casada and Individual 4 were disclosed." Indictment ¶ 21; *accord id.* ¶ 24. As Casada told Cothren, they had to hide who was performing the work because "the caucus . . . won't spend money on members['] companies and we want no one knowing your [sic] Phoenix." *Id.* ¶ 34. Much in the same way the defendant in *Cornier-Ortiz* used "sham contracts" with a patsy to hide who was really doing work for him, 361 F.3d at 36, the defendants here used a fake persona, Indictment ¶ 23, "sham invoices . . . in the names of Company 1 and Company 2," *id.* ¶ 25, and other means of deception to hide who was really doing

---

[4] Several circuits have held that the question of the safe harbor provision's application is ordinarily one for the jury. *See, e.g.*, *George*, 841 F.3d at 62; *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007).

work for the State and its legislators.  A scheme that employed such deceptive means to induce the State and its legislators to do business despite their preferences to the contrary "is hardly legitimate or acceptable."  *Cornier-Ortiz*, 361 F.3d at 36.  Consequently, the profits from that scheme cannot be considered bona fide.

More broadly, unlike the conduct at issue in *Mills* and *Mann*, the scheme the Indictment alleges was rife with deceit throughout.  Not only did the conspirators create a fake persona to conceal who was behind their company, *see* Indictment ¶¶ 21, 24, but the Indictment asserts that they also gave falsified tax documents to the State to substantiate their fraud, *see id* ¶ 37.  They even fabricated email exchanges between their company's fake employees to pressure the State to pay invoices.  *See id.* ¶¶ 47–48.  And on top of all that, the conspirators represented that Company 1 and Company 2 were doing work that, in truth, Phoenix Solutions was performing— effectively using the companies as shells to hide the breadth of Phoenix Solution's involvement in the State Mailer Program.  *See id.* ¶ 19 (explaining that a purpose of the conspiracy was to "caus[e] State payments to be made to Phoenix Solutions, Company 1, and Company 2 for mailer services provided by Phoenix Solutions"); *id.* ¶ 25 (alleging that the conspirators "conceal[ed] their involvement in Phoenix Solutions by submitting sham invoices to the State in the names of Company 1 and Company 2"); *id.* ¶ 36 (outlining a series of transactions in which Casada billed the state from Company 1 and then, when the state paid, the conspirators transferred the proceeds from Company 1's bank account to Phoenix Solutions' bank account).  Casada and Individual 4 even deposited most of the kickbacks from Cothren into their companies' bank accounts, further masking their personal profit off the scheme.  *See* Indictment ¶¶ 45, 53–54, 56–57.

The conspirators went to such lengths to conceal their activities that the grand jury charged

21

them with nine counts of money laundering. *See id.* ¶ 77 (alleging a money laundering conspiracy in which the conspirators deposited money from the State into bank accounts associated with Company 1 and Company 2, then transferred those proceeds to Phoenix Solutions); *see also id.* ¶¶ 79, 81 (describing money laundering transactions). In *Mills* and *Mann*, there were no allegations that the employees did not actually perform the work they were paid to perform or passed off their work responsibilities to someone else while they collected the salaries. In fact, *Mills* explicitly distinguished the facts of that case from other cases involving "clearly . . . unacceptable business practice[s]," 140 F.3d at 633 n.1 (citing *United States v. Valentine*, 63 F.3d 459, 465 (6th Cir. 1995)), and one in which the defendant "'performed little work for the Sheriff's office' and did not 'perform functions for the sheriff's office on a regular basis,'" *id.* (quoting *United States v. Grubb*, 11 F.3d 426, 431 (4th Cir. 1993)).

Meanwhile, unacceptable business practices permeated Phoenix Solutions' mailer work, and Company 1 and Company 2 performed no work at all. Therefore, even if the conspirators' scheme ultimately resulted in the production of constituent mailers, they did not earn their compensation "without fraud or deceit and in the normal routine of a business." *See Walsh*, 156 F. Supp. 3d at 384–85. None of the funds that Phoenix Solutions, Company 1, or Company 2 received from the State were bona fide under § 666(c).

Finally, the defendants' overly broad view of the safe harbor provision cannot be correct because it would swallow much of § 666. The defendants claim that all the mailer funds the State paid to Phoenix Solutions, Company 1, and Company 2—even the portion that Casada and Individual 4 received as kickbacks—were bona fide compensation that cannot count toward the $5,000 transactional element. *See* Casada Mem. 8; Cothren Mem. 13. Under that capacious

22

reading of the safe harbor provision, § 666 "would not apply where a bribe was paid to obtain any benefit that included the payment of legitimate salaries," including "a contract under which individuals would be paid salaries and wage to perform legitimate work." *United States v. O'Brien*, 994 F. Supp. 2d 167, 184–85 (D. Mass. 2014). So, "for example, a $10,000 bribe paid to obtain a $10 million consulting contract would not fall within the statute if the contract involved the payment of legitimate salaries for legitimate work." *Id.*

Such a far-reaching position would legalize much of the corruption that Congress designed § 666 to combat. *See United States v. Burke*, No. 19-CR-322, 2022 WL 1970189, at *31 (N.D. Ill. June 6, 2022) ("Effectively, [the defendant's] position [on the safe harbor position] is that he can cleanse the tainted procurement process if he receives some non-sham services. That view of § 666(c) is untenable. Congress would not craft an exception that swallows the rule."); *Walsh*, 156 F. Supp. 3d at 386 (describing a position like the defendants' as "absurd" and "plainly contrary to the intent of Congress" because it "would potentially permit local and state government agents to steal or misappropriate federal money so long as it had the indicia of wages and salary"); *O'Brien*, 994 F. Supp. at 184–85 (rejecting as "counterintuitive" a reading of the safe harbor provision that would legalize the paying of bribes to obtain contracts so long as "individuals would be paid salaries and wage[s] to perform legitimate work"). Courts have repeatedly affirmed the viability of the type of legislator kickback scheme alleged in the Indictment. *See, e.g.*, *United States v. Porter*, 886 F.3d 562, 564 (6th Cir. 2018) (affirming convictions under § 666 when a mayor "steer[ed] business and contracts to companies owned by his co-defendant" in return for bribes); *United States v. Gee*, 432 F.3d 713, 714–15 (7th Cir. 2005) (holding that there was sufficient evidence to sustain a § 666 conviction when the defendant paid kickbacks to a state

23

legislator in exchange for the legislator's help in obtaining state contracts).

For these reasons, the Court should deny the defendants' request to dismiss Counts 2–4 of the Indictment for failure to state § 666's transactional element.

B.     The Indictment properly alleges that the object of the conspirators' scheme was the State's property.

Cothren next argues that the Indictment insufficiently states the federal programs theft charge (Count 2) because it did not allege that the conspirators' scheme aimed to cause or resulted in "an actual loss of money or property." Cothren Mem. 18; *see id.* at 17–25. He contends that, even though the conspirators tricked the State and its legislators into doing business with them, the State and its legislators still received exactly what they bargained for: mailer services. *See id.* at 20–24. Cothren's contentions are legally and factually incorrect.

It is true that federal programs theft must have property as its "'object.'" *Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)). That means the wrongdoer's goal cannot be, for instance, "to alter . . . a regulatory choice." *Id.* at 1572; *see United States v. Davis*, 53 F.4th 833, 843 (5th Cir. 2022) (affirming wire fraud conviction where the scheme "defrauded the government of money, not a license"). But the object of the scheme here was to "obtain[] money from the State of Tennessee." Indictment ¶ 61. Therefore, that element of § 666(a)(1)(A) is properly alleged.

Cothren's claim that the Indictment must "allege an actual loss of money or property, or that the Defendants' alleged scheme contemplated a cognizable loss of money or property," Mem. 18, is contrary to longstanding Supreme Court precedent. In *Shaw v. United States*, 580 U.S. 63 (2016), a defendant charged with bank fraud argued that he could not be convicted because "he did not intend to cause the bank financial harm." *Id.* at 67. The Supreme Court disagreed,

24

emphasizing that the statute "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Id.* The Court instead endorsed Judge Learned Hand's observation that "'a man is nonetheless cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value.'" *Id.* (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir.) (Hand, J.)); see *Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014) (rejecting the argument that the bank-fraud statute "requires the Government to prove that the defendant's scheme created a risk of financial loss to the bank"); *Carpenter v. United States*, 484 U.S. 19, 26 (1987) (rejecting any requirement of actual or intended "monetary loss").

The Court's decisions in *Shaw* and earlier cases accord with the settled rule at common law. For example, "it is generally held that the lack of financial loss is no defense" to the common-law crime of "false pretenses." 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.7(i)(3) (3d ed. 2018). And even if a plaintiff in a common-law civil action for fraud could not obtain damages in the absence of financial harm, she might be able to obtain rescission. *See* 3 Dan B. Dobbs et al., *The Law of Torts* § 664 n.6 (2d ed. 2011) ("If the plaintiff bargained for a Titian but got a Giorgione of equal value, she would have no pecuniary damages, but should be permitted to get rescission.").

Although courts sometimes speak in terms of "deprivation," "harm," or "loss" to the victim, the analysis is not as simple as whether the victim got something in return for giving up its property. *See United States v. Kachkar*, No. 19-12685, 2022 WL 2704358, at *5 (11th Cir. July 12, 2022) (unpublished) ("[T]he term 'harm' does not necessarily refer to a long-term financial loss on the part of the victim."); *cf. United States v. Palma*, 58 F.4th 246, 251 (6th Cir. 2023) (reversing dismissal of a wire fraud conspiracy charge when the alleged scheme aimed to falsify

25

engine test results to meet regulatory standards, then market the fact that the engine met those standards "to deceive consumers in order to falsely induce them to purchase goods"). A victim still suffers a deprivation of property when the wrongdoer induces a transaction based on a "misrepresentation [that] goes to the value of the bargain." *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016). The victim is harmed because "there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered." *United States v. Jabar*, 19 F.4th 66, 77 (2d Cir. 2021) (citation omitted). And importantly, the benefits and value of a bargain may include intangible considerations. *See United States v. Porat*, --- F.4th ----, 2023 WL 5009238, at *5–6 & n.6 (3d Cir. Aug. 7, 2023) (describing how misrepresentations regarding a business school's ranking factored into the bargain between the school and its students).

Here, the conspirators' misrepresentations went to the nature of the bargain. For one thing, their misrepresentations caused the State to approve, and State legislators to use, a vendor that would have otherwise been ineligible to receive mailer funds. The Tennessee House Speaker's Office approved Phoenix Solutions as a mailer vendor only after Cothren submitted a falsified W-9 form that he signed as Matthew Phoenix. *See* Indictment ¶¶ 37, 42. And the conspirators concealed the company's true owners in part to avoid the State and its legislators' concerns about potential conflicts of interest. The House had ethics rules generally forbidding actual and perceived conflicts of interest. *See id.* ¶ 8. As a result of the scheme, Casada—aided and abetted by Cothren—"fraudulently obtained money from the State of Tennessee" when multiple factors would have prohibited him from doing so. *See id.* ¶ 61.

Falsehoods meant to obtain money for somebody ineligible to receive it go to the heart of

any bargain—even if that person does real work. *See Davis*, 53 F.4th at 843 (explaining that a defendant's misrepresentations "went to the 'nature of the bargain'" when they fraudulently induced a government agency to pay "millions in GI-Bill benefits to a school ineligible to receive them"); *United States v. Maxwell*, 579 F.3d 1282, 1302–03 (11th Cir. 2009) (rejecting the argument that no deprivation of property occurred even though the government "received the electrical work they sought" because the defendant lied about who performed the work so his company could "obtain[] construction contracts and substantial payments . . . for which it was not eligible" under a program that set aside money to hire socially and economically disadvantaged businesses); *United States v. Culver*, 822 F. App'x 976, 981 (11th Cir. 2020) (unpublished) (affirming wire and mail fraud convictions when a defendant deceived a school district into hiring his company by fabricating a recommendation from a third-party that he then used as a pass-through to hide the fact that his company was making purchases to avoid "a conflict of interest").

For another thing, the State and its legislators did not get what they bargained for when they approved and hired Phoenix Solutions to perform mailer work. Casada and Individual 4 claimed that the company's founder, Matthew Phoenix, was an experienced political consultant who had previously worked at a real firm in Washington. *See* Indictment ¶¶ 23, 46. In reality, Cothren—a businessman tainted by scandal—ran the company. *See id.* ¶ 9. Who performed the work matters. For that reason, the Eleventh Circuit upheld a defendant's wire fraud convictions when he had his friend, a hot-air balloon pilot, pose as the president of a company with a team of software engineers to secure a contract to develop a phone app. *See United States v. Sams*, 769 F. App'x 769, 773 (11th Cir. 2019) (unpublished). The defendant then "hired relatively inexpensive contract programmers" to do the work. *Id.* As the court explained, by lying about

27

who performed the work, the defendant "deprived [the victim] of the opportunity to weigh the true risks and benefits of the transaction and thereby accomplished a scheme to defraud . . . regardless of whether [the victim] experienced a financial loss, and regardless of the quality or cost of the work performed." *Id.*

Here, the State and its legislators likewise took on risk they did not agree to when the conspirators deceived them into hiring a company led by someone who lacked promised experience. What is more, in the sensitive arena of politics, the State legislators took on an additional risk by unknowingly entering into business with someone whose "inappropriate conduct" had been serious enough to cause him to resign as Casada's chief of staff and Casada to resign as Speaker of the House. *See* Indictment ¶¶ 3, 9. Moreover, as described above, Casada and Individual 4 submitted sham invoices to the State in the names of Company 1 and Company 2 for the purpose of secretly funneling money from the State to Phoenix Solutions through the bank accounts of Company 1 and Company 2. *Id.*; *see also id.* ¶¶ 36. Those sham invoices caused the State to disburse more than $23,000 to Company 1 and Company 2 based on false representations that those companies were actually performing Mailer Program work. *Id.* ¶¶ 36, 51, 77, 79. In reality, Company 1 and Company 2 performed no Mailer Program work at all. So even if Cothren performed actual mailer work, the conspirators' misrepresentations certainly "affected [the victims'] economic calculus" and "impacted [their] valuation of the bargain." *See Porat*, 2023 WL 5009238, at *5–6 (internal quotation marks and citation omitted).

Cothren's retort is filled with distinguishable cases. He first asserts that the Indictment relies on the "right-to-control" theory of fraud that the Supreme Court recently renounced in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023). *See* Cothren Mem. 16–17, 19–20. The right-

28

to-control theory posited that a defendant could commit wire fraud by "schem[ing] to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions." *Ciminelli*, 143 S. Ct. at 1124 (internal quotation marks and citation omitted). In scrapping the theory, the Court reasoned that "the wire fraud statute reaches only traditional property interests" like those in money or property and that "[t]he right to valuable economic information needed to make discretionary economic decisions" was not such an interest. *Id.* at 1126.

Notably, however, the *Ciminelli* Court recognized that, in the case before it, the government had "relied solely on" the right-to-control theory even though an earlier indictment had alleged that the defendants aimed to obtain contracts. *See id.* at 1125 n.1. Furthermore, Justice Alito made clear in a concurrence that the decision did not prevent the government from retrying the case "on the theory that [the petitioner] conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts." *Id.* at 1129 (Alito, J., concurring). The *Ciminelli* Court thus drew a line between using deception to impinge on "intangible interests such as the right to control the use of one's assets," *id.* at 1125 (majority opinion), which cannot support a fraud prosecution, and fraudulently acquiring traditional property interests like money, which can, *see id.* at 1126. This case falls on the traditional-property side of that line. After all, the object of the conspirators' scheme was the State's money via Mailer Program agreements with the State and its legislators. *See Kelly*, 140 S. Ct. at 1573.[5]

---

[5] Cothren suggests that *Ciminelli* casts doubt on the federal programs bribery charges too. *See* Cothren Mem. 16–17. But aside from pointing to general policy concerns the case raised about the scope of federal fraud statutes, he does not explain how it affected the law with respect to federal programs bribery. *See id.* To the contrary, in *Kelly*, the Supreme Court distinguished between "a state or local official's fraudulent schemes . . . for obtaining money or property" and

29

The other cases Cothren relies on did not involve misrepresentations that affected the nature of the bargain—unlike the misrepresentations here. But before getting into those cases, one decision he cites clarifies when exactly that happens. The *Takhalov* court explained that one way "a defendant lies about the nature of the bargain" is when he "lie[s] about the characteristics of the good (*e.g.*, if he promises that a gemstone is a diamond when it is in fact a cubic zirconium)." 827 F.3d at 1313–14. Accordingly, a defendant would commit fraud if he "promised to give [a victim] a true dollar but gave her a fake one instead." *Id.* at 1313. And a bartender would defraud a patron if he "poured the man a glass of [the rare and expensive bourbon] Pappy Van Winkle but gave him a slug of [the much cheaper] Old Crow instead." *Id.* (footnotes omitted). These misrepresentations about a good's quality "go[] to the value of the bargain." *Id.* On the other hand, lies unrelated to the good's characteristics (or price) that nevertheless induce a transaction are not fraudulent because the victim still "received exactly what they paid for." *Id.* at 1313–14 (citation omitted). So a defendant would not commit fraud if he prompted a sale by falsely claiming "that he is the long-lost cousin of a prospective buyer." *Id.* at 1314. Nor would he defraud a neighbor if he dishonestly tells her that his child is ill to convince the neighbor to exchange her dollar for real quarters. *Id.* at 1313.

The misrepresentations in this case related to the quality and characteristics of Phoenix Solutions, Company 1, and Company 2. Although Casada and Individual 4 promised their colleagues that an experienced political consultant would perform the mailer work, or that

---

those that involve "bribes or kickbacks," 140 S. Ct. at 1572, indicating that the latter were unaffected by the Court's decision. Nothing in *Ciminelli*, which, as discussed above, exclusively addressed the right-to-control theory of money-or-property fraud offenses, called that distinction into question.

Company 1 and Company 2 would be performing it, a disgraced businessman with political baggage did, *see id.* ¶ 9. These "intangible" differences were important. *See Porat*, 2023 WL 5009238, at *5–6 (affirming wire fraud conviction when a defendant made misrepresentations to inflate a business school's ranking and generate more tuition income, even though the students still received an education). Even if Phoenix Solutions did produce mailers, the State and legislators that knowingly (and, some, unknowingly) hired the company took on significantly more risk than they anticipated. *See United States v. Riley*, 621 F.3d 312, 328 (3d Cir. 2010) (explaining that there was a deprivation of property when a scheme aimed "to get property into [the defendant's] control" as part of a city redevelopment project "when others more qualified . . . were waiting in line" because, "[w]hether or not the [city] actually lost money or experienced significant delay in the rehabilitation of the properties involved in [the defendant's] transactions, there was risk of that occurrence because of her lack of experience and privileged position" as the mayor's intimate partner). "Instead of serving . . . the promised Pappy Van Winkle, [Casada and Individual 4] poured Old Crow." *Sams*, 769 F. App'x at 773.

By contrast, the lies in the cases that Cothren cites were unrelated to the quality and characteristics of the good bargained for. The defendants in *Takhalov* would not have committed fraud if their only deceit was hiring women to induce men to buy drinks because the men got the drinks they paid for. *See* 827 F.3d at 1314–15. Similarly, the professor in *United States v. Hu* may have lied about his affiliation with a Chinese university, but he did not lie about his qualifications or the kind of research he provided to NASA. *See* No. 3:20-CR-21, 2021 WL 4130515, at *18 (E.D. Tenn. Sept. 9, 2021). And even though the salespeople in *United States v. Regent Office Supply Co.* made false claims to sell stationery, none of those claims exaggerated

31

the quality of the stationery they sold.  *See* 421 F.2d 1174, 1176–77, 1180 (2d Cir. 1970). Finally, the misrepresentations the defendants in *United States v. Jackson* made about their organization's charitable status had little to do with the so-called victims' willingness to let the defendants host bingo games and raffles on their behalf in exchange for "a portion of the proceeds they otherwise would not have received."  No. 3:16-CR-31, 2017 WL 1129941, at *9 (N.D. W. Va. Mar. 24, 2017).  The misrepresentations in all these cases were peripheral to whatever the bargain at issue was—they did not affect the quality of the good or service sold.

Here, the State and its legislators paid for something categorically different—and much less valuable—than what they bargained for.  Not only was Cothren a different person than the fictional Matthew Phoenix, but he also had less experience and came with greater political risk than the conspirators led their victims to believe.  *See Sams*, 769 F. App'x at 773; *Riley*, 621 F.3d at 328.

For these reasons, the Court should reject Cothren's loss-based challenge to Count 2.

> C.  <u>The Indictment adequately alleges that Casada and Individual 4 were agents of the State of Tennessee with corrupt intent.</u>

Cothren raises two attacks on the federal programs bribery charges (Counts 3–4).  Having already challenged the charges' monetary thresholds, *see* Part I.A, *supra*, his remaining attacks focus on the crime's substantive elements.  He first argues that Casada and Individual 4 were not acting as agents of the State when they promoted Phoenix Solutions but rather as private business owners.  *See* Cothren Mem. at 25–27.  He then says that Casada and Individual 4 did not corruptly solicit the mailer payments.  *See id.* at 27–28.  Neither argument is persuasive.[6]

_____

[6] As an initial matter, by focusing solely on Casada and Individual 4's conduct rather than his own, Cothren implicitly directs his attacks only to Count 3, which charges Casada—aided and abetted by Cothren and Individual 4—with corruptly accepting kickbacks in violation of

32

> i. The Indictment offers numerous allegations indicating that Casada and Individual 4 acted as agents of the State, and the Court must accept those allegations as true.

The Indictment specifically states that all the conspirators agreed that Casada and Individual 4 would "exploit[]" their "official positions as legislators" to effectuate the scheme. Indictment ¶ 18; *see also id.* ¶¶ 16, 26. It also offered numerous allegations that Casada and Individual 4 did in fact use the access and influence their official positions gave them to pressure other State officials to approve, hire, and pay Phoenix Solutions. *See* Indictment ¶¶ 23, 38–42, 46–49. Given the Court must accept these allegations as true and construe them liberally, *Lee*, 919 F.3d at 349, Cothren can hardly claim he lacks notice of the government's theory as to how Casada and Individual 4 acted as agents of Tennessee.

Cothren prematurely asks this Court to determine before trial that Casada and Individual 4 operated only in their personal capacities when promoting Phoenix Solutions. *See Lee*, 919 F.3d at 353–54 (chiding a defendant who challenged an indictment's honest services and Hobbs Act charges for "fail[ing] to address the fact that the standard for sufficiency of an indictment is not the same as that for a conviction"). Indeed, even the cases Cothren cites for support indicate that the agency issue is one of fact—both cases reversed convictions only after a review of the evidence

---

§ 666(a)(1)(B). *See* Indictment ¶ 65. Cothren does not dispute his own corrupt intent to give bribes to State agents to influence them in connection with State business, which forms the basis of Count 4's allegation that he violated § 666(a)(2). *See id.* ¶ 69. For the purposes of Count 4, it does not matter whether Casada and Individual 4 technically acted as State agents or private citizens when they promoted Phoenix Solutions. Either way, the Indictment alleges that Cothren promised them kickbacks with the intention that they would use their official positions to get Phoenix Solutions approved as a mailer vendor and to pressure their colleagues to hire him using State funds. *See id.* ¶¶ 16, 18, 20, 69. That corrupt intent to influence State business is all that § 666(a)(2) requires to charge an accused bribe payor like Cothren. *See United States v. Abbey*, 560 F.3d 513, 520–21 (6th Cir. 2009) (explaining that § 666 requires only the corrupt intent to influence official business, not a *quid pro quo* of something of value in exchange for a specific official act).

that came out at trial. *See United States v. Muntain*, 610 F.2d 964, 969–70 (D.C. Cir. 1979) (reversing gratuity and conspiracy convictions because the government offered "no persuasive evidence" at trial of a corrupt agreement nor of any connection between payments and a public official's government duties); *United States v. O'Keefe*, 825 F.2d 314, 320 (11th Cir. 1987) (reversing Hobbs Act extortion convictions because the government failed to meet its burden at trial of showing that a payment the defendants received was "in exchange for their votes on city matters"). Cothren can make his case that Casada and Individual 4 acted as mere private citizens to a jury.

      ii.    The Indictment alleged enough facts to support an inference that Casada and Individual 4 corruptly took kickbacks in exchange for using their official positions to further the conspirators' scheme.

Cothren's challenge to the Indictment's allegations of Casada and Individual 4's corrupt intent is likewise unpersuasive. He seizes on a definition of corrupt intent in the Sixth Circuit's *Hills* case, which states: "To corruptly solicit or accept anything of value means that it was done with intent to give some advantage inconsistent with official duty and the rights of others." 27 F.4th at 1182 (citation and internal quotation marks omitted). Cothren claims that the Indictment fails to allege any kind of "duty to the State" that Casada and Individual 4's intended to "subvert." *See* Cothren Mem. 27. That is not true, of course. The Indictment alleges that the legislators violated their "fiduciary duty to provide honest services to the State and its citizens." *See* Indictment ¶ 7. And *Hills* itself makes clear that a public official accepting bribes in exchange for giving somebody preferential treatment is "inconsistent with official duty and the right of others" even if the recipient of the preferential treatment was "worthy." *See* 27 F.4th at 1182 (explaining that public hospital employees' "[s]ubversion of the admission process for the residency program" through bribery satisfied the corrupt intent element).

34

More to the point, the *Hills* court's formulation of corrupt intent did not announce some new duty element that an indictment must allege to plead federal programs bribery. It merely reiterated in different terms the idea that corrupt intent involves the giving (or receiving) of a thing of value with the intent to influence (or be influenced in) the performance of official duties. *See Abbey*, 560 F.3d at 521 ("[T]he jury was only required to find . . . that [a public official] accepted property with the corrupt intent to use his official influence in [the bribe payor's] favor."); *see also United States v. Inman*, 39 F.4th 357, 368 (6th Cir. 2022) (explaining that the "key question" when assessing a § 666(a)(1)(B) violation is whether a "corrupt agreement" existed between the public official and the bribe-payor). All an indictment must do is supply enough allegations to "support[] an inference" of that kind of intent. *Lee*, 919 F.3d at 354. And this Indictment does that. It says that Casada and Individual 4 took shares of Phoenix Solutions' profits in exchange for pressuring their colleagues to approve the company as a vendor, hire it to perform mailing services, and pay its invoices. *See* Indictment ¶¶ 16, 18, 23, 26, 38–42, 46–49. Those allegations show corrupt intent.

## II.  The Indictment sufficiently alleges that the defendants committed honest services wire fraud.

The defendants next challenge the Indictment's honest services wire fraud counts. *See* Indictment ¶¶ 70–72 (Counts 5–10). The mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, make it a crime to use the mail or the wires for the purpose of executing "a scheme or artifice to defraud." In 1987, the Supreme Court held that those statutes cover only fraudulent schemes to deprive another of money or property, and therefore they do not cover honest services fraud. *McNally v. United States*, 483 U.S. 350 (1987) (superseded by statute). In response to that holding, Congress enacted 18 U.S.C. § 1346, which defines the term "scheme or artifice to

35

defraud" for purposes of the mail and wire fraud statutes to include "a scheme or artifice to deprive another of the intangible right of honest services." In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court confined the reach of § 1346 only to a "criminal defendant who participated in a bribery or kickback scheme." *Id.* at 413; *see United States v. Terry*, 707 F.3d 607, 611 (6th Cir. 2013). Furthermore, the government must prove that the bribe or kickback "was solicited in return of an 'official act.'" *Hills*, 27 F.4th at 1180 (citing *McDonnell v. United States*, 579 U.S. 550 (2016)).

The defendants claim that the honest services charges are deficient for several reasons. First, both defendants say that the Indictment insufficiently alleges that the conspirators' misrepresentations in furtherance of their scheme were material. Casada Mem. 15–17; Cothren Mem. 30–31. Second, Cothren repeats his argument that neither Casada nor Individual 4 acted as public officials because they promoted Phoenix Solutions in their personal capacities. *Id.* at 31. Third, both defendants assert that the Indictment fails to allege that Casada or Individual 4 committed an official act as part of the conspirators' scheme. *Id.* at 31–33; Casada Mem. 17–20. Fourth, Casada claims that *Ciminelli*, *supra*, which addressed money-or-property fraud, bears on the separate and distinct honest services theory of prosecution alleged in the Indictment. *Id.* at 20–22. Finally, Cothren argues that the honest services and wire fraud statutes are unconstitutionally vague. Cothren Mem. 34–35. Because the government already refuted Cothren's second argument above, *see* pp. 33–34, *supra*, it addresses only the defendants' four remaining arguments here. None of them have any merit.

A.  <u>The Indictment contains more than enough facts to support an inference that the conspirators made material misrepresentations.</u>

The defendants first claim that the Indictment inadequately alleges that the conspirators

36

made misrepresentations to the State and its legislators that were material. Casada Mem. 15–17; Cothren Mem. 30–31. They acknowledge that the Indictment asserts that the conspirators concealed Cothren's involvement and the kickback arrangement because they believed that neither the State nor the legislators would work with Phoenix Solutions otherwise. *See* Casada Mem. 16 (citing Indictment ¶¶ 21, 24). But the defendants take issue with the Indictment's wording. They say the Indictment falters because it does it "does not allege that any misrepresentation or omission was material to *the recipient* of the alleged misrepresentation or omission." *Id.* at 15; *see* Cothren Mem. 30. That rigid parsing of the Indictment's language cannot justify the dismissal of any charge against the defendants.

To commit wire fraud, a defendant's scheme to defraud must "include a material misrepresentation or concealment of a material fact." Sixth Circuit Pattern Jury Instructions (Criminal) § 10.02 (2023) (wire fraud instruction); *see also Neder v. United States*, 527 U.S. 1, 25 (1999). Because the material misrepresentation in a bribery or kickback scheme is so obvious, the Sixth Circuit has not described materiality as an element of honest services fraud. *See, e.g.*, *Hills*, 27 F.4th at 1184–85; *Dimora v. United States*, 973 F.3d 496, 500 & n.3 (6th Cir. 2020); *Lee*, 919 F.3d at 350; *Terry*, 707 F.3d at 611–12. Therefore, it is dubious that the government must offer proof of materiality beyond the fact that the defendant "participated in a bribery or kickback scheme," *Skilling*, 561 U.S. at 413, to sustain a § 1346 conviction.

Nevertheless, other circuits appear to hold that the honest services fraud statute "must be read against a backdrop of the mail and wire fraud statutes, thereby requiring fraudulent intent and a showing of materiality." *See United States v. Milovanovic*, 678 F.3d 713, 727 (9th Cir. 2012) (citation omitted) (collecting cases). Several district courts in the Sixth Circuit have reached the

37

same conclusion.  *See, e.g.*, *United States v. Beasley*, No. 12-20030, 2015 WL 1737478, at *3 (E.D. Mich. Apr. 16, 2015), *aff'd*, 700 F. App'x 394 (6th Cir. 2017).

Materiality depends on whether the misrepresentation "has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." *McAuliffe*, 490 F.3d at 531 (quoting *Neder*, 527 U.S. at 16).  Critically with respect to the defendants' motions, "an indictment is not fatally insufficient for its failure to allege [the materiality element] *in haec verba*."  *Id.* at 531–32.  In other words, the Indictment does not need to use the magic word "material" to describe a particular misrepresentation.  It is enough "if the facts alleged in the indictment warrant the inference of . . . materiality."  *Id.* at 532.  Above all at this stage of the proceedings, "[a]n indictment is to be construed liberally in favor of its sufficiency."  *Id.* at 531.

The Indictment here sets forth more than enough facts to support the inference that the misrepresentations the conspirators made were material.  As the defendants acknowledge, it asserts that the conspirators hatched their scheme because they believed that neither the State nor its legislators would work with Phoenix Solutions if they knew that Cothren was involved and that Casada and Individual 4 received a portion of the company's profits.  Indictment ¶¶ 21, 24.  The defendants minimize the significance of the conspirators' belief.  *See* Casada Mem. 16–17; Cothren Mem. 30.  But even the one case that Casada cites to support his position recognizes that a defendant's knowledge of the importance of a misrepresentation to the person who receives it bears on materiality.  *See Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) (explaining that materiality sometimes depends on whether a defendant "knew . . . that the recipient of the representation attaches importance to the specific matter" or "that for some special

38

reason [the representation] is likely to induce the particular recipient to manifest his assent" (alteration in original) (citations omitted)).

In any case, the Indictment alleges facts that substantiate the conspirators' expectations that the State and its legislators would want to know who ran and profited from Phoenix Solutions. It indicates that the State and its legislators did not want to do business with Cothren because he was mired in scandal. Just months before Phoenix Solutions came on the scene, Cothren resigned from his position as Casada's chief of staff when "multiple news forums published allegations that [he] had engaged in inappropriate conduct." *Id.* ¶ 9. The scandal engulfed Casada, too. He resigned his position as Speaker of the House having spent less than a year in the job "after allegations [about Cothren] became public." *Id.* ¶ 3. The fact that a recently disgraced political operative was behind Phoenix Solutions would undoubtedly have "a natural tendency to influence" the State and its legislators' decision to do business with the firm—especially in the sensitive arena of state politics.

In addition, the Indictment makes clear that the State and its legislators were concerned with potential conflicts of interest. It outlines the Tennessee House's ethics rules, which included prohibitions on "conduct that even appears to violate the trust the people have placed in them," "[a]ctions that destroy a representative's independence of judgment as a legislator," and [a]ctions that are a personal interest in conflict with the proper discharge of the representative's duties." *Id.* ¶ 8. The Indictment also relates a conversation in which Casada asked Cothren how they could "do[] [caucus] mail" even though the "caucus . . . won't spend money on members [sic] companies." *Id.* ¶ 34 (second alteration in original). Presumably for that reason, Individual 4 lied to caucus members and said that Individual 4 "did not make any money from Phoenix

Solutions." *Id.* ¶ 49. Individual 4 instead recommended the company to other legislators based on the falsehood that Matthew Phoenix was an experienced consultant who had performed good work in the past. *Id.* ¶¶ 46, 49. Casada repeated the same story. *Id.* ¶ 23. It takes no great leap to infer from these facts that the State and its legislators would have found it significant that Casada and Individual 4's recommendations were based not on actual experience with Phoenix Solutions but rather financial self-interest.

Reading the Indictment as a whole and construing it in favor of sufficiency, there is little question it alleges enough facts to infer that the coconspirators made misrepresentations that tended to influence others' decisionmaking. The defendants' argument does not grapple with the more flexible standard the Sixth Circuit has set for determining whether an indictment sufficiently alleges materiality. *See McAuliffe*, 490 F.3d at 532 ("[A]n indictment is not fatally insufficient for its failure to allege [materiality] *in haec verba*, if the facts alleged in the indictment warrant the inference of . . . materiality . . . ."). This Court should reject their materiality claim.

B.    The Indictment sufficiently alleges official acts.

The defendants next assert that the Indictment falls short in articulating what official acts underpin the honest services fraud charges. Casada Mem. 17–20; Cothren Mem. 31–33. The Indictment alleges multiple official acts. It says that Casada and Individual 4 "pressure[ed] the Tennessee House Speaker's Office and other State officials to approve Phoenix Solutions as a Mailer Program vendor and to disburse funds to Phoenix Solutions, Company 1, and Company 2;" "advis[ed] and pressure[ed] other members of the Tennessee House of Representatives to use Phoenix Solutions, Company 1, and Company 2 as their Mailer Program vendor and to disburse State funds to" those companies; and "cho[se] to use Phoenix Solutions, Company 1, and Company 2" to perform their own mailer work. Indictment ¶ 26. The defendants acknowledge that the

40

Indictment alleges these as official acts, but claim that the actions were not "formal" or "significant" enough to be official. *See* Cothren Mem. 32; Casada Mem. 18–19. They are wrong.

An official act is "any 'decision or action' on any 'question, matter, cause, suit, proceeding or controversy' pending before a public official." *Dimora v. United States*, 973 F.3d 496, 502 (6th Cir. 2020) (quoting 18 U.S.C. § 201). To prove an official act, the government must make two showings. *McDonnell v. United States*, 579 U.S. 550, 567 (2016). It first needs to "identify a question, matter, cause, suit, proceeding or controversy that may at any time be pending or may by law be brought before a public official." *Id.* (internal quotation marks omitted). A matter is "something specific and focused" that "involve[s] a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 574. "Pending" means that the matter is discrete in the sense that it "can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 570. Second, the government "must prove that the public official made a decision or took an action 'on' that" matter. *Id.* at 567. Importantly, a public official can take such an action by "using his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.* at 574. Consequently, "[s]etting up a meeting, talking to another official, or organizing an event" by themselves do not constitute official acts. *Id.* By contrast, "initiat[ing]" a state study, "allocat[ing] grant money," and deciding that a state health plan will cover a certain drug are official acts. *Id.* at 570–71.

The actions alleged in the Indictment meet the definition of "official act." Whether to

41

approve a vendor to perform state work, whether to contract with a vendor to perform state work, and whether to disburse state funds to a vendor each qualify as matters pending before State officials. Each matter is specific enough to "be put on an agenda, tracked for progress, and then checked off as complete." *See Hills*, 27 F.4th at 1179 (describing as official acts decisions regarding flex-time schedules, adjustments to incentive bonuses, and an increase in the number of dental residents in the dental department of a public hospital). And each matter involves the exercise of the State's power. Hiring a contractor to perform State work and dispensing State funds to pay the contractor are "not only akin to . . . agency determination[s]—[they are] agency determination[s]." *See United States v. Repak*, 852 F.3d 230, 253 (3d Cir. 2017) ("[A] decision by . . . a governmental agency[] to award money to contractors . . . is undoubtedly the 'formal exercise of governmental power.'"); *see also McDonnell*, 579 U.S. at 570–71 (describing the decision to "allocate grant money" as one "involv[ing] a formal exercise of governmental power").

The same logic applies to approving Phoenix Solutions as a Mailer Program vendor. The Indictment indicates that the General Assembly's Office of Legislative Administration managed the approval process for mailer invoices and managed disbursements, with ultimate authority to approve or deny a vendor residing with the Speaker. *See* Indictment ¶¶ 12–13. A decision on such "qualifying" or "narrowing" steps are just as much official acts as the ultimate decision. *See McDonnell*, 579 U.S. at 572 ("A decision or action to initiate a research study—or a decision or action on a qualifying step, such as narrowing down the list of potential research topics—would qualify as an 'official act.'"). The Indictment also repeatedly alleges that Casada and Individual 4 used their positions as legislators to pressure other officials to take actions on those matters. *See, e.g.*, Indictment ¶¶ 18, 26, 38–42, 46, 48. Indeed, the defendants do not dispute the

42

Indictment's sufficiency as to this second official act requirement—that a public official took action on a matter.  They focus on whether the Indictment alleges a matter at all.  *See* Casada Mem. 18 (admitting that "pressuring another public official is sufficient" so long as "the pressure . . . [is] for the purpose of inducing another public official to make an 'official act'" that "ha[s] bearing on some issue where there is dispute or formal action"); Cothren Mem. 32–33 (arguing that the "selection and use of a [vendor] for routine, optional constituent mailers" does not qualify as an "official act" and that "another public official or individual's advice or 'pressure' applied in the context of such decision-making cannot convert these administrative actions into 'official' ones").

The defendants' challenges are unsupported by law.  With barely a citation to the Supreme Court's general definition of "official act," they variously fault the Indictment for not describing the Speaker's vendor-approval process enough to establish its formality, Casada Mem. 19, for not detailing why hiring a company to perform mailer work is an official act, *id.* at 19–20, and for improperly alleging merely "administrative and ministerial task[s]" as official acts, *id.* at 20; Cothren Mem. 32–33.  To the extent that Casada takes issue with the level of detail the Indictment provides, he "fails to address the fact that the standard for sufficiency of an indictment is not the same as that for a conviction."  *See Lee*, 919 F.3d at 353.  Reading the Indictment as a whole and construing its "allegations in a practical sense with all the necessary implications," it fairly informs the defendants of the charges against them and does so in specific enough terms that they could claim double jeopardy in a later prosecution if necessary.  *See McAuliffe*, 490 F.3d at 531.

With respect to the defendants' suggestion that a "ministerial" or "administrative" act cannot constitute an official act, they cite no authority for that incorrect proposition.  *See* Casada

43

Mem. 17–20; Cothren Mem. 31–33; *see also Hills*, 27 F.4th at 1179 (rejecting the argument that decisions regarding flex-time schedules, adjustments to incentive bonuses, and the number of dental residents at a public hospital were not official acts and remarking that the defendants had not "offered any authority establishing that such decisions or actions would not be an exercise of governmental power on a 'question, matter, cause, suit, proceeding or controversy'" (citation omitted)).   The defendants mistake the actual requirement that there be a "formal exercise of governmental power" for a nonexistent requirement that there be some kind of formal governmental proceeding.   That is not the law.   *See United States v. Henderson*, 2 F.4th 593, 600 (6th Cir. 2021) (Rogers, J., concurring) (cautioning that the court's decision "should not be construed as always requiring something like a potential hearing").   After all, the federal corruption statutes cover the conduct of even government officials who may never "be involved in proceedings that are analogous to formal lawsuits, agency determinations, or hearing committees."  *Id.*

Cothren makes several improper attempts to bolster his argument.   He first looks to the Mailer Program policy documents that he attaches to his motion to take issue with the Indictment's characterization of the mailer vendor approval process.   Cothren Mem. 32.   But once again, Cothren "fails to address the fact that the standard for sufficiency of an indictment is not the same as that for a conviction."   *See Lee*, 919 F.3d at 353.   At this stage, it is the Indictment's factual allegations that control.   *See id.* at 353–54.

Cothren also likens this case to cases in which public and private officials simply failed to disclose conflicts of interest.   *See* Cothren Mem. 33 (citing *Skilling*, 561 U.S. at 410; *United States v. Ford*, 639 F.3d 718, 723 (6th Cir. 2011)).   The public's right to honest services does not extend

44

to a public official who takes official action that "furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a financial duty." *Skilling*, 561 U.S. at 410–11. But Cothren's comparison is inapt. This case involves "no mere failure to disclose a conflict of interest" but instead constitutes "a classic kickback scheme." *See id.* at 410. In exchange for Casada and Individual 4's help promoting Phoenix Solutions, Cothren returned to them a portion of any State mailer business they sent his way—including proceeds from their own mailer business. *See* Indictment ¶¶ 18–20, 26, 43–45, 53–57. Their concerted efforts to generate kickback payments from the State "went far beyond undisclosed self-dealing." *See United States v. Silver*, 864 F.3d 102, 114 & n.50 (2d Cir. 2017) (explaining that the kickback scheme at issue was not undisclosed self-dealing because the public official's colluded with others to obtain "side payments" from third parties (citation omitted)); *see also Skilling*, 561 U.S. at 410 (distinguishing a kickback scheme from a "mere failure to disclose a conflict interest" on the basis that "the official conspired with a third party so that both would profit from wealth generated by public contracts"). The conspirators' scheme thus falls squarely in the heartland of honest services fraud.

The Indictment alleges that Casada and Individual 4 advised and pressured other State officials: to approve Phoenix Solutions as a mailer vendor; to hire Phoenix Solutions, Company 1, and Company 2 to perform mailer work for the State; and then to disburse State funds to those companies. It also alleges that Casada and Individual 4 hired Phoenix Solutions, Company 1, and Company 2 for their own mailer needs. These actions are quintessential uses of governmental power. They were official acts.

      C.    <u>Casada is incorrect that a recent Supreme Court case addressing money or property wire fraud applies to this honest services fraud prosecution.</u>

Casada grounds his last attack on the Indictment's honest services fraud charges in a recent

Supreme Court decision: *Ciminelli v. United States*, *supra*.   In that case, the question presented was whether the "right to control" theory of fraud could sustain a conviction under the federal wire fraud statute, 18 U.S.C. § 1343.   *Id.* at 1126.   As already described above, the right-to-control theory posited that a defendant could commit money or property wire fraud by "schem[ing] to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions."   *Id.* at 1124 (internal quotation marks and citation omitted).   Reasoning that "the wire fraud statute reaches only traditional property interests" like those in money or property and that "[t]he right to valuable economic information needed to make discretionary economic decisions" was not such an interest, the Court determined that the right-to-control theory did not provide "a valid basis for liability under" § 1343.   *Id.* at 1126.

Casada mistakenly claims that *Ciminelli* applies to his case.   He says the thrust of the Indictment—that the conspirators defrauded the state and its legislators by concealing information about Phoenix Solutions—boils down to the premise that the conspirators "deprived [the state and its legislators] of information necessary to make discretionary economic decisions."   Casada Mem. 20.   Because "[t]he present prosecution travels under the now debunked 'right to control' theory," Casada concludes, it "must . . . be dismissed."   *Id.* at 22.

Casada ignores that the Indictment against him alleges that he and his coconspirators committed honest services fraud, in violation of § 1346, not traditional money or property fraud. The Indictment accuses the conspirators of depriving their victims not of "valuable economic information," but rather the honest services that Casada and Individual 4 owed as public officials. *See* Indictment ¶¶ 16, 71.   As Congress clearly established by creating § 1346 and superseding the Supreme Court's decision in *McNally*, the entire point of the honest services fraud statute is to

46

criminalize corruption in which "the betrayed party suffered no deprivation of money or property." *Skilling*, 561 U.S. at 400. In fact, the *Ciminelli* Court explicitly stated that its reasoning did not extend to deprivations of "the intangible right of honest services" because Congress had explicitly proscribed them. *See* 143 S. Ct. at 1128 (citation omitted). For these reasons, *Ciminelli* has no bearing on the Indictment in this case.

> D. <u>The honest services fraud statute is not unconstitutionally vague as applied to the conspirators' kickback scheme.</u>

In a final effort to head off honest services fraud liability, Cothren declares that the honest services fraud statute is unconstitutionally vague. *See* Cothren Mem. 34–35. Ironically, the same case he cites to outline the test for vagueness affirmed that the honest services fraud statute is not vague as applied to bribery and kickback schemes—like the one the Indictment alleges here. *See Skilling*, 561 U.S. at 412 ("Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague.").

Without trying to distinguish that holding, Cothren's essentially reiterates his complaint that the official acts the Indictment alleges are too informal—and thus too vague—to count as the *quo* in a *quid pro quo* bribery or kickback scheme. *See* Cothren Mem. 34–35. As already explained, however, the conspirators' efforts to promote and profit from Phoenix Solutions fit solidly within the definition of "official act." *See* Part II.B, *supra*.

> **III. The Indictment sufficiently alleges the elements of conspiracy, none of which include successfully committing the related substantive offense.**

The defendants argue that the conspiracy charge (Count 1) falls along with the federal programs theft, federal programs bribery, and honest services wire fraud charges. Cothren Mem. 35–36; Casada Mem. 22–24. Cothren appears to claim that no conspiracy charge can stand if what he, Casada, and Individual 4 agreed to was not a crime. That is true. The first element of

47

conspiracy is that two or more people agreed to commit a crime.  *See* Sixth Circuit Pattern Jury Instructions (Criminal) § 3.01A; *Hills*, 27 F.4th at 1180.  In that sense, the validity of the conspiracy charge may depend on how the Court adjudicates Cothren and Casada's attacks on the underlying charges.

But if Cothren, like Casada, is arguing that "[i]t is elemental that to allege a criminal conspiracy to commit a specific crime, the Government must adequately allege the crime," Casada Mem. 23, that proposition directly contradicts the law.  The elements of conspiracy to commit an offense are that: (1) two are more people agreed to commit an offense; (2) the defendant knowingly and voluntarily joined that agreement; and (3) a member of the conspiracy performed one of the overt acts alleged in the indictment with the purpose of advancing the conspiracy.  Sixth Circuit Pattern Jury Instructions (Criminal) § 3.01A (2023); *Hills*, 27 F.4th at 1180.  Nowhere in those elements is a requirement that anyone committed the agreed-upon offense.  "[T]he commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Pinkerton v. United States*, 328 U.S. 640, 643 (1946).  And because "[t]he gist of the crime of conspiracy is the agreement to commit an illegal act, not the accomplishment of the illegal act," "conspiracy does not require proof that the object of the conspiracy of the conspiracy was achieved."  Sixth Circuit Pattern Jury Instructions (Criminal) § 3.01A cmt. (quoting *United States v. Fruehauf Corp.*, 577 F.2d 1038, 1071 (6th Cir. 1978)); *see also United States v. Myers*, 854 F.3d 341, 355 (6th Cir. 2017) ("Conspiracy requires an agreement, while the substantive crime does not; the substantive crime requires completion, while conspiracy does not.").[7]

---

[7] In his motion (Mem. 23–24), Casada misreads *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173 (6th Cir. 1992), which cogently explained: "[I]t is well settled that an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not

48

Assuming what Casada, Cothren, and Individual 4 agreed to was a crime, the Indictment sufficiently alleges conspiracy's other two elements. The Indictment accuses Casada, Cothren, and Individual 4 of "knowingly conspir[ing] and agree[ing] with each other" to commit federal programs theft, federal programs bribery, and honest services fraud. Indictment ¶ 16. It then outlines a variety of overt acts that the conspirators performed to further their scheme, such as creating Phoenix Solutions along with Matthew Phoenix's fake persona, *id.* ¶¶ 28–34; submitting invoices to the State for mailer work and transacting with the proceeds, *id.* ¶¶ 35–36, 43–45, 51–57; and making misrepresentations to and exerting pressure on State officials, *id.* ¶¶ 37–42, 46–50. These allegations are enough to support the Indictment's conspiracy charge.

### IV. The Indictment sufficiently alleges that Casada and his coconspirators used the fake Matthew Phoenix persona to further their unlawful scheme.

The defendants next take aim at the allegation in Count 11 that Casada aided and abetted Cothren's use of a fictitious name to commit a fraud in violation of 18 U.S.C. § 1342. As relevant here, § 1342 makes it a crime to "use[] or assume[] . . . any fictitious, false, or assumed title, name, or address or name other than [one's] own proper name" if done "for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in [the mail fraud statute] or any other unlawful business." Casada complains that the Indictment falls

---

necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *Id.* at 176 (quoting *United States v. Reynolds*, 762 F.2d 489, 494 (6th Cir. 1985)). *Superior Growers* does not suggest that a conspiracy indictment must allege the substantive offense if, when reading the indictment, the substantive offense charges somehow loom larger than the conspiracy charge. *See id.* On the contrary, that case—and the cases it cites—simply reiterate in the context of evaluating an indictment that the core of conspiracy is an agreement to commit a crime, not whether someone actually committed the crime. *See Reynolds*, 762 F.2d at 494–95 (explaining, while rejecting a challenge to an indictment alleging both mail fraud and conspiracy charges, that the conspiracy charge did not have to allege the mailing element of mail fraud because it was "not an element of the crime of conspiracy").

49

short of alleging that crime for two unpersuasive reasons.

First, Casada argues that the Indictment does not allege that the operation of Phoenix Solutions was unlawful. *See* Casada Mem. 24. This argument seizes on a misreading of the Indictment's accusation that Cothren, aided and abetted by Casada, adopted a false name "for the purpose of conducting, promoting and carrying on by means of the United States Postal Service an unlawful business, that is, the fraudulent operation of Phoenix Solutions." *See id.* (quoting Indictment ¶ 74). Casada appears to read the word "business" in § 1342 and the Indictment as referring to a particular company and its operations, meaning that the government must show that the company's operations were somehow unlawful.

Read fairly in context, however, the word describes not a specific "commercial enterprise carried on for profit," but rather "transactions or matters" in a "collective" sense. *See Business*, *Black's Law Dictionary* (11th ed. 2019). To be more specific, § 1342's placement of the phrase "any other unlawful business" opposite "any scheme or device mentioned in [the mail fraud statute]" indicates that phrase is meant to encompass the use of a false name not only in furtherance of mail fraud, but also any other crime. *See United States v. Odutayo*, 406 F.3d 386, 393 (5th Cir. 2005) (recognizing that § 1342 prohibits a broader range of conduct than the mail fraud statute because it extends to the use of a false name to promote "any other unlawful business," which may not involve fraud); *cf. United States v. White*, 543 F. App'x 563, 565 (6th Cir. 2013) (unpublished) (affirming, without analysis, convictions under § 1342 alongside convictions for conspiracy to defraud the United States, wire fraud, and bank fraud).

Therefore, the government need not prove that Phoenix Solutions operated unlawfully—only that the defendants used a false name to conduct some unlawful business. And here, the

50

Indictment alleges that the conspirators created the Matthew Phoenix persona to facilitate federal programs theft and bribery, honest services wire fraud, and money laundering. *See* Indictment ¶¶ 23, 28, 33, 37, 46–48. Its reference to "the fraudulent operation of Phoenix Solutions" merely alludes to the company's central role in the conspirators' fraudulent scheme. *See id.* ¶ 74. To nitpick the Indictment's language, as Casada invites the Court to do, is hardly reading it "liberally in favor of its sufficiency." *See Lee*, 919 F.3d at 349 (citation omitted).

Second, Casada gripes that the Indictment does not support its allegation that he aided and abetted Cothren's use of a fictitious name to conduct unlawful business. *See* Casada Mem. 24. As an initial matter, the Indictment did not need to allege aiding and abetting at all. Because aiding and abetting is "merely a theory of liability, and not an offense distinct in and of itself," there is no requirement that an indictment give a defendant notice of it. *See United States v. Taniguchi*, 49 F. App'x 506, 520–21 (6th Cir. 2002) (unpublished) (rejecting the argument that an indictment did not give the defendant "notice of potential aiding and abetting liability" when the indictment "did not include the statutory language of 18 U.S.C. § 2" but "did cite to the statute following each charge"); *see also United States v. McGee*, 529 F.3d 691, 695 (6th Cir. 2008) (approving a jury instruction on aiding and abetting liability even though the indictment "not only lacked language referring to aiding and abetting, but also failed to cite 18 U.S.C. § 2"). In any case, the Indictment did allege enough facts to show that Casada "helped to commit the crime" and "intended" to do so. *See* Sixth Circuit Pattern Jury Instructions (Criminal) § 4.01 (aiding and abetting). It accuses Casada of providing State officials and vendors with Cothren's false name so they would do business with Phoenix Solutions. *See* Indictment ¶¶ 23–24, 34, 50. Casada has pointed to no flaw in the Indictment's allegation that his conduct violated § 1342.

51

Cothren's argument addressing Count 11 is like his attack on the conspiracy charge. He says that Count 11, which charges him with using a fictitious name to commit a fraud in violation of 18 U.S.C. § 1342, should fall if the Court decides that the deceptive scheme alleged in the Indictment was not unlawful. Cothren Mem. 36. That is right. As relevant here, § 1342 makes it a crime to "use[] or assume[] . . . any fictitious, false, or assumed title, name, or address or name other than [one's] own proper name" if done "for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in [the mail fraud statute] or any other unlawful business." Cothren can commit that crime only if the scheme described in the Indictment amounted to some kind of "unlawful business." However, as described above in response to Casada's § 1342 claims, that is exactly what the Indictment alleges.

### V. The Indictment correctly alleges that both federal programs bribery and honest services wire fraud are specified unlawful activities that can support money laundering charges.

Lastly, Casada makes two arguments related to the Indictment's money laundering charges. Casada Mem. 26. Both arguments focus on the element common to each money laundering charge, that the laundering transaction related to "specified unlawful activity." *See* 18 U.S.C. §§ 1956(a)(1)(B)(i), 1957(a). Neither has merit.

Casada first argues that the Indictment errs in alleging honest services wire fraud as a specified unlawful activity that can support money laundering charges. Casada Mem. 26. But "specified unlawful activity" includes offenses listed in 18 U.S.C. § 1961(1). 18 U.S.C. § 1956(c)(7)(A). And that provision names the wire fraud statute that forms the basis of the honest services wire fraud charges against Casada and Cothren. *Compare id.* § 1961(1) (referencing 18 U.S.C. § 1343), *with* Indictment ¶¶ 79, 81 (alleging that the "specified unlawful activity" includes violations of 18 U.S.C. § 1343 along with the honest services fraud statute).

52

Casada's first argument is therefore misplaced.

Second, Casada asserts that the Court should dismiss the money laundering counts because the Indictment insufficiently alleged the specified unlawful activities they are predicated on—the federal program bribery and honest services wire fraud charges. Casada Mem. 26. As argued above at length in Parts I and II, *supra*, the Indictment adequately states those charges. They form valid bases for the Indictment's money laundering counts.

Cothren, for his part, points out that the money laundering charges—Counts 12 through 20—depend on the viability of the federal programs fraud, federal programs bribery, and honest services wire fraud charges. Cothren Mem. 36–37. As with his conspiracy argument, he is again correct. An element common to all the money laundering charges is that the relevant laundering transaction be related to "specified unlawful activity." *See* 18 U.S.C. §§ 1956(a)(1)(B)(i), 1957(a). Consequently, the government must prove that activity—which, here, consists of the federal programs and honest services wire fraud offenses, *see id.* § 1956(c)(7)(D); *id.* §§ 1956(c)(7)(A), 1961(1)—to prove the money laundering charges. *See* Sixth Circuit Pattern Jury Instructions (Criminal) §§ 11.02, 11.06.

As argued above at length in Parts I and II, *supra*, the Indictment adequately accuses the defendants of committing federal programs theft, federal programs bribery, and honest services wire fraud. Those crimes form valid bases for the Indictment's money laundering charges.

## CONCLUSION

For the foregoing reasons, the Court should deny Casada and Cothren's motions to dismiss.

Respectfully submitted,

THOMAS JAWORSKI
Attorney for the United States
Middle District of Tennessee
Acting Under Authority Conferred
By 28 U.S.C. § 515

By:

    /s/ Amanda J. Klopf
AMANDA J. KLOPF
Assistant U.S. Attorney
110 Ninth Avenue South, Suite A-961
Nashville, TN 37203
(615) 736-5151
Email: amanda.klopf@usdoj.gov

COREY R. AMUNDSON
Chief
Public Integrity Section

By:

    /s/ John P. Taddei
JOHN P. TADDEI
Trial Attorney
1301 New York Ave. NW
Washington, DC 20530
(202) 514-3885
Email: john.taddei@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing response was electronically filed with the Clerk on August 18, 2023, and service was made upon all persons registered in that case via CM/ECF and/or by email.

/s/ John P. Taddei
JOHN P. TADDEI
Trial Attorney