## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:22-cr-00282** |
| | ) | **JUDGE RICHARDSON** |
| | ) | |
| **GLEN CASADA and** | ) | |
| **CADE COTHREN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### GLEN CASADA'S MOTION FOR NEW TRIAL AND MEMORANDUM IN SUPPORT PURSUANT TO FED.R.CRIM.P. 33(a)

Pursuant to D.E. 364, Glen Casada submits his Motion for a New Trial via Fed.R.Crim.P. 33(a) and incorporated Memorandum in Support, as outlined below. Specifically, Mr. Casada requests that the Court Grant his Rule 29 motion made at the conclusion of both the Government's case-in-chief and the Defendants' case-in-chief,[1] but in the event that the Court declines to do so, Mr. Casada requests a New Trial pursuant to Fed.R.Crim.P. 33(a).

### PROCEDURAL BACKGROUND

On August 22, 2022, the Grand Jury for the Middle District of Tennessee returned the above referenced Indictment. (D.E. 3). Jury trial began on April 22, 2025 (D.E. 323) and lasted four (4) weeks. The jury returned its verdict on May 16, 2025 (D.E. 344, 350), finding Mr. Casada Guilty as follows: Conspiracy to commit multiple offenses in violation of 18 U.S.C. §371 (Count 1),

---

[1] Mr. Casada is simultaneously filing his statement of intent to maintain his previously raised general Rule 29 motions for acquittal. Nothing in this Memorandum shall nor is intended to modify Mr. Casada's general Rule 29 motions or waive any arguments previously preserved.

Violations of 18 U.S.C. §666 (Counts 2-4), Violations of 18 USC 1343 and 1346 (Counts 6-9), Violation of 18 USC 1342 (Count 11), and Money Laundering conspiracy and substantive offenses in violation of 18 U.S.C. §1956 and 1957 (Counts 12-19) (D.E. 350). Mr. Casada was found Not Guilty of two (2) counts of Honest Services Fraud – counts 5 and 10 (D.E. 350). The Government dismissed Count 20 of the Indictment on its own Motion. (D.E. 333).

On May 30, 2025, the Court granted Mr. Casada's timely Amended Motion to Extend Deadlines to File Motions Pursuant to Fed. R. Crim. P. 29 and 33, rescheduling the deadline for Mr. Casada to make his Fed.R.Crim.P. 29 filing and his Fed.R.Crim.P. 33 filing to June 30, 2025 (D.E. 364).[2]

## **LEGAL STANDARD**

Fed. R. Crim. P. 33(a) provides in pertinent part: Upon the defendant's motion, the court may vacate any judgment and grant a new trial "if the interest of justice so requires." Rule 33 "does not define 'interest[ ] of justice' and the courts have had little success in trying to generalize its meaning." *United States v. Munoz*, 605 F.3d 359, 373–74 (6th Cir. 2010). Nonetheless, from the body of Rule 33 case law, several recurring themes emerge. *United States v. Munoz*, 605 F.3d 359, 373–74 (6th Cir. 2010). The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that "the [jury's] verdict was against the manifest weight of the evidence." *United States v. Crumb,* 187 Fed.Appx 532, 536 (6th Cir.2006). Furthermore, it is widely agreed that Rule 33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred. *United States v. Munoz*, 605 F.3d 359, 373–74 (6th Cir. 2010). When weighing the

---

[2] On June 27, 2025, this Court granted Mr. Cothren's Motion to Extend Deadline to file Motion for New Trial, extending the deadline for him to file his Motion for New Trial to July 7, 2025. (D.E. 368). To the extent that Mr. Cothren raises issues in his Motion for New Trial that are jointly applicable to Mr. Casada, Mr. Casada requests leave to join Mr. Cothren's Motion for New Trial.

evidence as to each element of the crimes against Mr. Casada, this Court will determine that most

Counts require a new trial.

## ANALYSIS[3]

### I.     MANIFEST WEIGHT OF THE EVIDENCE[4]

Under the "manifest weight of the evidence" standard, the movant brings challenges to the

weight of the evidence to the trial judge. This standard is broader than the review of a Rule 29

motion for acquittal, which challenges the *sufficiency* of the evidence, requiring the court to

examine the evidence "from a standpoint most favorable to the government," seeking to determine

if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt. *United States v. Dimora*, No. 1:10CR387, 2012 WL 2872144, at *2 (N.D. Ohio July 12,

2012). Contrastingly, a movant seeking a new trial under the manifest weight standard invites the

court to embody the role of the thirteenth juror and weigh the evidence and consider the credibility

of witnesses "to ensure that there was no miscarriage of justice." *United States v. Lewis*, 850 F.

Supp. 2d 709, 714 (N.D. Ohio 2012)). "If the complete record, testimonial and physical, leaves a

strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment

of acquittal, the district judge may be obliged to grant a new trial. *United States v. Lewis*, 850 F.

Supp. 2d 709, 714 (N.D. Ohio 2012), aff'd, 521 F. App'x 530 (6th Cir. 2013).

---

[3] The official trial transcripts have not been prepared as of this filing.  Instead, undersigned counsel relies on his "good faith belief as to what particular testimony is" regarding any factual assertions. (D.E. 364).

[4] Mr. Casada argues that the manifest weight of the evidence does not meet the legal standards set forth in the final jury instructions, which were determined by the Court after lengthy argument by the parties. In doing so, Mr. Casada is *not* agreeing that legal standards in the final jury instructions and argued herein are proper but instead preserves his arguments and challenges to the instructions and other legal issues as previously raised.

3

### A. **Count 2 – Obtaining Property by Fraud (18 USC §666(a)(1)(A))**

Count 2 of the Indictment charged Mr. Casada with obtaining federal money by fraud in violation of 18 U.S.C. § 666(a)(1)(A). To sustain a conviction on this Count, the Government must establish proof in the record that Mr. Casada was (1) an agent of the State of Tennessee who (2) obtained money worth at least $5,000 by fraud.[5] 18 U.S.C. § 666(a)(1)(A). The Government failed to elicit proof beyond a reasonable doubt as to key components of each of these elements.

#### (1) Agent of the State of Tennessee

In the context of Section 666, "agent" means "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d). The Government's proof at trial was simply that Mr. Casada was an elected "State Representative," so therefore he falls within the definition of "representative" as included in 666(d). However, Congress's mere use of the term "representative" in the statutory definition is not alone determinative because the term itself requires analysis of another who is being represented. For a "representative," the agency relationship, and who the agent can act on behalf of, is established by *who they represent*. The Government did not establish that Mr. Casada represented the State of Tennessee.

It is undisputed that Tennessee's State Representatives are part-time legislators who were in session approximately 90 days per year. While these part-time legislators are commonly known

---

[5] The Parties stipulated to the additional elements that the State of Tennessee received federal benefits in excess of $10,000 in each of the years of the offenses such that they are not at issue in this Motion.

as a "State Representative" in the general sense, they are representatives *at* the State level *for* the districts that elected them. Part-time Tennessee legislators "*represent*" those they have an agency relationship with to act on behalf of—their constituents who elect these officials to "represent" them at the State level. Ms. Helton testified that her job was representing District 30 *in* the House of Representatives. Ms. Reedy similarly testified that he represented District 74, and those people voted for him *to go to* the House of Representatives to vote on things, including amending and repealing state laws. Ms. Smith even testified that legislators were representatives *for* their district. Part-time officials elected to advance the interests of their constituents are not "representatives" *of* the State of Tennessee with an agency relationship that gives them alone the authority to act on behalf of the State. To say that a single part-time state legislator is a representative of the State (to whom they advocate *to*), rather than those who they advocate *on behalf of* is contrary to the foundational principle of a representative democracy.

When the General Assembly achieves the required number of votes to take action, it, *as a whole*, acts on behalf of the State of Tennessee, but no representative has the authority to do that alone. The part-time legislators who testified noted their roles of voting on budgets, people, rules, and bills. In doing so, those actions were taken as by each individual legislator as a "representative" acting on behalf of, and with the authority of, their district. Often times, state legislators seek to amend State statutes, the Tennessee State Constitution, or other State rules or regulations, and in such contexts, they are individually *adverse* to the State in advancing an interest on behalf of their district. Each time a legislator presses "vote" at the House of Representatives, they act with agency from their constituents, not the State. It is only when the legislators act together to reach a required threshold that action is actually taken "on behalf of the State of Tennessee." The Government did

not introduce proof that Mr. Casada, a single Tennessee State Representative, was a state "employee" or a "representative" who had the authority to act on behalf the State of Tennessee.

### (2) Obtained by Fraud through Materiality

To prove a violation of Section 666(a), the prosecution must have established beyond a reasonable doubt that Mr. Casada obtained the State's money by fraud. The parties' contested the standard for how to instruct the jury of the standard to "obtain by fraud" until the Court decided, while preserving objections that this element could be proven if the prosecution established that Defendant Casada either: (1) made a false representation of a material fact: (a) knowing it to be false; (b) to someone one who did not know that it was false; (c) with intent to deceive such person and to influence such person to take some action; and (d) that actually deceives such person and influences such person to take such action to the damage of such person or some other individual or entity (including a government) or (2) by concealing a material fact (a) by intentionally and successfully creating or continuing, in the mind of some other person, a false impression as to that fact or the non-existence of that fact; (b) with the intent to deceive such other person and to influence such person to take some action; and (c) and thereby actually deceiving such person and influence him to take such action to the damage of such person or some other individual or entity (including a government). Both avenues require the presence of a *material fact*, which the prosecution did not establish beyond a reasonable doubt.

The government cannot sustain a conviction for federal fraud based on fraudulent inducement without proving materiality beyond a reasonable doubt. *Kousisis v. United States*, 145 S. Ct. 1382, 1396 (2025). The jury instructions did not define materiality. The Sixth Circuit defines a misrepresentation or concealment as "material" if it at least "has a natural tendency to influence or is capable of influencing the decision of a person of ordinary prudence and comprehension."

6th Cir. PJI 10.01(2). This is an objective standard. *United States v. Petlechkov*, 922 F.3d 762, 766 (6th Cir. 2019). The Defendants proposed defining materiality under the "essence of the bargain" standard, which raises the standard for materiality to only criminalize misrepresentations and concealments that "go to the very essence of the bargain at issue." (D.E. 295, PageID 2154, 2202); *Kousisis v. United States*, 145 S. Ct. at 1396 (Sotomayor, J, concurring). This standard was argued by the Defendants in this case and adopted by the Department of Justice in its briefing in *Kousisis*. *See Kousisis*, 145 S.Ct. at 1396, 1400 (Thomas, J., concurring), 1413 (Sotomayor, J., concurring) (noting "[c]counterintuitively" that the government advocated "for a more demanding standard" where "misstatements are material only if they go to the very 'essence of the bargain' at issue.").

The manifest weight of the evidence preponderates against the jury' verdict because the government did not establish beyond a reasonable doubt that Mr. Casada's misrepresentations or concealments went to the essence of the bargain or even that they were capable of influencing an ordinary person. The government claimed that Mr. Casada failed to disclose his receipt of money from Phoenix Solutions derived from services they undisputedly provided and concealed Mr. Cothren's involvement as a subcontractor for those mail services. When weighing the evidence and credibility of witnesses, it is clear that these facts were immaterial. These customers of Phoenix Solutions testified that the material terms and essence of the bargain related to a high-quality mailer that was fairly priced and represented them well to their constituents—which is exactly what Phoenix Solutions delivered. No representative who testified knew the person they *thought* was performing the services that Mr. Cothren performed nor even thought to ask, although they knew it was not Mr. Casada. Reedy was unaware who even performed the work until 2 weeks before trial and can hardly claim the "scandal" would have kept him away from Mr. Cothren when he worked with Mr. Casada, who was subject to that same scandal, prior to working with Phoenix

7

Solutions. No ordinary person would be influenced by the identity of the person who designed or coordinated mailers blasted out en masse for political advertising any more than they would the person who designs their letterhead. An example of how an ordinary person may act is how the Department of Justice acted when it found out Mr. Cothren was involved—it did not care, and in fact *mandated* Ridley use taxpayer funds to pay Phoenix Solutions invoices even though she did not want to.

Lastly, the fact that a state representative was profiting from the work was immaterial as well. The customers who testified came to Right Way Consulting, Rivers' Edge Alliance, and Phoenix Solutions through at least one representative (Smith or Casada), so they knew that the representative was making money through this arrangement, but did not care because it was lawful, Smith and Casada were extremely qualified, and they received what they paid for.

**B.** **Counts 3-4 – Soliciting/receiving bribes and kickbacks, and aiding/abetting offering of bribes and kickbacks (18 USC §666(a)(1)(B)(1)-(2))**

Counts 3 and 4 of the Indictment charge Mr. Casada with additional federal fraud crimes based on allegations of bribes and kickbacks. Both Section 666(a)(1)(B) and Section 666(a)(2) require the government to prove that Mr. Casada was an agent of the State of Tennessee who took money with the intent to be influenced or rewarded for a future official act.[6] The line between legitimate business relationship and unlawful bribery or kickback scheme becomes clearer when viewing the parties' intent and actions at the critical stages of the facts. Mr. Casada is entitled to a new trial on these Counts because the government failed to prove beyond a reasonable doubt that he was paid money in exchange for an official act instead of a legitimate business relationship.

---

[6] Mr. Casada adopts and incorporates the arguments above regarding his non-"agent" status and incorporates them as applied to Counts 3 and 4.

8

The government is required to prove that the money was paid to Mr. Casada in return for an "official act." *United States v. Hills*, 27 F.4th 1180, 1185 (6th Cir. 2022).

> An "official act" is defined as any "decision or action" on any "question, matter, cause, suit, proceeding or controversy" pending or may be brought before a public official. That definition contains a "two-part test." First, an official act must involve an official issue—a "question, matter, cause, suit, proceeding or controversy." Second, the public official must have "made a decision or t[aken] an action," or "agreed to do so," on that official issue.

*Dimora v. United States*, 973 F.3d 496, 502-03 (6th Cir. 2020). The matter on which Mr. Casada acts must be a specific and focused formal exercise of governmental power. *McDonnell*, 579 U.S. 550, 568 (2016). Then the action taken by Casada must have been, or intended to be, using his official position to exert pressure on another to perform an official act. *Id.* at 574. For example, "setting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk . . . or gather additional information," does not qualify as an official action "as long as the public official does not intend to exert pressure on another public official." *Id.* at 573. An official act is not "any action taken or to be taken under color of official authority,"[7] every action a part-time official takes in its public or private capacity,[8] nor mere access to a public official.[9] The line

---

[7] *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017).

[8] *Greene v. State*, 263 So. 2d 194, 196 (Fla. 1972) (separating official actions taken by a part-time state legislator from actions he took solely as a private attorney, reasoning "[a] part-time public official who is a lawyer should be placed in no worse position than any other lawyer to provide the services sought by his client, again so long as there is no official connection with his duties as commissioner, as emphasized above. Citizens' participation in government is vital and it is important that able and qualified persons be encouraged to hold part-time public positions where the compensation is limited for the public benefit and not expected as full-time pay to such officials who are willing so to serve. We should not discourage those who are willing to do so by curtailing their livelihoods should they accept.").

[9] *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 359 (2010) (noting that equating mere access to public officials to corruption is violative of the First Amendment).

9

between an official act is best determined by the actors' knowledge and steps taken with that knowledge.

The weight of the evidence shows that, at the time Smith, Casada, and Cothren agreed to run Phoenix Solutions, their intent was to be paid for providing high quality mailers to customers who needed them. The three met before the 2020 legislative session with Casada and Smith being part-time public officials and part-time private business owners who had a history of running successful campaigns and helping others do the same, and Cothren knew how to coordinate and perform the usually externally subcontracted accounting and administrative design, printing, and mailing work. Smith testified that they created a business plan with each of their roles, potential clients, and a goal to make money as private consultants—which was legal for part-time public officials to do, and they knew there was money allocated to the individual representatives to create a willing paying customer in need of service. At the time of the agreement, they knew people would want to hire them because of their prior success and had no idea that Director of Legislative Affairs Ridley may not pay invoices if Mr. Cothren was on them (as Ridley testified that she never told Smith, Casada, nor Cothren about her personal distaste for legislators performing State work or why Michael Lofti was not an approved vendor). Ms. Smith confirmed this by testifying that her intent was to provide great service and make money—which is what Phoenix Solutions undisputedly did—but never to commit a crime. Proof entered through audio clips of Mr. Casada and Mr. Cothren confirmed that intent when each said they did not believe they had done any crime through their consulting services such that all co-conspirators failed to act with the intent to commit official acts in exchange for payment. The manifest weight of the evidence shows that there was no intent to engage in any official act at the time of the agreement.

The parties also did not engage in any official acts in securing or performing the work. The evidence established that Smith and Casada were able to obtain work as political consultants performing mail services for state legislators because of their successes—both as people who had previously helped others in fundraising and community engagement and who had a proven track record of raising money, constituent support, and winning their own races—not through any exerted pressure or coercion as public officials. Further, each individual representatives' choice for a PPA vendor would not involve the formal exercise of governmental power, as the proof established that PPA funds were allocated to the individual representative irrespective of their vendor, then those representatives were free to select and contract with their vendors at their own discretion with no "vendor approval process." (See Gov. Tr. Ex. 421) The weight of the evidence did not establish any official act in securing the work—instead, it showed that the way the work was secured and performed was a legitimate business where a qualified consultant (Casada or Smith) brought in the clients (Hazelwood, Helton, Reedy) who had funds, a need, and wanted to work with a consultant who would give them a high quality product at a fair price, regardless of those consultants being part-time representatives who would make money from the deal.

Despite the government's witnesses' consistent use of legal buzzwords to try to carry them to a conviction, the proof also did not establish that Casada engaged in a scheme of official acts to get Phoenix Solutions' invoices approved in exchange for payment. Further, establishing "pressure" as an official act to underpin 8 Counts of criminal fraud related to bribery/kickbacks requires more than forced repetition by the government's cooperating witnesses. To sustain Mr. Casada's convictions based on bribery/kickbacks for approval of invoices submitted to the State, the government must establish proof in the record beyond a reasonable doubt of steps taken to "pressure" Ridley—not just to set up a meeting, talk to another official, or gather additional

11

information—and that the pressure was on Ridley for her to take an official action. The government's proof on official acts related to Ridley's approval of the invoices fails to establish both pressure by Casada/Smith and a formal governmental action by Ridley as a matter of law.

The government's proof did not establish that Smith or Casada pressured Ridley to approve Phoenix Solutions' invoices. Ridley testified explicitly that Mr. Casada reached out to her about overdue invoices for his company, Right Way Consulting, because she had not explained why the invoices had not been processed. Mr. Casada never discussed Phoenix Solutions with Ridley at all. Similarly, Smith emailed from her private Rivers' Edge Alliance email *before* legislative session hours seeking to meet *after* legislative session hours in her capacity as a consultant following up invoices that had been left unpaid without explanation. (Def. Tr. Ex. 208) Ridley never testified that she was pressured and instead stated that Smith and Casada simply stopped by and followed up about unpaid invoices related to their private consulting companies which she admittedly had held without explanation. Despite what Smith, Casada, and Cothren may have postured internally, Ridley confirmed that Smith and Casada were never threatening or tried to persuade her to do anything against her role or that she had not done before. Instead, the proof established that the interactions with Smith/Casada and Ridley were merely meetings to request additional information, which *McDonnell* found to not be official acts. Contrastingly, the DOJ was the only one who pressured Smith to do something she did not want to do by making her pay Phoenix Solutions after admittedly discovering that Cothren was affiliated with the company.

The government also failed to prove that the actions Smith and Casada were allegedly "pressuring" Ridley to take qualified as official acts. For a defendant to be culpable for pressuring another official to take an official act, the target must be for the pressured official to take an official act. Here, however, the meetings were about paying invoices for services already rendered. The

government did not establish beyond a reasonable doubt that payment of invoices for services contracted between individual representatives and vendors (and those vendors subcontractors) was a formal governmental action that could "be put on an agenda, tracked for progress, and then checked off as complete." *McDonnell*, 579 U.S. at 569. There was no proof of any policy that required vendor approval before contracting, nor a policy or practice *that Smith or Casada knew of* that Ridley had the authority to deny payment after the content had been approved and the vendor seeking payment had completed the work. Instead, Ridley performed administrative, non-legislative work of processing the proper paperwork for invoices and issuing payments, removing the interactions with her from the purview of "official acts."

The proof similarly fails on any official act taken towards the Speaker's Office. The only proof the government submitted on the official action taken towards the Speaker's Office was an email from Smith attempting to expedite the invoice payments. While this may sound like pressure in the abstract, the email itself shows it was nothing but a simple follow-up explicitly requesting to "please provide guidance" and "not to crush [Ridley]" for this slow payment. (Govt. Tr. Ex. 83) (emphasis added). Ridley did not testify regarding this email at all. As such, the government failed to establish any official act taken towards the Speaker's Office.

The lack of official act contrasted by the undisputed excellent performance of the work that was charged at a fair market value highlights the government's failure to set forth sufficient proof related to another element of its bribery-related Counts—that the money was offered or *paid in exchange for* official acts. Simply put—the proof established that the money was earned. There was no dispute that every customer who testified received exactly what they paid for, paid a fair market price, and was a satisfied customer. There was no proof that Smith or Casada were paid a bonus or any additional amount for "pressure" or any official acts; to the contrary, the proof

actually showed that Smith, Casada, and Cothren had a spreadsheet showing income, expenses, and payments owed per person for the work they performed. (Gov. Tr. Ex. 90). The proof at trial matched what the government has admitted for over three (3) years, this money was *earned* for actual services performed by a part-time legislator.

### C. **Counts 6-9 - Honest Services Wire Fraud (18 U.S.C. §§ 1343, 1346)**

The jury convicted Mr. Casada of honest services fraud in Counts 6-10 of the Indictment. To prove these Counts beyond a reasonable doubt, the government was required to prove that the contested elements that Mr. Casada (1) was involved in a scheme to defraud the public of its right to honest services of a public official through bribery or kickbacks and did so by (2) engaging a misrepresentation of a bribery or kickback scheme.

Mr. Casada is entitled to a new trial if the Government has not sustained its burden with proof that Mr. Casada engaged in a bribery or kickback scheme as those legal terms are defined. While this seems elementary, the proof at trial showed an exchange of money for services. This *could* be a bribery or kickback scheme with a public official if the money was paid as a quid pro quo with the intent to be in exchange for official acts. However, it could just as easily be payments for money earned based on services rendered by part-time state legislators who were providing private consulting services as permitted under Tennessee law. The government drew a thin and vague line in attempting to distinguish between lawful business and unlawful federal crimes, basing its proof of unlawfulness on the money being paid to Casada and Smith with the intent that it was in exchange for official acts. The government failed to establish beyond a reasonable doubt that the money was paid in exchange for official acts, or acted with such intent, because the manifest weight of the evidence showed that Casada, Smith, and Cothren were operating a lawful business that rendered services and made payments based on the money they earned.

14

The proof showed that Mr. Casada and Ms. Smith utilized their talents in being known as successful politicians to earn payments for part-time political consulting services that were authorized by state law and sought after by other state legislators. This was not a bribery or kickback scheme—it was a business that provided high-quality services to customers that was worth the money paid. Mr. Casada incorporates the arguments made above regarding the lack of an official act, value paid in exchange for an official act, and the intent related to these elements above and applies them to the corresponding elements in Counts 6-9. The weight of the evidence proves this was a business providing necessary services to willing customers who received what they asked for, and then the business transparently distributed the profits internally based on their work and internal agreements.

Similarly, the weight of the evidence did not establish that Mr. Casada made a misrepresentation or concealment "of a bribery or kickback." The second element the Court established for Counts 6-9 was that Mr. Casada made a misrepresentation, false statement, false pretense, or concealment from the State of Tennessee and its citizens "of a bribery or kickback scheme." Unlike Section 666, honest services law (and the jury instruction) narrowed the misrepresentations/concealments that have to be proven to satisfy this prong. Honest services fraud convictions cannot be based on an undisclosed self-dealing or a purported conflict of interest; instead, the finding can only be a misrepresentation or concealment "of a bribery or kickback scheme." *Skilling v. United States,* 561 U.S. 358, 409 (2010). Therefore, the misrepresentation/concealment required for the second element cannot be because of a nondisclosure of Mr. Cothren's involvement or Mr. Casada's or Ms. Smith's personal financial gain, but instead only on the scheme that public officials were being paid in an unlawful exchange for official acts. As described herein, the weight of the evidence from the testimony of witnesses

and documents went to alleged misrepresentations/concealments about Mr. Cothren's involvement, Mr. Cothren's fictitious name, and Mr. Casada or Ms. Smith's financial gain—not the fact that the payments from Cothren to Casada and Smith were for money earned in performing consulting services.

### D.  Count 11 – Use of Fictitious Name to Carry out Fraud (18 U.S.C. §1342)

The jury convicted Mr. Casada of Count 11 as an aider and abettor to Mr. Cothren committing the crime of using a fictitious name to carry out fraud. To be found liable as an aider and abettor, the government must have proven (1) that Mr. Cothren committed the crime (2) that Mr. Casada helped or encouraged Mr. Cothren to commit the crime, and (3) that Mr. Casada intended to help commit or encourage the crime. The weight of the credible evidence established that Mr. Casada did not encourage or help Mr. Cothren to use a fictitious name to carry out a fraud.

First, the government did not prove that Mr. Cothren engaged in unlawful business through his fictitious name. The government submitted proof that Mr. Cothren used the name Matthew Phoenix on a W-9 and in various communications, but not that the use was for "an unlawful business" because it failed to establish that Phoenix Solution's business was unlawful for the reasons described herein.  Indeed, the proof regarding Phoenix Solutions was that it was a business that provided quality services at a fair price with satisfied customers.  And while much was made of the W9 signed by "Matthew Phoenix," the proof at trial was that the W9 provided the information it was designed to provide – that the company is legal and registered for tax purposes – in order for the Speaker's Office to effectuate payment.

But regardless, the government also failed to prove—as shown by the jury's acquittal of Mr. Casada on Count 5—that Mr. Casada was aware of or involved in Mr. Cothren's submission

16

of the Matthew Phoenix W-9 on January 15, 2020. There was no proof introduced that Mr. Casada knew, encouraged, or helped Mr. Cothren's submission of the W-9 to the State of Tennessee. Further, the use of a fictitious name must have been for an unlawful purpose that Mr. Casada knew about and intended to help Mr. Cothren achieve. The jury's acquittal of Count 5 shows that they found the weight did not prove that Mr. Casada was involved in that allegedly unlawful act, and the other acts connected with the use of Matthew Phoenix do not rise to the level of "unlawful business."

## Counts 13-18 – Concealment Money Laundering in violation of 18 U.S.C. §1956(a)(1)(B)(i)

The 6th Circuit in *United States v. Faulkenberry,* 614 F.3d 573, 586 (6th Cir. 2010), discussed the sufficiency of proof required to sustain a conviction under 18 U.S.C. §1956.  The *Faulkenberry* court held:

> To prove a violation of that subsection (§1956), it is not enough for the government to prove merely that a transaction had a concealing effect. Nor is it enough that the transaction was *structured* to conceal the nature of illicit funds. Concealment—even deliberate concealment—as mere facilitation of some *other* purpose, is not enough to convict. *Cuellar v. United States,* 553 U.S. 550, 128 S.Ct. 1994, 170 L.Ed.2d 942 (2008) (evidence was insufficient to convict where it "suggested that the secretive aspects of the transportation were employed to *facilitate* the transportation, but not necessarily that secrecy was the *purpose* of the transportation") (emphasis in original). What is required, rather, is that concealment be an animating purpose of the transaction. *See id.* at 2003.

The primary trial witness to testify about the concealment Money Laundering counts was FBI forensic accountant Alexandria Hunter.  Mrs. Hunter testified that the transactions at issue –

payments from the State of Tennessee "mailer program fund" to either RightWay Consulting or REA, then on to Phoenix Solutions, were simple to trace. None of the hallmarks of concealment money laundering were present – there were no offshore bank accounts, rapid withdrawal of funds, unexplained sources of funds, payments to third parties that could not be identified. Hunter was easily able to trace the funds at issue and testified that she felt that "nobody was trying to mislead anyone" as to certain checks. The memo line of several of the checks even identified the State Representatives for whom services were rendered. (Gov. Tr. Ex. 405, 408-9) RightWay Consulting and Rivers Edge Alliance were either properly registered with the State or otherwise well known to be affiliated with Mr. Casada and Ms. Smith, respectively. (Gov. Tr. Ex. 368, 374) Each check that Mr. Casada wrote to Cade Cothren was addressed directly to Cade Cothren (See eg. Gov. Tr. Ex. 381-384). The proof elicited at trial did not even sufficiently show concealment, much less that the "animating purpose" of the transactions was to conceal.

Additionally, because the manifest weight of the evidence preponderates against the jury's findings regarding the underlying conduct, the money laundering convictions should be set aside and a new trial granted on those grounds as well.

### E. Count 19 – "Use" money laundering in violation of 18 U.S.C. §1957

Count 19 of the Indictment alleged a violation of 18 U.S.C. §1957 ("use" money laundering), specifically that on March 8, 2020, Phoenix Solutions transferred $10,969.12 of unlawfully obtained funds to REA's bank account. The jury convicted Mr. Casada of this count.

Put simply, there was no evidence that Mr. Casada played any role whatsoever in this conduct. Phoenix Solutions' bank accounts were controlled by Cade Cothren. (Gov. Tr. Ex. 363) The testimony at trial was that Cothren's role in Phoenix Solutions included performing administrative and accounting functions, whereas Mr. Casada's role was limited primarily to

recruiting business. No proof was elicited that Mr. Casada controlled, or could control, Phoenix Solutions' bank accounts. Similarly, Robin Smith operated REA as a "d/b/a." All the proof at trial pointed to the fact that Ms. Smith operated REA separate from Mr. Casada. She did not allow Casada access to her accounts, client information, and so forth (See eg. Gov. Tr. Ex. 61, 374). There is no proof that Mr. Casada controlled REA's bank accounts in any way.

Nor is there any proof that Mr. Casada aided and abetted this transaction. As noted, Ms. Smith and Mr. Casada largely operated separately from one another, and Mr. Casada had no influence on the banking transactions of either Phoenix Solutions or REA.

Finally, because the manifest weight of the evidence preponderates against the jury's findings regarding the underlying conduct, the money laundering convictions should be set aside and a new trial granted on those grounds as well.

### F. Counts 2 and 12 – Related Conspiracy Counts

As conspiracy-based offenses are only viable when the substantive counts remain, the granting of a new trial on any substantive count would warrant a new trial on any corresponding conspiracy count.

### II. SUBSTANTIAL LEGAL ERROR

Another basis for a new trial under Rule 33 is when a "substantial legal error has occurred." *Munoz*, 605 F.3d at 373. Substantial legal errors include "any error of sufficient magnitude to require reversal on appeal" or where the defendant's "substantial rights" or constitutional rights were jeopardized by the errors or omissions made at trial. *Id.*

### A. Denial of Motion for Mistrial

On April 20, 2025, two days prior to the start of the jury trial, the parties entered a heavily negotiated document titled "Joint Stipulations Regarding Authenticity, Admissibility and Order of Some of the Proof to be Presented at Trial." (D.E. 320 and 320-1). The document was signed by the attorneys for all parties. The agreement included 22 separate "evidentiary" stipulations (D.E. 320) and 3 stipulations to required elements of the charged offenses (D.E. 320-1). The "evidentiary" stipulations included agreements about the authenticity of documents (D.E. 320 at paragraphs 1-8, 11-20), hearsay issues (D.E. 320 at paragraphs 2, 8, 11,14-19), the admissibility of documents (D.E. 320 at paragraphs 4-5, 7,13), and other miscellaneous issues. The "elemental" stipulations included agreements about facts that are necessary for the prosecution to establish as an element for every count of the Indictment.

Notably, paragraph 10 of the stipulation provided that "the Government shall redact" specific portions of Mr. Casada's recorded interview with FBI agents. The redacted portions were *Bruton* protected as to Mr. Cothren and were inculpatory and incriminating as to Mr. Casada. Mr. Casada specifically bargained for, and made concessions to obtain, the exclusion of the pertinent clips of his FBI interview. Throughout the trial, both before and after the prosecution's error, the government made ample use of both the evidentiary and elemental stipulations.

On May 5, 2025, Task Force Officer Austin Barger testified. The primary thrust of Mr. Barger's testimony was to explain the circumstance surrounding the recorded statement made by Mr. Casada and to admit both the entire 2.5 hour recording (with redactions) of Mr. Casada's interview (Gov. Tr. Ex. 135A) and also specific clips from Mr. Casada's interview that the prosecution intended to highlight. (D.E. 365, PageID 2539-40). However, instead of submitting the agreed upon recording that contained the bargained for redactions of the incriminating statements made by Mr. Casada, the prosecution submitted into evidence a version of the recording

that was unredacted in pertinent parts. When Mr. Casada elected to play the entire recording[10] to provide context for the prosecution's selected clips, the jury heard the portions of the tape that the prosecution agreed to redact. Specifically, the clip references Casada's understanding that House Speaker Cameron Sexton would have refused to allow Cade Cothren, or any company affiliated with Cothren, to work with or be paid by the State of Tennessee AND that Cothren was aware of that fact. This testimony is inculpatory as to Casada's knowledge, intent and mental state and is directly related to every count of the Indictment.

On May 6, 2025, Mr. Casada made an oral motion for a mistrial based on the prosecution's breach of the stipulation agreement in violation of Mr. Casada's due process right to a fair trial, the prejudice to Mr. Casada, and the lack of an appropriate remedy. The Court denied the motion for mistrial, and instead i) gave the jury a curative instruction and ii) ordered the prosecution to withdraw the unredacted exhibit and replace it with a properly redacted exhibit for the jury's consideration during deliberations.

Agreements between the prosecution and a defendant are subject to contract interpretations. However, unlike commercial contract arrangements, agreements made by the prosecution in criminal proceedings can implicate due process protections. *See Mabry v. Johnson,* 467 U.S. 504, 509, 104 S.Ct. 2543, 2547, 81 L.Ed.2d 437 (1984); *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971); *United States v. (Jerry) Harvey,* 869 F.2d 1439, 1443–44 (11th Cir.1989); *Innes v. Dalsheim,* 864 F.2d 974, 978 (2d Cir.1988), *cert. denied,* 493 U.S. 809, 110 S.Ct. 50, 107 L.Ed.2d 19 (1989); *In re Arnett,* 804 F.2d 1200, 1202–03 (11th

---

[10] Mr. Casada justifiably relied on the prosecution's obligation to enter into evidence the correct recording.

Cir.1986) (discussing due process protections in the plea agreement context and the immunity agreement context).

In the stipulation agreement, Mr. Casada agreed to both evidentiary and elemental concessions in exchange for certain concessions in return from the prosecution. These concessions included the redaction of testimony that was unquestionably incriminating and inculpatory. By its actions, the prosecution undeniably breached the stipulation agreement to the detriment of Mr. Casada, thus denying him his constitutional right to a fair trial. The bell could not be unrung – the jury heard the redacted statements, and there is no meaningful way to undo that error. This breach is both a violation of the stipulation and a due process violation and should be treated as such. To that end, Mr. Casada's motion for a mistrial should have been granted.

Where, as here, a defendant argues that the district court should have granted a mistrial due to improper testimony, the Court should first consider whether the challenged testimony was in fact improper. *Zuern v. Tate,* 336 F.3d 478, 485 (6th Cir.2003), *United States v. Howard*, 621 F.3d 433, 458–59 (6th Cir. 2010), *United States v. Peatross,* No. 07–2410, 2010 WL 1924707, at *13 (6th Cir. May 13, 2010) (unpublished). In the present matter, the introduction of the testimony – i.e. the unredacted recorded interview of Mr. Casada – was clearly improper. The parties specifically bargained for the exclusion of the recorded testimony, and the Government at trial made no serious argument that the introduction of the wrong recording was not improper.

Next, because the testimony was improper, the Court should determine whether the challenged testimony "was so clearly improper and prejudicial to the defendants that the harm could not be erased by any instruction which the court might give." *United States v. Smith,* 601 F.3d 530, 538 (6th Cir.2010). The five factors considered in making this determination are as follows:

(1) whether the remark was unsolicited, (2) whether the government's line of questioning

was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful,

(4) whether any bad faith was evidenced by the government, and (5) whether the remark

was only a small part of the evidence against the defendant. *Zuern v. Tate,* 336 F.3d

478, 485 (6th Cir.2003), *United States v. Howard*, 621 F.3d 433, 458–59 (6th Cir. 2010).

Application of the factors supports the grant of a mistrial. The remark was not unsolicited,

and the limiting instruction occurred the following day. While Mr. Casada does not go so far as to

accuse the prosecution of intentionally introducing the wrong exhibit, "governmental misconduct"

or "bad faith" can be satisfied by gross neglect See e.g. *United States v. Patterson,* No. 3:21-MJ-

1122-KAC-DCP, 2023 WL 2621198, at *3 (E.D. Tenn. Mar. 7, 2023), report and recommendation

adopted, No. 3:21-MJ-1122-KAC-DCP, 2023 WL 2614595 (E.D. Tenn. Mar. 23, 2023). And in

light of Mr. Casada's lack of interactions with any Speaker's office officials regarding Phoenix

Solutions, his limited role in the formation and marketing of Phoenix Solutions, and the paltry

amount of payments received from Phoenix Solutions, any evidence against Mr. Casada cannot be

considered "small."

**B. Introduction of "caucus/campaign" evidence - Res Gestae/404(b) and Variance**

Among the heaviest litigated issues during the trial of this matter was the admissibility of

services and/or solicitation of services by Phoenix Solutions related to "caucus" work or

"campaign" fundraising work (hereinafter "campaign/caucus work"). The Defendants filed

motions *in limine* regarding this issue and made multiple contemporaneous objections to the

introduction of evidence regarding campaign/caucus work at the trial of this matter. Broadly, the

defendants' objections to the introduction of evidence of campaign/caucus work are that it was i)

legal for Phoenix Solutions to engage in campaign/caucus work, ii) campaign/caucus work was

23

not included in any indicted count, and iii) evidence of the work was inadmissible under Fed.R.Evid. 402, 403 and 404(b).

Pretrial, Casada (joined by Cothen) moved the Court *in limine* to exclude evidence of campaign/caucus work, citing that it is irrelevant, prejudicial, and properly analyzed under 404(b). (D.E. 186). The prosecutors responded (D.E. 278), reiterating that it did not intend to introduce the campaign/caucus evidence under 404(b) but instead as res gestae. In his Reply, Casada confirmed that the prosecution was eschewing reliance on 404(b), to which the prosecution did not reply nor take any action. Similarly, the prosecution's written 404(b) notice of prior bad acts omitted any reference to campaign/caucus work. (D.E. 280-2, 179-1). The Court rightly concluded that this evidence could not be admitted under 404(b).

But instead of resolving the issue, the Court ultimately ruled that the campaign/caucus work, while not admissible under 404(b), instead was admissible to prove the financial motive of the defendants under a res gestae theory of liability, specifically to show financial motive and to rebut the Defendants' perceived "small potatoes" argument. Of course, "motive" is one of the grounds through which 404(b) evidence may sometimes be introduced.

The Sixth Circuit "ha[s] recognized the admissibility of res gestae, or background evidence, in limited circumstances when the evidence includes conduct that is 'inextricably intertwined' with the charged offense." *United States v. Clay*, 667 F.3d 689, 697 (6th Cir.2012) (emphasis added). Res gestae is sometimes also known as "intrinsic evidence." "Intrinsic acts are those that are inextricably intertwined with the criminal act charged or a part of the criminal activity as opposed to extrinsic acts, which are those that occurred at different times and under different circumstances from the offense charged." *United States v. Stafford*, 198 F.3d 248 (6th Cir.1999).

24

The Sixth Circuit has "acknowledge[d] that the distinctions among res gestae, inextricably intertwined evidence, intrinsic evidence, and background evidence [are] far from clear." *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015). Even if evidence is res gestae, the district court must also conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice pursuant to Federal Rule of Evidence 403. *United States v. Joseph*, 270 Fed.Appx. 399, 406 (6th Cir.2008) (per curiam), *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015).

The evidence adduced at trial regarding campaign/caucus work was not properly res gestae evidence. The campaign/caucus work evidence was, in fact, 404(b) evidence. It was evidence about the conspirators misrepresenting the ownership of Phoenix Solutions and the identity of the person "doing the work" in order to gain money – exactly the theory that the prosecution used to Indict and convict Casada of several counts. The evidence was purportedly elicited to show motive. Because the Court specifically and correctly ruled that the prosecution could not submit campaign/caucus evidence via Rule 404(b), it should have excluded the work altogether. Instead, the prosecution elicited ample evidence of campaign/caucus work to the unfair prejudice of Casada.

The government introduced substantial proof under its res gestae theory that dealt solely and exclusively with campaign/caucus work. This evidence included emails, text messages, audio recordings and witness testimony (See recorded calls to Robin Smith introduced at trial, (See eg. Robin Smith testimony, Alexandra Hunter testimony, Nick Crawford testimony, Austin Barger testimony, Clay Worcester testimony, Gov. Tr. Ex. 91, 104, 15, 18, 73, 116, 45, 410-411, 365 (non-exhaustive) Casada objected to the introduction of this evidence on Fed.R.Evid. 403 grounds as

well, arguing that the evidence was cumulative under the res gestae theory. That objection was also overruled.

The admission of this evidence not only prejudiced Casada's right to a fair trial because improper bad acts evidence was admitted, it also resulted in a variance. Reversal is warranted when a defendant proves that (1) a variance occurred and (2) that the variance affected a substantial right. *United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008); *United States v. Prince,* 214 F.3d 740, 757 (6th Cir.2000). A variance "occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* at 756–57. The substantial rights of the defendant "are affected only when the defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *United States v. Hynes,* 467 F.3d 951 (6th Cir.) (quoting *United States v. Barrow,* 118 F.3d 482, 488–89 (6th Cir.1997)).

The Indictment alleged 20 counts all arising from one accusation – that the conspirators paid kickbacks and/or misrepresented/failed to disclose the ownership of and benefits received by Phoenix Solution *specifically regarding funds from the so-called "mailer program."* The evidence adduced at trial included evidence related to the charged conduct but also included reams of evidence related to campaign/caucus work that was obtained and performed in the same manner as the charged conduct. These facts are "materially different" in that they prove matters that, while done in the same manner, involve wholly different players and money from wholly different sources. Certainly, the Government's own evidence showed that the conspirators received approximately $51,000 from the indicted conduct and another approximately $175,000 from the non-indicted conduct. (Gov. Tr. Ex. 410-411) Casada, for his part, earned $4600 from the indicted conduct (See testimony of Alexandra Hunter), and there was ample proof that he earned that $4600

via recruiting business or assisting with the survey/mailer content (Def. Tr. Ex. 239-251, testimony of Agent Worcester). As such, the piles of evidence introduced about campaign/caucus work drastically changed the facts as to Casada. And because of this drastic alteration of the facts, the "general fairness" of the trial was adversely affected. Casada was indicted for and convicted of (among other things) participating in a scheme regarding kickbacks related to "mailer program" work. But the government introduced evidence of a much more far-reaching scheme to include other, legal work from which Casada received no benefit, all in the name of showing "financial motive."

### C. <u>Improper Jury Instructions</u>

On April 8, 2025, Mr. Casada (jointly with Mr. Cothren) submitted his proposed jury instructions, wherein he provided to the Court the instructions he specifically requested to be included in the jury charge. (D.E. 295). During trial, the parties engaged in lengthy discussions about the jury charge. The Court ultimately charged the jury on May 13, 2025. (D.E. 341). Several of Mr. Casada's proposed instructions were correct statements of the law, not substantially covered by the final charge, and sufficiently important that failure to charge impaired Mr. Casada's defense.

If the defendant requested an instruction that was denied, and the denied instruction was: "(1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concern[ed] a point so important in the trial that the failure to give it substantially impair[ed] the defendant's defense," then a reversal of conviction is warranted. *United States v. Godofsky*, 943 F.3d 1011 (6th Cir. 2019) (quoting *United States v. Volkman*, 797 F.3d 377, 385 (6th Cir. 2015)); *United States v. Frei*, 995 F.3d 561, 566–67 (6th Cir. 2021).

### i.      Safe Harbor provision codified at 18 U.S.C. §666(c)

18 U.S.C. § 666(c) provides that the federal prohibition on theft or bribery concerning programs receiving federal funds "does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  The Sixth Circuit has provided binding precedent on District Courts regarding the "safe harbor" provision in *United States v. Mann*, 1999 WL 17647 (6th Cir. 1999) and *United States v. Mills*, 140 F.3d 630 (6th Cir. 1998).  The Sixth Circuit interprets Section 666's statutory language to parse the alleged "procurement" of a job from the "transaction," itself as two (2) distinct elements, each with a valuation requirement attached. While the "procurement" element relates to the alleged bribery itself and is satisfied if the defendant solicits or offers "anything of value," the separate "transactional" element is only met when the transaction "in connection" with such a bribe is valued at $5,000 or more *after subtracting any amounts paid that fall within the safe harbor provision. Mills* 140 F.3d at 633 (applying the safe harbor provision to Sections (a)(1)(B) and (a)(2)); *Mann*, 1999 WL 17647, at *2–3 (applying the safe harbor provision to Section (a)(1)(A)).  Put simply, the Sixth Circuit, supported by statutory language, applies the safe harbor provision to all valuations of Section 666. *Mills*, 140 F.3d at 633.

Mr. Casada specifically requested in his proposed jury instructions language consistent with the binding precedent of *Mills* and *Mann*. (D.E. 295, PageID 2157-58, 2171-72, 2179).  The Court declined to give the requested instruction.  Mr. Casada's requested instruction was squarely within the holdings of *Mills* and *Mann*, and as such was a correct statement of the law.  And the instruction was critical to the defense.  A central theme of the defense was that for each and every mailer program client, including those who hired RightWay Consulting (Mr. Casada's consulting firm), a quality product was delivered at a fair price.  Particularly as to Mr. Casada, for whom there

28

was no proof that he personally interacted with the Speaker's Office regarding Phoenix Solutions, the transaction element was critically important. There was ample proof that Mr. Casada earned his $4600 from Phoenix Solutions – he recruited clients (Robin Smith testimony, Def. Tr. Ex. 239-251, testimony of Agent Worcester) and assisted those clients in making decisions regarding the look and content of their surveys or updates. (See eg. Gov. Tr. Ex. 16, 17, 19, 24, 28, 29, 30, 75-77 (non-exhaustive) The jury would have been compelled to find that the value requirement for the transaction element has not been satisfied had it been instructed consistently with *Mills* and *Mann*.

### ii. Undisclosed self-dealing, Conflict of interest, Legality of RightWay Consulting

The United States Supreme Court in *Skilling v. United States*, 561 U.S. 358 (2010) narrowed the scope of honest services fraud-based prosecutions. The *Skilling* court specifically held that certain acts that were perhaps unethical were nonetheless insufficient to trigger federal criminal liability. The Supreme Court held that both undisclosed self-dealing and conflicts of interest were insufficient bases to support a federal criminal conviction. *Skilling*, 561 U.S. at 409 (2010).

In his proposed jury instructions, Mr. Casada requested several instructions that were squarely within the holding of *Skilling*. Specifically, Mr. Casada requested that the jury be instructed as follows: "It is not a violation of federal law for a public official to engage in undisclosed self-dealing. Undisclosed self-dealing is the taking of official action by a public official that furthers his own undisclosed financial interest while purporting to act in the interests to whom he owes a fiduciary duty." (D.E.295, PageID 2170, 2178, 2204). Mr. Casada also requested an instruction regarding conflicts of interest, namely "It is not a violation of federal law for a public official to engage in a transaction in which he may have had a conflict of interest."

29

(Id.)  The Court declined to instruct the jury as requested by Mr. Casada, in essence determining that the instructions given were sufficient for the jury to conclude that undisclosed self-dealing and conflict of interest transactions were insufficient.  However, the requested instructions, taken straight from the holding of *Skilling*, were correct statements of the law, and Mr. Casada respectfully disagrees that the Court's instructions appropriately addressed this issue.

Mr. Casada also requested the following instruction: "It was permissible under Tennessee state law for Defendant Casada to own and operate a private consulting company and provide certain services, including the services at issue in this case, to members of the Tennessee General Assembly." (D.E. 295, PageID 2169, 2177, 2201). These instructions were explicitly derived from Tennessee statutory law but were not given. Relatedly, Mr. Casada later requested that the Court include an instruction that being a "State Representative" does not automatically qualify a person as an "agent" under the definition of Section 666, and to clarify that Section 666(d)'s use of "representative" would not improperly cause jurors to improperly equate that title (which is more accurately a "Representative from House District ＿＿＿＿") with an agent authorized to act on behalf of the *State* as required by Section 666(d).  However, this instruction was not given either. Lastly, Mr. Casada requested instructions that he was working in his capacity as a public official at the time of the alleged misconduct, given the unique nature of his role as a part-time state legislator who was allowed to have a private job providing consulting services to the State, but this instruction was denied.

These instructions were important to Mr. Casada's defense.  The thrust of the prosecution in this matter was that the Defendants had an interest in Phoenix Solutions that was not disclosed to the Speaker's Office or to individual representatives, and that this failure to disclose/conflict of interest was improper.  The trial evidence established that Mr. Casada did not make any affirmative

misrepresentations to either the Speaker's Office or any representative regarding the mail program funds. Instead, the trial evidence revealed that Mr. Casada made $4600 from the mailer program without affirmatively telling Phoenix Solutions' clients or the Speaker's Office of his role in Phoenix Solutions (such as it was). The trial evidence also adduced that Mr. Casada solicited clients through his own consulting company, then sub-contracted the work to Phoenix Solutions—a process that the prosecution framed as illegitimate and designed to conceal. In light of this, the jury likely did find criminal liability based upon either undisclosed self-dealing or conflicts of interest. The jury should have been charged consistently with *Skilling* and instructed that it could not convict based on these debunked theories. The jury should have also been charged that RightWay Consulting was not per se illegitimate or a sham company as implied by the government throughout the trial. In failing to do so, there is a significant likelihood that the jury verdict was tainted by the prosecution's implications that Mr. Casada being involved in the consulting business at all, much less not disclosing his involvement, is somehow improper.

## CONCLUSION

For the reasons outlined above, Mr. Casada requests that, in the event that this Court denies Mr. Casada's general Fed.R.Crim.P. 29 motion, this Court GRANT his Motion for a New Trial pursuant to Fed.R.Crim.P. 33(a).

Respectfully submitted,

*/s/ Jonathan Farmer*
Ed Yarbrough (BPR #004097)
Jonathan P. Farmer (BPR #020749)
Chase Fann (BPR #036794)
511 Union St, Suite 1000
Nashville, TN 37219
(P) 615-238-6300
eyarbrough@spencerfane.com
jfarmer@spencerfane.com
cfann@spencerfane.com
Counsel for Glen Casada

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2025, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following:

Taylor J. Phillips
Assistant US Attorney
U.S. Attorney's Office - Middle District
719 Church St. Suite 3300
Nashville, TN 37203
taylor.phillips@usdoj.gov

John P. Taddei
Blake J. Ellison
Trial Attorneys
Public Integrity Section, Criminal Division
U.S. Department of Justice
1301 New York Ave., NW
Washington, DC 20530
john.taddei@usdoj.gov
blake.ellison@usdoj.gov

*/s/ Jonathan Farmer*
Jonathan Farmer

32