IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | NO.    3:22-cr-00282 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| GLEN CASADA | ) | |
| CADE COTHREN | ) | |

## GOVERNMENT'S COMBINED OPPOSITION TO DEFENDANTS' MOTIONS FOR NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33(A) AND MOTIONS FOR ACQUITTAL UNDER FED. R. CRIM. P. 29

After a nearly four-week trial with hundreds of exhibits, a jury unanimously found each defendant guilty of more than a dozen felonies involving bribery, fraud, and money laundering. The trial evidence did not weigh heavily against the jury's verdicts, and neither Defendant has shown any extraordinary circumstances warranting a new trial. Accordingly, Defendants' posttrial motions should be denied.[1]

---

[1] Defendants have renewed their general Rule 29 arguments. (D.E. #368, 370.) They have also moved for new trials by arguing, in part, that the trial evidence did not meet Rule 33's broader standard. (D.E. #372, 377.) For efficiency, the government addresses these arguments and their general Rule 29 motions in the same opposition brief. Because Rule 33 permits the Court to weigh evidence in a manner prohibited by Rule 29, the government discusses the evidence under the Rule 33 standard. *Cf. United States v. Parker*, No. 22-6047, 2024 WL 464492, at *5 (6th Cir. Feb. 7, 2024) (discussing the differing standards of Rules 29 and 33).

In addition, because Defendants' general Rule 29 arguments do not touch on specific elements, the government respectfully requests the opportunity to address any questions the Court may have beyond those addressed in this brief. Generally speaking, however, Robin Smith's testimony about the conspirators' agreement and intent, combined with evidence of the specific wirings underlying Counts Five through Ten and the applicable stipulations, was sufficient for a reasonable juror to convict Defendants of Counts One through Eleven. And in light of all that evidence, the structure of the financial transactions as established through the testimony of FBI Forensic Accountant Alexandra Hunter was sufficient for a reasonable juror to convict Defendants of Counts Twelve through Nineteen. Additional evidence relevant to these counts is also referenced herein.

## A.  Legal Standard

### 1.  Rule 29 Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 permits a court to enter a judgment of acquittal when the evidence is insufficient to sustain a conviction. "There is only one ground for a motion for a judgment of acquittal. This is that 'the evidence is insufficient to sustain a conviction' of one or more of the offenses charged in the indictment or information." 2A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 466 (4th ed. 2025). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "A defendant claiming insufficiency of the evidence therefore bears a very heavy burden." *United States v. Robinson*, 99 F.4th 344, 354 (6th Cir. 2024) (brackets omitted) (citation omitted). "All that a defendant is entitled to on a sufficiency challenge is for the court to make a 'legal' determination whether the evidence was strong enough to reach a jury at all." *Musacchio v. United States*, 577 U.S. 237, 244 (2016) (quoting *Jackson*, 443 U.S. at 319).

### 2.  Rule 33 Motion for New Trial

A court "may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). One ground for raising a new-trial motion is "the argument that the jury's verdict was against the manifest weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). The court reviewing such a claim may consider the credibility of witnesses and weight of the evidence—but only "to insure that there is not a miscarriage of justice." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). That standard does not permit second-guessing a jury's verdict "simply because different inferences could have been drawn or because other results are more reasonable." *See United States v. Lyimo*, 574 F. App'x 667, 672

(6th Cir. 2014) (unpublished) (quoting *Porter v. Lima Mem'l Hosp.*, 995 F.2d 629, 635 (6th Cir. 1993)). Instead, a defendant must show that "the evidence preponderates heavily against the verdict." *United States v. Bowens*, 938 F.3d 790, 796 (6th Cir. 2019) (citation omitted); *accord Hughes*, 505 F.3d at 593. "A new trial is an extraordinary remedy for 'extraordinary circumstances.'" *United States v. VanDemark*, 39 F.4th 318, 322 (6th Cir. 2022) (quoting *United States v. Burks*, 974 F.3d 622, 625 (6th Cir. 2020)); *see also Burks*, 974 F.3d at 627 (6th Cir. 2020) ("[V]irtually every one of our cases dealing with the weight of the evidence involves affirmances of district court denials of new trial motions."). As such, "[o]nly 'when the verdict exceeds the bounds of reasonableness[] should the district court order a new trial.'" *VanDemark*, 39 F.4th at 322 (second alteration in original) (quoting *Burks*, 974 F.3d at 625).

Another ground for raising a new-trial motion is the charge that "substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). When evaluating a claim of substantial legal error, the trial court does not assess witnesses' credibility or weigh the evidence as a "thirteenth juror." *Id.* n.9. Furthermore, harmless legal errors do not justify the vacatur of convictions under Rule 33. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *cf. United States v. Whittle*, 223 F. Supp.3d 671, 675, 683–84 (W.D. Ky. 2016) (denying a new-trial motion because, even if the admission of statements violated the Confrontation Clause violation, the error was harmless).

Regardless of the basis for a motion under Rule 33, "[t]he burden is on the defendant to prove that a new trial should be granted." *Lyimo*, 574 F. App'x at 671; *accord United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994); *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991).

**B.    The Evidence Did Not Preponderate Heavily Against the Jury's Verdicts**

The jury's verdicts were amply supported by the evidence. Defendants cannot show otherwise. The Court should therefore decline their invitation to disturb the jury's findings.

*1.    Agency Under 18 U.S.C. § 666 (Counts 2–4)*

Defendants begin by asserting that they deserve a new trial on their convictions under 18 U.S.C. § 666 because there was no proof that Casada was an "agent" of the State of Tennessee. (*See* D.E. #372, at 4–6; D.E. #377, at 3–7.)[2] They are wrong. The government presented evidence at trial that Reps. Casada and Smith were agents of the State of Tennessee in at least three different ways. So to vacate their convictions, Defendants must demonstrate that the evidence heavily weighed against each of the three theories of agency. They cannot meet that burden.

First, the evidence showed that Reps. Casada and Smith were State employees. *See* 18 U.S.C. § 666(d)(1) (defining "agent" to include a government "employee"). Patsy Hazlewood explained that the House of Representatives was a creation of the Tennessee State Constitution. And each of the current and former State representatives who testified—Patsy Hazlewood, Esther Helton-Haynes, Jay Reedy, and Robin Smith—described their elected office as a "job" with official duties that included voting on and passing State laws, reviewing and approving the State budget, and electing State constitutional officers. In exchange for performing those duties, the Tennessee General Assembly Administrative Policies and Procedures provided that House members like Reps. Casada and Smith would receive a "salary" in monthly installments. GX 421, at 6. And sure enough, Smith's bank statements showed direct deposits from the State of Tennessee

---

[2]    Casada raises the agency argument against all three of his convictions under Section 666. (*See* D.E. #372, at 4–6, 8 n.6). Cothren focuses his agency challenge on Count 2, (D.E. #377, at 3–7.), but mentions that Counts 3 and 4 also required proof of an agency relationship (*id.* at 10).

at the end of every month. *See generally* GX 377. In addition to a salary, House members received monthly expense and per diem allowances—administered in accordance with State law—to help them perform their "official duties." *See* GX 421, at 6. Reps. Casada and Smith's mere receipt of a salary and expense allowances from the State indicates that they were State employees. *See, e.g.*, *Employee*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1999) ("one employed by another usually for wages or salary and in a position below the executive level"); *Employee*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2015) ("a person employed for wages or salary, especially at nonexecutive level"). And the fact that they received those salaries in exchange for performing duties with Statewide effect that originated in the State constitution confirms their employee status. *Compare United States v. Thomas*, 377 F.3d 232, 238 (2d Cir. 2004) (rejecting a defendant's argument that there was insufficient evidence of agency in a prosecution under 18 U.S.C. § 2314 by looking to, among other things, the fact that the agent had an "ongoing relationship" to provide financial advisory services to the principal, which paid the agent "a monthly salary"), *with United States v. Phillips*, 219 F.3d 404, 412 (5th Cir. 2000) (holding there was insufficient evidence that a tax assessor was an agent of a parish for purposes of Section 666 in part because the "assessor's duties [were] set forth by state, not parish, law" and "the assessor's salary [was] not set by the parish, the salary [was] not paid for by the parish, and the assessor receive[d] no employee benefits from the parish").

Cothren argues that other language in the Administrative Policies and Procedures cuts against a finding that House members were State employees. (D.E. #377, at 6–7.) Specifically, he says that the following language "clearly delineates" "Members of the General Assembly" from "state employees":

5

> The salary for the Members of the General Assembly is $24,316 paid in monthly installments of $2,026.33 from the date of election forward. This salary is adjusted in November following a general election to reflect the average percentage pay increase provided for state employees by the general appropriations act during the previous two fiscal years.

(*Id.* at 6 (quoting GX 421, at 6).) If General Assembly members "do not get pay increases at the same time" as "state employees," Cothren claims, then General Assembly members cannot be considered state employees. (*Id.*) But the passage is equally (if not more) likely to be additional evidence of the opposite conclusion. By applying a pay-raise increase "for state employees" to "[t]he salary for Members of the General Assembly"—albeit in a modified manner that avoids the appearance of General Assembly members giving themselves a raise—the Policies and Procedures treat General Assembly members like a type of state employee. In other words, the language Cothren cites just as plausibly places General Assembly members in a subcategory of "state employees" as it sets them apart as a separate category of State-salary recipients. The fact that the Policies and Procedures language might have a variety of plausible readings is no reason to disturb the jury's verdict. *See Lyimo*, 574 F. App'x at 672 ("[T]he verdict should not be considered unreasonable simply because different inferences could have been drawn . . . ." (citation omitted)).

Second, Reps. Casada and Smith were "authorized to act on behalf of" the State. *See* 18 U.S.C. § 666(d)(1). They in fact did so when they selected vendors to perform State-funded work using their postage and printing allowance ("PPA"). The Tennessee General Assembly Administrative Policies and Procedures explained that each House member received an annual allowance of $3,000 to fund certain kinds of expenditures "in connection with their duties as a legislator." GX 421, at 8. House members could choose how to spend their PPA funds from a suite of options (e.g. maps, flags, state seals) and whom to hire to perform PPA-funded work. *See id.* at 5–6. Testimony from Reps. Hazlewood, Helton-Haynes, Reedy, and Smith, as well as House

6

Majority Caucus Advisor Nick Crawford and Director of Legislative Administration Connie Ridley, confirmed that PPA funds were State taxpayer money allocated to each House member to be used at the member's discretion (subject to the approval of certain State officials).

Testimony from the same witnesses also explained how a House member's PPA decisions bound the State. When a House member decided to use PPA funds on constituent mailers, the vendor he chose would work with him to develop a mailer and send him an invoice. *See, e.g.*, GX 270 (invoice to Smith); GX 281 (invoice to Casada). He would pass along the mailer and invoice to State officials like Ridley and staffers in the House Speaker's Office. So long as the mailer complied with certain restrictions that came with the use of taxpayer money and received approval from the Office of Legislative Administration and Speaker of the House, the State would issue a check to pay the invoice. In sum, House members like Casada and Smith acted on behalf of the State to engage the services of constituent mailer vendors. Reps. Casada and Smith were thus State agents with respect to their postage and printing allowances.

Third, Reps. Casada and Smith were "representatives" of the State of Tennessee. Each of the House members who testified identified their and their colleagues' title as "State representative." And Defendants do not dispute that the title applies to Casada and Smith. (*See, e.g.*, D.E. #372, at 5 (referring to "Tennessee's State Representatives"); D.E. #377, at 5 (same).) So as a textual matter alone, Casada and Smith should fall within Section 666's definition of "agent" because the definition explicitly includes, "in the case of a[] . . . government," a "representative." *See* 18 U.S.C. § 666(d)(1); *see also United States v. Roberson*, 998 F.3d 1237, 1249–50 (11th Cir. 2021) ("By the plain reading of its text, Representative Robinson is an agent of the State of Alabama for purposes of 18 U.S.C. § 666(a)(2)."); *United States v. Goss*, No. 6:19-

7

CR-03048-1, 2022 WL 4349047, at *5 (W.D. Mo. Sept. 19, 2022) ("[T]he undersigned concludes that the Arkansas state legislators . . . were *agents of the state of Arkansas . . . .*").

Looking to State representatives' duties only confirms what their title makes plain. As discussed above, House members received a State salary as compensation for performing official duties with Statewide effect grounded in the State constitution, including voting on State laws, approving the State budget, and electing State constitutional officers. The State thus gave its legislators authority to perform a core State function on its behalf: to legislate. Exercising that authority made Reps. Casada and Smith the State's representatives. *See Roberson*, 998 F.3d at 1249 (holding that an Alabama state representative was an agent of the state in part because "as a member of the House of Representatives, . . . his position entail[ed] voting on the budget for state agencies . . . which is prototypical action on behalf of the state"). Indeed, "there is no more classic government 'representative' than a legislative branch officer." *United States v. Fernandez*, 722 F.3d 1, 8 (1st Cir. 2013). "[I]f a state legislator is not an agent of the state for purposes of section 666, it is unclear who would be." *Roberson*, 998 F.3d at 1249.

Defendants claim that Reps. Casada and Smith could not be agents of the State because they represented their constituents, not the State. (*See* D.E. #372, at 4–6; D.E. #377, at 5–6.) But the two agency relationships are not mutually exclusive. An agent may represent multiple principals at the same time. *See* RESTATEMENT (THIRD) OF AGENCY § 3.16 cmt. b (2006) ("Multiple principals may consent that an agent take action on their behalf in the same transaction or other matter."); *see also N.L.R.B. v. Town & Country Elec., Inc.*, 516 U.S. 85, 94–95 (1995) (explaining that employees could be agents both of their employer and a union). Reps. Casada and Smith may have thus represented both their constituents and the State.

Likewise, the fact that a State Representative is one constituent part of a State legislative body does not mean he cannot be a State agent. A principal may have multiple agents with respect to the same matter and require them to act jointly to take action on that matter. *See* RESTATEMENT (THIRD) OF AGENCY § 3.14 cmt. e ("A principal may consent to a relationship of agency with more than one agent, including representation by multiple agents in relation to the same transaction or other matter. . . . A principal may also structure a relationship among coagents to provide that the agents must act jointly to take action."). State Representatives like Casada and Smith are simply coagents for the State who must act together to pass State laws or approve State budgets. *Cf. United States v. Lipscomb*, 299 F.3d 303, 333–34 (5th Cir. 2002) (opinion of Wiener, J.) (footnote omitted) ("Congress clearly sought to apply § 666 to legislative-branch officials. . . . [T]here is little or no basis for holding that federal jurisdiction over bribery of Council members depends on whether the briber can command a majority. One Council member's vote, after all, can tip the balance on a close question . . . .").

Nor does it matter that the Tennessee House is just one of several major organs of State government. As at least three courts of appeals have found, a state legislator is a representative of not just a legislative body but her entire state. *See Roberson*, 998 F.3d at 1249 (rejecting the argument that an Alabama state representative "was only an agent of the Alabama Legislature and not the State as a whole"); *United States v. Willis*, 844 F.3d 155, 167 (3d Cir. 2016) ("[A] territorial legislature is part and parcel of the government of the territory, and . . . the principles of separation of powers do not excuse an agent of the Legislature from § 666's coverage."); *Fernandez*, 722 F.3d at 9 ("The Puerto Rico Senate is a constituent part of the Commonwealth government, created by the Puerto Rico Constitution. Its members are thus part of the limited category of government

officials who represent the 'State' as a whole, unlike employees of localities or of agencies at every level of government." (citation omitted)).

In short, Defendants cannot meet their burden of showing that the evidence at trial weighed heavily against all three of the government's theories of agency.

### 2. *Obtaining Property by Fraud (Count 2)*

Similarly, Defendants cannot meet their burden of showing that the trial evidence weighed heavily against the jury's verdicts on the fraud counts. They principally argue that the government did not satisfy its burden to prove that the conspirators' deceptions were material. (*See* D.E. #372, at 6–8; D.E. #377, at 7–10.)

The common-law element of materiality "[r]esembl[es] a but-for standard," which is satisfied "if a reasonable person would attach importance to [the deception] in deciding how to proceed, or if the defendant knew . . . that the recipient would likely deem it important." *Kousisis v. United States*, 145 S. Ct. 1382, 1396 (2025) (citing *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016)).[3] Here, the conspirators deceived State Representatives, the Director of Legislative Administration Connie Ridley, House Majority Caucus Advisor Nick Crawford, and the Office of the Speaker of the House about both Cothren's involvement in Phoenix Solutions

---

[3]     Casada argues that "[a]n example of how an ordinary person may act is how the Department of Justice acted when it found out Mr. Cothren was involved—it did not care, and in fact mandated Ridley use taxpayer funds to pay Phoenix Solutions invoices even though she did not want to." (D.E. #372, at 8 (emphasis omitted).)

Insofar as Casada invites the Court to gauge materiality based on the Department's response, the government welcomes that framing. When the Department learned of Cothren's involvement in Phoenix Solutions, it very much did care: the FBI launched a multiyear investigation, part of which involved recommending that Ridley not tip off the targets by abruptly shutting off payment.

10

and his payment of kickbacks to Reps. Casada and Smith. The trial evidence showed that both of those deceptions were material.

Multiple trial witnesses credibly testified that they did not want to associate themselves or their offices with Cothren because he was the central figure in a prominent scandal.[4] Rep. Hazlewood testified that Cothren's reputation in Tennessee politics was "pretty much destroyed," that the scandal made her "incredibly upset," and that she cared about reputation of people involved in her constituent communications.[5] As a result, she told the jury, she would not have hired Phoenix Solutions had she known that Cothren was behind it. Rep. Helton-Haynes similarly testified that she cared about the reputation of people involved in her constituent communications because those with bad reputations reflected poorly on her and her office. She would not have hired Phoenix Solutions if she was aware of Cothren's involvement either. Rep. Reedy likewise testified that, had he believed Cothren was involved in his constituent communications, he would have used a different vendor or would not have used the PPA program at all.[6] Crawford, a State

---

[4] Under Rule 33, the trial court is empowered to make credibility determinations that are rarely disturbed by an appellate court. *See United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988) (holding that trial court's determination that the evidence does not preponderate heavily against the verdict is reviewed only for "clear and manifest abuse of discretion"). Here, the Court should find that the witnesses' demeanors and presentation in court were indicative of truthful testimony. For example, Ridley's demeanor was direct, precise, and forthright, regardless of whether she was testifying in response to questions from the government or defense. Similarly, Rep. Smith's responses were just as lengthy and thorough for the defense as they were for the government, and—with a few exceptions when she testified emotionally about letting down those around her—her demeanor did not significantly change throughout her testimony.

[5] Throughout this response, the government occasionally quotes witness testimony. When it does so, the quotations are based on government counsel's good-faith belief and memory of the testimony. (*See* D.E. #364, at 1 (Court order advising Defendants that their briefing in support of their motions under Rules 29 and 33 "may rely on [their] good faith belief as to what particular testimony is").)

[6] Cothren contends that Rep. Reedy could "hardly claim the 'scandal' would have kept him away from Mr. Cothren when he hired Mr. Casada, who was subject to the same scandal, to help

11

employee who worked for the House Majority Caucus, testified that he too cared about the reputation of vendors whom caucus members used to produce constituent mailers. Had he known of Cothren's involvement in Phoenix Solutions, Crawford said, he never would have recommended the company to State legislators.

Ridley cared about Cothren's involvement in constituent mailer work too. She testified that she was concerned when she discovered that Cothren was behind Phoenix Solutions because she lacked confidence in his judgment and decision-making. She was so concerned, she said, that she would not have approved Phoenix Solutions to do mailer business for the State had she known the truth. Ridley also testified that she had previously exercised her authority to terminate another vendor under similar circumstances. Specifically, she refused to pay invoices to Red Ivory Strategies (a consulting firm not involved in the charged conduct) because she felt it was inappropriate for the State to do business with a company whose proprietor had engaged in misconduct while previously employed at the House of Representatives. Ridley explicitly testified that her decision was not based on Red Ivory Strategies' failure to comply with administrative requirements like submitting a W-9. The jury was entitled to credit Ridley's testimony find that, had she known about Cothren's involvement, she would have treated Phoenix Solutions the same way.

Furthermore, numerous text exchanges and emails between the conspirators as well as testimony from Rep. Smith showed that the conspirators knew Cothren's name could not be included in documents submitted to the State or the PPA invoices would not be paid. For example,

---

with his campaign before working with Phoenix Solutions." (D.E. #377, at 9.) This claim contradicts Rep. Reedy's testimony under oath. It also misunderstands a fundamental aspect of the deception—namely, that the conspirators were much more concerned about concealing Cothren's involvement in the scheme, given Cothren's far more toxic reputation.

in one text message, Cothren wrote that "using a registered agent is of course what allows us to mask identities." GX 13. Rep. Smith testified that the conspirators needed to "mask" Cothren's identity because they knew that, if his involvement was apparent, House members would not have hired Phoenix Solutions and State officials would not have paid them. That is why Cothren frequently reminded Rep. Casada to take his name off documentation that Casada was supposed to pass along to other State officials. *See, e.g.*, GX 21, at 4; GX 29, at 8, 19; GX 31, at 3. And that is why Cothren used the fake Matthew Phoenix name when he submitted a W-9 to the State, *see* GX 81, or prepared draft mailers for Casada to send to client-legislators, *see, e.g.*, GX 25; GX 75. Rep. Smith and Cothren were also concerned that the House Speaker's chief of staff Holt Whitt— and, by extension, House Speaker Cameron Sexton himself—would connect the dots, with Cothren writing in one text message, "If [H]olt know[s], Cameron knows." *See* GX 59, at 5. Later in the same text chain, Rep. Smith even discussed creating a fake confrontation with Rep. Casada in front of Sexton to obscure the conspirators' relationships from him. *See id.* at 7. These kinds of evidence show that the conspirators knew that Cothren's involvement was material. *See Kousisis*, 145 S. Ct. at 1396 ("[A] misrepresentation is material . . . if the defendant knew . . . that the recipient would likely deem it important.").

Even if the Court had defined materiality as having a "natural tendency to influence" or going to the "essence of the bargain," the evidence would have fit the bill. As discussed, every legislator who testified, Ridley, and Crawford told the jury said that they would have acted differently had they known that Cothren was behind Phoenix Solutions. In other words, the conspirators' concealment did in fact influence those witnesses' decisions. Furthermore, the witnesses' testimony established that they sought not just a quality mailer but a mailer competently created by someone who would not reflect poorly on their offices or the State. They did not receive

13

that. So even under an essence-of-the-bargain formulation of materiality, the evidence justifies the jury's guilty verdicts. *See id.* at 1410 (Gorsuch, J., concurring) (explaining that, even under a benefit-of-the-bargain test, a defendant who misrepresented the identity of persons working on government contract committed fraud because the government did not receive what it bargained for).

As to the conspirators' concealment of the kickbacks, Defendants try to wave away any concern by arguing that everyone knew that Reps. Casada and Smith were profiting from the State mailer program. (*See* D.E. #372, at 8.) They reframe one of their trial themes—namely, that Reps. Casada and Smith were "prime contractors" who merely used Cothren as an immaterial subcontractor. That mischaracterizes their arrangement, however: no prime contractor pays the full contracted amount to a subcontractor and then patiently waits for the subcontractor to pay the prime contractor its share.

Here, had the other Representatives, Ridley, and the Speaker's Office known that a representative was accepting a kickback from a "subcontractor" in exchange for the representative steering taxpayer funds, they would not have authorized Phoenix Solutions' work. Reps. Hazlewood, Helton-Haynes, and Reedy each testified about the kickbacks, with Rep. Reedy going so far as to say that, when he found out about it, he deemed it "a very corrupt way of doing business." Similarly, Ridley testified that she would not have approved Phoenix Solutions if she believed Cothren was paying a percentage of its profits to Reps. Casada and Smith. And Crawford testified that he never would have recommended sending taxpayer money to a member.

Finally, Cothren knew that the kickbacks were material. He was careful to advise Rep. Smith not to "say any connection [she had]" with Phoenix Solutions. GX 18, at 3. He also assured Rep. Smith, "no one needs to know you're part of Phoenix and there's no paperwork with you on

14

it." GX 23, at 6. Cothren spoke similarly to Rep. Casada, warning him, "just remember that you have zero connection to [Phoenix Solutions] and don't even know that much other than they've done work for you and are very good." GX 17, at 4.

Defendants cannot show that the evidence greatly weighed against jury's guilty verdicts on Count Two.

### 3. *Soliciting and Receiving Bribes and Kickbacks (Counts 3 & 4)*

Defendants next attack their Section 666 bribery convictions by reiterating their trial argument that their conduct involved no official act. (D.E. #372, at 9-13; D.E. #377, at 10-18.) But the government offered evidence that Defendants' corrupt bargain with Rep. Smith included three kinds of official acts: (1) Reps. Casada and Smith's selection of mailer vendors to perform State-funded PPA work; (2) other legislators' selection of mailer vendors to perform State-funded PPA work; and (3) the Office of Legislative Administration's authorization of payment on PPA invoices. To convict Defendants of Counts 3 and 4, the jury needed to have found only that one of those decisions was an official act that formed part of the bargain. So to justify a new trial, Defendants must establish that the great weight of the evidence disqualifies all three kinds of decisions from being official acts. They cannot do that.

An official act requires the government to make two showings. It must first "identify a question, matter, cause, suit, proceeding or controversy that may at any time be pending or may by law be brought before a public official." *McDonnell v. United States*, 579 U.S. 550, 567 (2016) (internal quotation marks omitted). A matter is "something specific and focused" that "involve[s] a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 574. It is discrete or "circumscribed" in the sense that it "can be put on an agenda, tracked for progress, and then

15

checked off as complete." *Id.* at 570. Second, the government must demonstrate that a "public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *Id.* But the bribed public official need not take the action himself. The public official is still culpable if he "us[ed] his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice w[ould] form the basis for an 'official act' by another official." *Id.* at 574.

i.    The Selection of a PPA Vendor Was an Official Act

Cothren argues that a legislator's selection of a mailer vendor was not an official act. He first claims that the PPA selection decision was not a "focused, formal, or concrete" matter, (D.E. #377, at 11), that "could be checked off or tracked for progress," (*Id.* at 12.) But seeing as the PPA selection decision boiled down to a legislator's use of a pot of money, that position makes little sense. The Tennessee General Assembly Administrative Policies and Procedures provided that each House member would receive $3,000 in PPA funds each year. GX 421, at 8. The Policies and Procedures further provided that a House member's use of her PPA funds would be reported to her each month. *Id.* at 9. And Rep. Smith confirmed in her testimony that the Office of Legislative Administration provided her monthly reports of her PPA usage and balance. In other words, the evidence demonstrated that a legislator's use of her allowance was "circumscribed" and easily "tracked." *See McDonnell*, 579 U.S. at 570.

Cothren next claims that the selection of a PPA vendor was not an official act because it was a "minute" decision that came with little process. (D.E. #377, at 12; *see also* D.E. #372, at 11.) He conflates the requirement that an official act "involve a formal exercise of governmental power," *McDonnell*, 579 U.S. at 574, with the importance or "consequence" of the act, (D.E. #377, at 12). But the formality requirement is not a question of degree that turns on the weightiness of

16

the action or the rules that surround it. *See United States v. Henderson*, 2 F.4th 593, 600 (6th Cir. 2021) (Rogers, J., concurring) (cautioning that the court's decision "should not be construed as always requiring something like a potential hearing"). After all, the corruption statutes cover many government agents who "may not be involved in proceedings that are analogous to formal lawsuits, agency determinations, or hearing committees." *Id.* The formality requirement is instead a categorical determination: Did the matter "involve a formal exercise of governmental power" or not? *See McDonnell*, 579 U.S. at 567. An official act may therefore include action on matters as seemingly trivial as "whether to allow flex-time schedules" or "make adjustments to incentive bonuses." *See United States v. Hills*, 27 F.4th 1155, 1179 (6th Cir. 2022). Relevant here, allocating and dispensing government money to a particular vendor necessarily involves the formal exercise of governmental power. *See United States v. Repak*, 852 F.3d 230, 253 (3d Cir. 2017) ("[A] decision by . . . a governmental agency[] to award money to contractors . . . is undoubtedly the 'formal exercise of governmental power.'"); *see also McDonnell*, 579 U.S. at 570–71 (describing the decision to "allocate grant money" as one "involv[ing] a formal exercise of governmental power"). So when Rep. Casada, Rep. Smith, and their fellow House members selected a vendor to produce State-funded constituent mailers, they exercised State power.

Cothren also argues that the postage and printing allowance was not "a matter set or pending before" a House member because the member was not "obligated" to spend it. (*Id.* at 12–13.) Regardless of whether a member had to use his postage and printing allowance, however, the allowance was still "pending" before his. *McDonnell* refers to a "matter" being "within the specific duties of an official's position;" nowhere does it say that a matter is "pending" only when the law mandates that the public official make a decision on the matter. *See* 579 U.S. at 570. It is enough if the public official's position gives him authority to act on the matter—if the matter is within

17

"the function conferred by the authority of his office." *See id.* Here, House members had the discretion to use their postage and printing allowances—to spend State money—by virtue of their offices. In fact, the allowances had "the purpose of funding postage and printing in connection with their duties as a legislator." GX 421, at 8.

ii.    <u>The Authorization of Payment on a PPA Invoice Was an Official Act</u>

Defendants take aim at the government's third category of official acts too. As Cothren puts it, the Office of Legislative Administration's decisions to disburse State funds to pay PPA invoices were not official acts because Ridley "had no decision-making authority" and was merely performing an "administrative duty." (D.E. #377, at 16–17; *see also* D.E. #372, at 12–13). The evidence at trial showed otherwise. Ridley herself testified that she had the authority to approve or deny a PPA vendor. She even told the jury how she had previously terminated a PPA vendor—Red Ivory Strategies—because she felt it was inappropriate for the State to continue to do business with a company whose proprietor was a former House employee twice discharged for cause. In addition, Ridley stated on cross-examination that she delayed payments to the conspirators' companies not merely due to administrative issues but because of concerns she had regarding the propriety of those companies performing State-funded mailer work. Defense counsel repeatedly challenged Ridley on her claims of authority, but she held her ground. And when Cothren's counsel asked her whether anyone had ever questioned her authority to approve or deny PPA payments, she responded simply: "No."

Reps. Helton-Haynes and Smith corroborated Ridley's account, each testifying that Ridley had the authority to approve PPA payments. Further substantiating Ridley's authority over PPA payments were numerous invoices for PPA work marked with Ridley's handwritten approval notations. *See, e.g.*, GX 268 (Reedy invoice); GX 270 (Smith invoice); GX 273 (Hazlewood

18

invoice). Contrary to Cothren's cursory claim that the invoices were not a "decision pending in front of" Ridley, (D.E. #377, at 17 (emphasis omitted)), the invoice notations and the checks that paid them confirmed that the State did not issue checks to pay PPA invoices until Ridley approved payment. In *McDonnell* terms, Ridley's invoice approvals were "focused and concrete"—"the kind of thing that can be . . . checked off as complete." *See* 579 U.S. at 570. In sum, the evidence showed that Ridley had the authority to determine whether to disburse State funds to pay a PPA invoice. And again, the decision to disburse State funds was an official act. *See McDonnell*, 579 U.S. at 570–71; *Repak*, 852 F.3d at 253.

iii.    Casada and Smith Advised and Pressured Other Officials to Perform Official Acts They Did Not Perform Themselves

Aside from whether selecting a PPA vendor or approving a PPA invoice constitute official acts, Defendants assert that the evidence failed to prove that Reps. Casada and Smith advised or pressured other public officials to take those acts. (*See* D.E. #372, at 11–13; D.E. #377, at 14–18.) That assertion flies in the face of the evidence presented at trial.

Ample evidence established that Reps. Casada and Smith recommended that other public officials spend PPA funds with the conspirators' companies. Reps. Hazlewood and Helton-Haynes testified that Rep. Smith advised them on how to use their PPA accounts. The defense even introduced text messages showing that Rep. Smith prompted Reps. Hazlewood and Helton-Haynes to spend their PPA funds. On November 14, 2019—shortly after Cothren texted Rep. Smith a list of legislators for her to call, *see* GX 15—Rep. Smith texted Reps. Hazlewood and Helton-Haynes asking how much money they had in their postage and printing allowances because she wanted to do a constituent mailer for them. *See* DX 117 (Rep. Hazlewood); DX 119 (Rep. Helton-Haynes). That outreach led to those representatives spending PPA funds with Rivers Edge Alliance and

19

Phoenix Solutions. *See* GX 273 (Phoenix Solutions invoice to Rep. Hazlewood); GX 284 (Rivers Edge Alliance invoice to Rep. Helton-Haynes).

House Majority Caucus Advisor Nick Crawford—a state employee who helped caucus members with constituent mailers—testified that Rep. Smith pitched him on Phoenix Solutions too. He told the jury that Rep. Smith approached him in the Cordell Hull State Office Building and suggested that, if a House member asked him or the caucus for a PPA mail vendor to use, he recommend Phoenix Solutions. Based on Rep. Smith's suggestion, Crawford recommended Phoenix Solutions to Reps. Reedy and Rudd, whom he indicated trusted Rep. Smith's recommendation. Sure enough, both Reps. Reedy and Rudd spent PPA money with Phoenix Solutions. *See* GX 268 (Rep. Reedy invoice); GX 293 (Rep. Rudd invoice).

Rep. Reedy explained that he worked on his PPA mailer not only with Crawford but also with Rep. Casada. According to Rep. Reedy, Rep. Casada informed him that he could use PPA funds for a mailer. Text messages corroborated that testimony. Early in the scheme, Cothren texted Rep. Casada that Rep. Reedy was a "high priority" to do a PPA mailer. GX 19, at 7. In response, Rep. Casada revealed that he was working with Rep. Reedy on a constituent survey, remarking that he advised Rep. Reedy against making the survey a newspaper insert. *Id.* at 8. These messages were consistent with many others showing that Reps. Casada and Smith—in consultation with Cothren—strategically solicited House members for PPA work. *See, e.g.*, GX 15 (Cothren and Rep. Smith texting about legislators on Rep. Smith's "list" of legislators to approach); GX 16 (Rep. Casada reporting to Cothren legislators whose PPA business he had secured); GX 18, at 2 (Rep. Casada remarking to Cothren and Rep. Smith, "too bad no one else thought of calling members asking for surveys!!!"); GX 19 (Rep. Casada and Cothren discussing secured and potential PPA clients).

The evidence also established that Reps. Smith and Casada pressured Ridley to approve PPA invoices for payment. Rep. Smith repeatedly testified that she did exactly that—at one point describing the pressure as part of her "job" in the conspiracy. She explained how her physical office's proximity to Ridley's gave her access that others lacked, and she told the jury that she made sure Ridley remembered that she was an influential House committee chairperson. When challenged on cross-examination, Rep. Smith bluntly reiterated, "I did pressure Connie Ridley to pay these invoices."

Cothren claims that Rep. Smith's "testimony did not withstand cross-examination." (D.E. #377, at 18). But it appears the jury disagreed—and for good reason. Rep. Smith's testimony was plainly consistent with contemporaneous documentary evidence. In one text message, for instance, Cothren wrote to Rep. Smith, "I officially set you loose on her ass." GX 58, at 2. Rep. Smith testified that she understood the text to mean that she needed to confront Ridley about payment to Phoenix Solutions. In another text message, Rep. Smith wrote Cothren, "Have appt tomorrow at 5 with Connie Ridley. She'd best have some answers." GX 36. And consistent with her testimony about the access her office provided, Rep. Smith vowed in yet another text message to Cothren, "I'll be visiting 8th floor [of the Cordell Hull State Office Building, where Ridley's office was located,] Monday." GX 35, at 1.

Documentary evidence shows that Rep. Casada participated in the pressure campaign too. In one text message to Rep. Smith, he wrote, "No rush call me when you're free just wanted to know if we needed to meet with Connie to try to push reimbursement along." GX 34. And in another text message thread, Rep. Casada told Cothren that he was "[t]rying to [m]eet with Connie

later today." GX 37, at 1. When Cothren responded that Rep. Casada "should ask Connie the status of your[ invoices] that have been submitted, Rep. Casada promised, "I will." *Id.* at 2.[7]

Reps. Casada and Smith exerted additional pressure on Ridley by appealing to the Speaker of the House's office, which oversaw Ridley's office along with the Speaker of the Senate. Rep. Smith testified that the conspirators wanted the Speaker of the House "override" Ridley. To that end, she wrote in a text message to Cothren that Holt Whitt, the Speaker of the House's chief of staff, was "going to get to do his job too." GX 58, at 3. Similarly, Rep. Casada told Rep. Smith in another text message that he was "going to touch base with Holt tomorrow on this situation of ours." GX 33. Whitt was responsive to the representatives' directives. When Rep. Smith emailed Whitt early in the morning about the delayed PPA invoice payments, Whitt responded about an hour later that he was "on it." GX 84. Rep. Smith then directed him to Ridley, writing: "Don't crush her, but Connie's been telling this vendor that the check's on the way for about two weeks." *Id.* Rep. Smith explained in her testimony that she knew Ridley served at the pleasure of the Speaker's office, so she wanted Whitt to "expedite" her payment of PPA invoices. This tactic was unusual. Rep. Smith was unaware of any other time that a vendor had called in the Speaker's chief of staff to override Ridley.

---

[7]     Casada suggests that meetings and discussions with Ridley were not enough to prove that he and Rep. Smith pressured her. (*See* D.E. #372, at 11–12.) The language he uses is reminiscent of *McDonnell*'s warning that "[s]etting up a meeting . . . or calling an official . . . does not qualify as a decision or action on the pending question." *See* 579 U.S. at 573. But the relevant "action on [a] pending question" was Ridley's approval of PPA invoices. Her approvals were official acts for the reasons stated above. Reps. Casada and Smith's efforts to pressure Ridley to make those approvals do not have to satisfy the requirements of an official act. As *McDonnell* explained, even "setting up a meeting . . . or making a phone call" may be evidence "that the official was attempting to pressure or advise another official on a pending matter." *Id.*

Ridley's testimony provided further support for a jury finding that Reps. Casada and Smith pressured her to approve PPA invoices. She described a conversation in which Rep. Casada expressed urgency in having PPA invoices paid. And she recounted Rep. Smith guilt-tripping her, telling her that the payment delays reflected poorly on the State of Tennessee. When Ridley tried to enforce new policy requirements for PPA work, Rep. Smith implied that what Ridley was asking was "illegal or unethical." *See* GX 99, at 1. Ridley said she felt that Rep. Smith was pushing back on the policy requirements. All the while, Ridley understood that she was dealing with state representatives. She was careful to address Rep. Smith by her title. *See* GX 96, at 1 (Ridley addressing an email to "Rep. Smith"). And she knew that Rep. Smith was not just an ordinary House member but in fact an influential member of the Republican caucus who was the chair of a legislative committee. Ridley told the jury that, in her three decades working for the Tennessee General Assembly, no other legislator had approached her about approving payment for a vendor. She also said that no other vendors had ever come to her office to ask for payments.

### iv. Completion of Work Obtained Through Bribery Is No Defense

Finally, Defendants appear to argue once again that they cannot be convicted of *bribery* charges because the State received what it paid for. (*See* D.E. #372, at 13-14; D.E. #377, at 19). That argument is not even conceivably an excuse. It runs contrary to law. *See, e.g.*, *United States v. Quinn*, 359 F.3d 666, 675 (4th Cir. 2004) ("It is not necessary . . . that the official act offered in exchange for the bribe be harmful to the government or inconsistent with the official's legal obligations."). And it runs contrary to common sense: if a contractor wins a government contract by dropping a sack of cash on an official's desk, the transaction does not become legal simply because the contractor subsequently performs the contract. *See United States v. Morgan*, 635 F. App'x 423, 465 (10th Cir. 2015) (unpublished) (Holmes, J., concurring) ("When a legislator takes

official action on a bill in return for money, he irreparably and egregiously betrays [the] public trust, and his betrayal is no less grave when the bill actually turns out not to do any harm."). Whether the conspirators did the work they were hired to do is simply the wrong focus. The question is instead whether Cothren paid Reps. Casada and Smith in exchange for official acts. The weight of the evidence showed that he did, so the Court should not disturb the jury's verdict.

4. *Honest Services Wire Fraud (Counts 5–10)*

As with the Section 666 bribery charges, Defendants contend that the jury should not have convicted them of honest services wire fraud because Cothren did not pay Reps. Casada and Smith to perform official acts. (D.E. #372, at 14–15; D.E. #377, at 18–19.) For the same reasons set forth above, the jury's conclusion that the scheme involved an official act was not against the manifest weight of the evidence.

The evidence also established that Cothren paid Reps. Casada and Smith in exchange for the official acts. Smith told the jury that Cothren paid her and Rep. Casada a portion of any State-funded PPA business they brought to Phoenix Solutions. And an email from Cothren to Reps. Casada and Smith corroborated her testimony. The email broke down profits from PPA clients—including Reps. Casada, Smith, Hazlewood, Helton, and Reedy—into payouts to the conspirators. GX 90. Defendants confirmed the arrangement in their interviews with the FBI. Cothren said that the payments corresponded to "leads." GX 215. And Rep. Casada expressly disclaimed doing work for Phoenix Solutions other than finding clients—for which he would receive a "commission." GX 152. In addition, Smith testified that Cothren expected her and Rep. Casada to ensure that the State paid PPA invoices. Text messages bore that out. In one exchange, Cothren told Rep. Casada that he "should ask Connie the status of [his invoices] that ha[d] been submitted." GX 37, at 2. Rep. Casada promised, "I will." *Id.* In another exchange, Cothren wrote Rep. Smith, "I officially set

you loose on [Ridley's] ass." GX 58, at 2. Rep. Smith replied, "It will happen tomorrow." *Id.* The jury justifiably found that the conspirators had a quid pro quo agreement.

Finally, Defendants cursorily argue that the government did not prove honest services wire fraud's misrepresentation-or-concealment element because the "weight of the evidence" of misrepresentations and concealment related to Cothren's involvement in Phoenix Solutions rather than the kickbacks he was paying. (D.E. #372, at 15–16; D.E. #377, at 20.) They fail to grapple with evidence showing that the conspirators were very much concerned about Reps. Casada and Smith's financial connection to Phoenix Solutions. *See, e.g.*, GX 17, at 4 (Cothren cautioning Rep. Casada, "just remember that you have zero connection to [Phoenix Solutions] and don't even know that much other than they've done work for you and are very good"); GX 18, at 3 (Cothren reminding Rep. Smith, "Obviously don't say any connection you have" to Phoenix Solutions); GX 23, at 6 (Cothren assuring Rep. Smith, "no one needs to know you're part of Phoenix and there's no paperwork with you on it"). Even Casada acknowledges that the evidence showed "alleged misrepresentations/concealments about Mr. Cothren's involvement, Mr. Cothren's fictitious name, and Mr. Casada or Ms. Smith's financial gain." (D.E. #372, at 15–16.) A jury could reasonably conclude that this constellation of deception was intended to conceal Cothren's kickbacks to the State officials. Had the relevant decision-makers known of Cothren's involvement and the officials' undisclosed financial gains, they would have easily inferred that the two were linked.

Furthermore, in honest-services cases, some courts have held that the deception element is satisfied by any misrepresentation communicated to the State, regardless of whether the misrepresentation was specifically that an official was not being bribed. *See, e.g.*, *United States v. Milovanovic*, 678 F.3d 713, 728 (9th Cir. 2012) (en banc) (holding that government sufficiently alleged a material misrepresentation by submitting false test results to the state). Other courts have

held that it is sufficient for the government to show that the bribe recipient failed to disclose or concealed the fact that he was being bribed. *See, e.g.*, *United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003) (en banc) (holding that it was sufficient for bribe-paying defendants to have caused bribed employees to omit the bribe scheme from communications with their employers); *United States v. Lusk*, No. 2:15-CR-124, 2017 WL 508589, at *10–11 (S.D.W. Va. Feb. 7, 2017) (holding that the defendant violated his fiduciary duty both by failing to inform his employer of kickback scheme and concealing the scheme). During the charge conference, the Court mused that a public official who fully discloses a bribery scheme to the public may be culpable under Section 666 but arguably not Section 1343. The Court need not decide that here, however, because Rep. Casada and Smith did nothing of the sort. Instead, the conspirators made numerous affirmative misrepresentations designed to conceal Cothren's involvement in Phoenix Solutions. Accordingly, under any of these formulations, Section 1343's deception element was satisfied.

5. *Use of a Fictitious Name to Carry Out a Fraud (Count 11)*

Defendants' arguments on Count 11 are almost entirely derivative of arguments as to other counts that Phoenix Solutions' activities were not unlawful. (*See* D.E. #372, at 16–17; D.E. #377, at 20.) For the same reasons those arguments fail elsewhere, they fail here too.

Defendants add that the W-9 that Cothren signed as "Matthew Phoenix" was "simply" to allow the State to confirm that the Phoenix Solutions had a valid tax identification number. (D.E. #377, at 20; *see also* D.E. #372, at 16.) They are plainly wrong. The evidence at trial showed that Cothren needed to use the fictitious name on the W-9 to prevent the State from learning who really controlled Phoenix Solutions, lest the scheme unravel.

26

Casada also contends that the government was required to prove that he knew that Cothren submitted the fraudulent W-9. (D.E. #372, at 16–17.) He says that his acquittal on Count 5 shows that the government failed to do so. (*Id.*) Casada is wrong for three reasons.

First, the W-9 was far from the only time that Cothren used the fictious name "Matthew Phoenix" to carry out the unlawful business of Phoenix Solutions, and Rep. Casada was well-aware of Cothren's use of the pseudonym. *See, e.g.*, GX 25 (text message from Cothren informing Casada that he "[j]ust sent [Casada] 3 emails from Matthew Phoenix" with constituent mailer drafts for Casada to forward to legislator-clients for edits); GX 75 (one of the three emails from Phoenix to Casada).

Second, the jury could have reasonably concluded that Casada knew Cothren would submit a falsified W-9 for Phoenix Solutions. Casada knew that vendors needed to submit W-9s to the State to receive PPA payments—after all, he was required to submit one for Rightway Consulting. *See* GX 424 (Rightway Consulting W-9). And Casada knew that Cothren was using the fictious name "Matthew Phoenix" for interactions with the State.

Finally, the jury's acquittal on Count 5 could have been for any number of reasons. The Court should not speculate that it was for the reason that Casada advances. *Cf. United States v. Anderson*, 78 F.3d 420, 423 (8th Cir. 1996) ("We may not speculate or inquire into why the jury chose to acquit [the defendant] on certain counts and convict him on another."). Indeed, even assuming the jury believed that Casada participated in a scheme to defraud (which it clearly did) but did not have actual knowledge of the specific email in Count 5, that would have been an insufficient reason for acquittal. *See United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994) ("[T]he defendant himself does not have to use the mails or interstate telephone lines, provided it is foreseeable that the mails or wire services could be used to further his scheme."); *see also*

27

*Pereira v. United States*, 347 U.S. 1, 9 (1954) (holding that it is sufficient for mail fraud statute that the use of the mails "can reasonably be foreseen, even though not intended").

      6.     *Concealment Money Laundering (Counts 13–18)*

Defendants next claim that the jury erroneously convicted them for concealment money laundering because there was insufficient evidence that the charged transactions were designed to conceal anything. (D.E. #372, at 17–18; D.E. #377, at 20–22.) To support that claim, Cothren correctly observes that "simply moving ill-gotten funds from one account to another or from one person is not enough" to prove concealment money laundering. (D.E. #377, at 21 (quoting *United States v. Fallon*, 61 F.4th 95, 117 (3d Cir. 2023).)

As *Fallon* itself recognizes and Cothren concedes, however, "structuring the transaction in a way to avoid attention" is evidence of an intent to conceal. (*Id.*, at 21 (quoting *Fallon*, 61 F.4th at 117).) Indeed, "purpose and structure are often related." *Cuellar v. United States*, 553 U.S. 550, 565 (2008). And where payments to an ultimate beneficiary are "made indirectly through [a] shell company" because direct payments would evince a kickback relationship, the jury may infer that the defendant "structured the transactions to avoid being directly linked to the payments and evade detection." *See United States v. Mehmood*, 742 F. App'x 928, 935 (6th Cir. 2018) (unpublished).

Here, the conspirators structured the transactions in Counts 13 through 18, at least in part, for the purpose of concealing the nature, ownership, and control of the proceeds of their scheme. Text messages showed that, even though Smith's company Rivers Edge Alliance and Casada's company Rightway Consulting billed the State for PPA work, Cothren did the work and prepared the invoices. *See, e.g.*, GX 28, at 5 (Cothren telling Casada that he would "give [an invoice for Casada's mailer] to robin and she will be billing you from rivers edge so that's what shows up on your disclosure"); GX 29, at 8 (Cothren writing Casada that "[i]t would be best if you bill [Rep.

28

Farmer] from your company when the time comes" and adding that he could "put the invoices together," to which Casada agreed); GX 32, at 2 (Cothren telling Casada that he had just sent Casada invoices for Casada to submit for payment). Smith testified that Rivers Edge Alliance was a "pass-through" into which she would receive proceeds of the scheme from the State before sending them on immediately to Phoenix Solutions. And she said that the conspirators had meetings in which they discussed Casada doing the same thing.

Further supporting the jury's finding of intent to conceal was the structure of the transactions themselves. As reflected in the summaries of the transactions that FBI Forensic Accountant Alexandra Hunter prepared, the conspirators caused the proceeds of their crimes to be deposited into Rightway Consulting and Rivers Edge Alliance accounts before immediately transferring them to Cothren-controlled accounts from which he would later dispense kickbacks. *See* GXs 405–09. These "series of unusual financial moves" belied Defendants' claims at trial that the conspirators had a traditional subcontracting relationship. *See Fallon*, 61 F.4th at 117 (citation omitted). And they had the effect—from which the jury reasonably inferred intent—of hiding that Cothren had ownership and control over the funds at issue in Counts 13 through 18.

Defendants nevertheless rehash their trial argument that the transactions could not have been meant to conceal if an FBI forensic accountant was able to trace the proceeds. (*See* D.E. #372, at 18; D.E. #377, at 22.) The argument is meritless. FBI Forensic Accountant Hunter was a trained accounting professional who had the benefit of grand jury subpoenas and knowledge of the underlying kickback scheme from months of investigation. The State officials whom the conspirators aimed to deceive were not similarly positioned. In any case, "[t]he fact that a defendant personally engages in a transaction without trying to disguise his or her identity . . . does not negate the effect of other evidence pointing to an intent to conceal." *See United States v.*

*Marshall*, 248 F.3d 525, 539 (6th Cir. 2001). And just because the conspirators were not ultimately successful in concealing the nature, ownership, or control of their criminal proceeds does not mean that they did not try. *See United States v. Sheridan*, 679 F. App'x 492, 495 (7th Cir. 2017) (unpublished) ("[T]he 'concealment' element . . . actually requires that the defendant know the financial transaction was designed to conceal, not that it successfully conceal." (emphasis omitted)).

### 7. *Transactional Money Laundering (Count 19)*

As to Count 19, Cothren argues only that the funds at issue were not the proceeds of unlawful activity "[b]ecause the manifest weight of the evidence preponderates against the jury's findings regarding the underlying conduct." (D.E. #377, at 23.) For the reasons the government set forth at trial and above, Cothren cannot show that is the case. The Court should therefore deny his motion for a new trial on Count 19.

Casada argues that he had "no role whatsoever in this conduct" and that there was no proof that he aided and abetted the Count 19 transaction. (D.E. #372, at 18–19.) But the Sixth Circuit rejected an analogous challenge in *United States v. Kerley*, 784 F.3d 327 (6th Cir. 2015). In *Kerley*, a defendant was convicted of aiding and abetting money laundering despite a lack of direct evidence showing that he knew of the particular transaction with which he was charged. *Id.* at 345–46. Acknowledging that his "argument might appeal to a jury," the court of appeals rejected it in light of evidence that the defendant arranged many similar financial transactions as part of the scheme. *Id.* at 346. Similarly, as described above, Casada was well aware that the conspirators' plan was for ill-gotten PPA funds to pass through Rivers Edge Alliance and Rightway Consulting to Cothren, who would subsequently pay out kickbacks. And he knew how the structured transactions worked because he actively participated in many of them. *See* GXs 405, 407–09.

30

Based on all that evidence, the jury could have inferred that Casada knew about and encouraged the transaction in Count 19.

### 8. *Conspiracy Counts (Counts 1 and 12)*

Defendants' arguments as to the conspiracy counts are entirely derivative of their arguments as to the substantive counts. (D.E. #372, at 19; D.E. #377, at 23.) Because their arguments on the substantive counts fail, so too do their arguments against their conspiracy convictions.

## C. The Court Properly Denied Cothren's Motion for Mistrial

The Court properly denied Cothren's motion for mistrial based on the inadvertent admission and publication of half of a sentence of Casada's recorded interview. The statement was not inadmissible under *Bruton* and, even if it had been, it was not so prejudicial as to require a mistrial.

The Supreme Court has explained that a "defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials." *Brown v. United States*, 411 U.S. 223, 231–32 (1973) (internal quotation marks and citation omitted). Mistrials are thus reserved for "where there is a legitimate claim of seriously prejudicial error." *United States v. Moore*, 917 F.2d 215, 220 (6th Cir. 1990). When evaluating a motion for mistrial based on an improper reference made during trial, the Court should consider five factors:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003); *accord United States v. Howard*, 621 F.3d 433, 458–59 (6th Cir. 2010).

31

*1.    Background*

On January 8, 2021, the FBI recorded an interview with Casada. At approximately 1:22:35–1:22:55, he stated:

> Yeah. But I think Cameron, who is Speaker of the House, doesn't like Cade, and Cade felt like they would not let him do the work, or not approve the work if they knew it was Cade. And that make sense to me because I think he was right on that, and I said okay, you know. So he said, "I've got this company." I mean, he didn't say it. He never said it was his company, but I knew it was, which was fine with me, you know. Just like we report anything else, you know, like with Rightway. Rightway bids the state.

On April 20, 2025, the parties stipulated that the government would prepare two versions of Casada's interview, each of which would redact these comments. (D.E. #320, ¶ 10.) The government did not, however, concede that the statements were in fact testimonial hearsay. (*See id.*) Because the parties were uncertain whether evidence would be admitted relating to legal entities that Cothren controlled other than Phoenix Solutions, one version of the interview redacted the quoted portion above and another incriminatory statement while the second version redacted both those portions *and* Casada's references to Cothren's non–Phoenix Solutions legal entities.

On April 24, the government shared with the defense a version of Government Exhibit 135A that redacted the portions specified in the stipulation agreement and the references to Cothren's non–Phoenix Solutions legal entities. On the morning of May 2, the government notified the defense of its intent to also redact 1:36:50–1:37:05, in which Casada referenced the scandal that cost Cothren his job as involving "texting or drugs or whatever." Although no party had contemplated redacting that portion during the stipulation negotiations, the government believed that a later agreement about witness questioning counseled in favor of redacting the reference to "drugs." Casada confirmed that he had no objection. Cothren did not respond.

On the morning of May 2, the government prepared a new version of Government Exhibit 135A that inadvertently redacted only the references to the scandal and Cothren's non–Phoenix Solutions legal entities—not the two sections of Casada's interview outlined in the parties' stipulations. The government provided this version to the defense at approximately noon on May 2. During the afternoon of May 2, the parties discussed Casada's intention to publish the entire recording of Government Exhibit 135A during cross-examination of a government witness. All parties believed that Government Exhibit 135A contained three sets of redactions: the specific timestamps included in the parties' stipulations, the references to Cothren's non–Phoenix Solutions legal entities, and the remark that the scandal involved "drugs."

It appears that no counsel—government or defense—reviewed the revised Government Exhibit 135A before the government offered it into evidence, without objection, on May 5. During cross-examination of a government witness, Casada's counsel published portions of the partially redacted recording, including the first of the two segments that the parties stipulated should have been redacted (1:22:35-1:22:55). Due to a bench conference that the government requested, Casada's counsel did not publish the other portion that the parties anticipated would be redacted under their April 20 stipulation (1:47:15–1:47:24).

On May 6, Cothren lodged his first objection to the admission or publication of Government Exhibit 135A.[8] Cothren proposed that the Court substitute a version of Government

---

[8]    Forfeiture thus offers one basis for the denial of Cothren's mistrial motion. *See* Fed. R. Crim. P. 51(b) (requiring contemporaneous objections); *United States v. DiCarlantonio*, 870 F.2d 1058, 1062 (6th Cir. 1989) ("DiCarlantonio failed to challenge the incomplete [*Bruton*] redaction before the statements were admitted, as required by the trial court's order. Indeed, the most damaging portion of the confession—which named DiCarlantonio and placed him in the office at the time the $30,000 was solicited—was admitted after DiCarlantonio's counsel stated in a bench conference that he did not consider it improper."); *United States v. Bullock*, No. 1:06-CR-120, 2009 WL 1707363, at *7 (N.D.N.Y. June 17, 2009) (denying mistrial motion predicated on *Bruton*

33

Exhibit 135A that was redacted consistent with the parties' stipulation and instruct the jurors to rely only on that exhibit and other clips introduced by the government—not the jurors' recollection of their publication. The government and Casada concurred. Shortly thereafter, Cothren instead moved for a mistrial, which the Court denied.

2.    *Argument*

As a threshold matter, the twenty seconds of Government Exhibit 135A whose publication formed the basis of Cothren's mistrial motion were not protected by *Bruton v. United States*, 391 U.S. 123 (1968), for two reasons: (1) they were not "powerfully incriminating," *id.* at 135; and (2) they were not hearsay and were therefore not testimonial for purposes of the Confrontation Clause.

*Bruton* was concerned with "contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* One such context that *Bruton* recognized is "where the *powerfully incriminating* extrajudicial statements of a codefendant . . . are deliberately spread before the jury in a joint trial." *Id.* at 135–36 (emphasis added).

As the Court concluded in its oral order on the twelfth day of trial, the twenty seconds of Casada's multi-hour statement that got inadvertently played for the jury were not "powerfully incriminating." For one thing, Casada's remark did not "shift blame" to Cothren in the manner that *Bruton* found concerning. *See Vincent v. Parke*, 942 F.2d 989, 991 (6th Cir. 1991) (recognizing

_____

when both defendants failed to object contemporaneously to the admission of each other's statement).

that a codefendant's motivation for shifting blame was a "critical element for the Court's decision in *Bruton*"). Indeed, the remark did not identify Cothren as a person who committed a crime at all.

For another thing, there was a permissible, nontestimonial use of Casada's statement about Cothren's state of mind. Specifically, it explained Casada's admission that followed immediately afterward: "[T]hat make sense to me because I think he was right on that, and I said okay, you know." This sentence—in which Casada admitted to knowing that Cothren's involvement in Phoenix Solutions was material to the Speaker of the House—would make no sense without the unredacted context of the sentence before it. To understand the meaning of the sentence, the jury needed to hear *what* "made sense" to Casada—namely, Casada's belief that "Cade felt like they would not let him do the work, or not approve the work if they knew it was Cade." Accordingly, the statement about what Cothren "felt" was not being offered for the truth of the matter asserted (to the extent it was offered for any "purpose" at all).

Rather, the statement of Casada's belief was a statement of a party opponent (*i.e.*, Casada), as well as a statement about his then-existing state of mind. It was therefore admissible under both Federal Rules of Evidence 801(d)(2)(A) and 803(3). And it was not testimonial *hearsay* barred by the Confrontation Clause or *Bruton*. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *see also Smith v. Arizona*, 602 U.S. 779, 784 (2024) ("The [Confrontation] Clause's prohibition 'applies only to testimonial hearsay'—and in that two-word phrase are two limits." (citation omitted)); *Tennessee v. Street*, 471 U.S. 409, 414 (1985) (holding that the introduction of an accomplice's confession for a nonhearsay purpose did not violate the Confrontation Clause); *United States v. Wolfe*, No. CIVA 09-1248, 2010 WL 1372448, at *6 & n.7 (W.D. Pa. Apr. 5, 2010) (finding no *Bruton* violation in part because the

codefendant's statement was offered as statement of a then-existing mental state under Rule 803(3)).

Even assuming that Casada's brief comment fell under *Bruton*, however, the *Zuern* factors do not indicate that the Court abused its discretion in denying the mistrial—much less that the denial was so "extraordinary" to demand a new trial under Rule 33. First, the brief comment was inadvertent—comparable to the "unsolicited" standard in *Zuern*. Second, there was no government line of questioning, so the second factor is (at most) neutral. Third, the Court's clear and forceful limiting instruction—which emphasized the government's culpability—occurred a day later. But in the chronology of proceedings for which the jury was present, the instruction occurred almost immediately after Government Exhibit 135A was published. Fourth, there was no bad faith on the part of the government.[9] Fifth, the half-sentence of audio that Defendants contend is *Bruton*-protected ("Cade felt like they would not let him do the work or not approve the work if they knew it was Cade") was buried deep in the publication of an audio recording more than an hour long. It is reasonable to assume that neither Defendant even noticed the half-sentence when it came up—otherwise they would have contemporaneously objected—and that the jury likely did not either. The half-sentence was never referenced in witness testimony, was not available to jury during deliberations, and was not argued by the government in closing.

---

[9]     Defendants argue that gross negligence can satisfy the requirement of "bad faith" within the meaning of *Zuern*. But they do not cite any case for that proposition. The sole unpublished, out-of-district case they cite found no government bad faith in the context of a motion to dismiss under the Speedy Trial Act. (*See* D.E. #372, at 23 (citing *United States v. Patterson*, No. 3:21-MJ-1122, 2023 WL 2621198, at *3 (E.D. Tenn. Mar. 7, 2023); D.E. #377, at 36 (same).)

In any event, although the government acknowledges its error in this case, the context set forth above—an attempted last-minute redaction intended to *benefit* Defendants—does not rise to the level of gross negligence.

In contrast to this fragmentary blip, the government drew the jury's attention to mountains of other evidence of Cothren's state of mind.[10] Smith testified that she communicated with Defendants about how they needed to conceal Cothren's involvement to get paid by the State. Corroborating her testimony were numerous exhibits of Cothren's own words demonstrating that he knew he needed to conceal his involvement in Phoenix Solutions. *See, e.g.*, GX 21, at 4 ("Just take my name off it"); GX 23, at 7 (agreeing with Smith, who wrote, "[m]aybe we should set up another company . . . just don't want to be in the middle of elections and have something fall apart"); GX 28, at 12 ("Just remember to take my name off the email."); GX 29, at 19 ("Just take my name off the email!"); GX 31, at 3 ("Make sure to take my name off!"); GX 45, at 2 (agreeing with Smith's "worry that some smarty pants will start linking Phoenix to us"); GX 59 (discussing an attempt to dupe Sexton through a fake confrontation between Smith and Casada); GX 86 ("I would like to keep the relationship between Phoenix Solutions . . . and myself confidential if someone were to ask."). And, of course, the conspirators used the pseudonyms "Matthew Phoenix" and "Matthew Cyrus"—supposedly an ex-Jamestown Associates consultant from New Mexico— to conceal Cothren's involvement from people who may have tipped off the Speaker had they known the truth, including Holt Whitt, *e.g.*, GX 84; Connie Ridley, *e.g.*, GX 99; Nick Crawford, *e.g.*, GX 81; Chip Saltsman, *e.g.*, GX 91; and Rep. Johnny Garrett, *e.g.*, GX 104. Cothren was right to be concerned about the Speaker's Office discovering that he was behind Phoenix Solutions: Ridley testified that when she found out, she notified the Speaker's Office, and the Speaker's chief of staff advised her to cooperate in the FBI's investigation.

---

[10]     For similar reasons, even if the Court applied the standard in *United States v. Macias*, 387 F.3d 509 (6th Cir. 2004), there was no error in denying the motion for mistrial.

Finally, insofar as Cothren argues that he "bargained for the *exclusion* of the recorded testimony," that is inaccurate. (D.E. #377, at 35 (emphasis added).)[11] The relevant portion of the parties' "heavily negotiated" agreement (D.E. #372, at 20)—which defense counsel drafted in the first instance—stated:

> As to each version of the audio recorded interview of Defendant Casada, the government shall redact the following portions of the interview corresponding to the following timestamps: 1:22:35-1:22:55 and 1:47:15-1:47:24. Other than the redactions described in the former sentence, the Defendants waive any potential Confrontation Clause issues as described in *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny related to their interviews.

(D.E. #320, at ¶ 10.) The government did not waive *its* argument that the statement was not covered by *Bruton* and was thus admissible. Cothren merely preserved his own *Bruton* argument. And Cothren was represented by experienced counsel. Had he wanted to bargain for the *government's* waiver, he could have proposed language to that effect. He did not.[12]

---

[11]   Casada also contends that he "specifically bargained for, and made concessions to obtain, the exclusion of the pertinent clips of his FBI interview." (D.E. #372, at 20.) On April 19 and 20, 2025, after the parties had negotiated an otherwise complete stipulation agreement that would have waived all of Cothren's *Bruton* claims regarding Casada's interview, Cothren's counsel sought to limit the scope of that waiver.

Casada's counsel made no "specific" request to limit the waiver of *Bruton* with respect to his own interview. And he could not have credibly made such a request, because he had no argument that his interview was inadmissible against him. Casada also made no concessions after Cothren's counsel proposed the more limited *Bruton* waiver.

[12]   Cothren acknowledges that the stipulation agreement was subject to contract principles. (*See* D.E. #377, at 34.) Contracts are typically construed according to their terms and, if the terms are ambiguous, they are construed against the drafter. *Cf. Heimer v. Companion Life Ins. Co.*, 879 F.3d 172, 176 (6th Cir. 2018) ("Were there any doubts that the plan is unambiguous, the ordinary contract principle to construe a contract against its drafter is the final nail in the coffin."). The Court should thus construe ambiguities in the stipulation against the defense.

Cothren also cites a series of cases relating to due process considerations in plea agreements and immunity agreements. (*See* D.E. #377, at 34–35.) Plea agreements are different from other contracts, however, as broken government promises affect whether a defendant's guilty plea is knowing and voluntary. *See Mabry v. Johnson*, 467 U.S. 504, 507–08 (1984) ("A plea bargain standing alone is without constitutional significance. . . . It is the ensuing guilty plea that

38

**D.    The Court Properly Admitted Caucus and Campaign Evidence**

For the reasons set forth in the government's opposition to Defendants' motion *in limine*, (D.E. #278, at 17–21), the Court appropriately ruled that the conspirators' caucus and campaign work was *res gestae* evidence that was inextricably intertwined with their PPA work. As the Court concluded on the sixth day of trial, part of the story of concealment that is at the heart of this case includes Defendants' efforts to obtain caucus and campaign work. *See United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) ("Typically, [background] evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense."). And even Casada acknowledges that the caucus and campaign work "was obtained and performed in the same manner as the charged conduct." (D.E. #372, at 26.) Indeed, it involved the same type of conduct by the same conspirators, using the same company, during the same period, targeting a similar group (Tennessee Republicans) to produce communications to constituents and prospective voters. *Cf. United States v. Daulton*, 266 F. App'x 381, 384–85 (6th Cir. 2008) (unpublished) (affirming district court's ruling that evidence of defendant's business practices prior to charged fraud scheme was appropriate intrinsic evidence). Accordingly, the Court acted

---

implicates the Constitution."); *Santobello v. New York*, 404 U.S. 257, 262 (1971) ("This phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances."); *Innes v. Dalsheim*, 864 F.2d 974, 979 (2d Cir. 1988) ("Because [plea agreements are largely dictated by the state] and the substantial constitutional interests implicated by plea agreements, the state must bear the burden for any lack of clarity in the agreement and ambiguities should be resolved in favor of the defendant."); *In re Arnett*, 804 F.2d 1200, 1203 (11th Cir. 1986) ("A guilty plea is more than an admission of past conduct; it is a waiver of the right to trial before a judge or jury."). So too are immunity agreements, as a defendant under a grant of immunity forgoes his Fifth Amendment privilege. *See United States v. Harvey*, 869 F.2d 1439, 1444 (11th Cir. 1989). Cothren cites no case applying due process considerations to any pretrial evidentiary stipulation, much less a case in which the remedy for breach was a new trial.

well within its discretion in ruling that the caucus and campaign evidence was inextricably intertwined with the charged conduct.[13]

Defendants argue that, even if the caucus and campaign work was intrinsic, it was irrelevant and more prejudicial than probative. (D.E. #372, at 25–26; DE #377, at 40.) Their arguments are subject to the Court's "broad discretion on evidentiary rulings." *See United States v. Hart*, 70 F.3d 854, 858 (6th Cir. 1995).

As to relevance, the campaign and caucus evidence clears the low bar of making a fact of consequence more likely to be true. The conspirators were more likely to engage in the charged PPA fraud and bribery scheme based on the prospect of using PPA work to secure more lucrative caucus and campaign work than they would have been if PPA work had been their only potential source of revenue. And that reasoning does not rely on speculative inferences. Through Smith's testimony and corroborating communications from Cothren and Casada, the government demonstrated that the conspirators always intended to use the PPA work to bolster their case for caucus and campaign work. *See, e.g.*, GX 24, at 12–21; GX 49; GX 91; GX 104. Furthermore, the defense's opening downplayed the possibility that Cothren's involvement in Phoenix Solutions mattered to anyone, which the Court rightfully observed "definitely [made] this relevant."

As to the notion that the jury would prejudicially conflate the caucus and campaign work with PPA work, the Court appropriately noted that, after Cothren's opening, "anyone that doesn't understand the difference wasn't listening." Both Defendants and the government repeatedly drew lines between the categories of Phoenix Solutions' business. And recognizing the defense's

---

[13] Although the Court did not admit the caucus and campaign evidence pursuant to the government's alternative Rule 404(b) argument, for the purposes of preserving that argument, the government incorporates its trial arguments by reference here.

sensitivity to the issue, the government was careful in closing argument not to suggest that the jury should convict Defendants for defrauding caucus and campaign clients.

In addition, the conspirators' lies in connection with the caucus and campaign work were hardly likely to inflame the jury's passions such that the evidence was substantially more prejudicial than probative. *See Daulton*, 266 F. App'x at 385 ("Evidence is not unfairly prejudicial simply because it provides more support for a conclusion that the defendant committed the crime. It is unfairly prejudicial if it serves to 'inflame the passions of the jury' and causes them to ignore the evidence." (quoting *United States v. Whittington*, 455 F.3d 736, 739–40 (6th Cir. 2006)). The deceptions related to caucus and campaign work were of a similar moral character to the conspirators' deceptions with respect to PPA work. Even assuming that evidence of the caucus-and-campaign-work lies incrementally prejudiced Defendants or confused the jury, the Court repeatedly gave an appropriate limiting instruction that it crafted after consultation with Defendants. *Cf. United States v. Harvel*, 115 F.4th 714, 737 (6th Cir. 2024) (holding that a district court's limiting instruction "reduce[d] any prejudice by making clear that [the defendant] was not on trial for the uncharged conduct").

Nor can Defendants show that the court abused its discretion in denying their objections on the grounds of cumulativeness. The Court carefully monitored the government's proposed caucus and campaign evidence throughout the trial. In particular, on the ninth day of trial, the parties engaged in an extended discussion of additional potential evidence related to caucus and campaign work, resulting in the government not offering some of that evidence.

Defendants also assert that the introduction of the caucus-and-campaign-work evidence constituted a variance from the indictment. (D.E. # 372, at 26; D.E. #377, at 38–39.) "[A] variance occurs when 'the evidence at trial proves facts materially different from those alleged' explicitly

in the indictment." *United States v. Belcher*, 92 F.4th 643, 648 (6th Cir. 2024) (citation omitted). Here, the government alleged misconduct related to caucus and campaign work in the indictment itself. (*See* D.E. #3 ¶¶ 33–34, 46, 49, 51–52.) Indeed, given that Cothren admits that the evidence was "[a]s predicted," (D.E. #377, at 41), he can hardly claim the prejudicial surprise required for the grant of a new trial based on a variance. *See United States v. Bradley*, 917 F.3d 493, 504 (6th Cir. 2019) ("The indictment must inform the defendant of the charges against him, but it need not inform him point-by-point of the manner in which the government will prove its case."). Furthermore, the government did not argue that the jury should convict Defendants of money or property wire fraud based on the caucus and campaign work. It instead appropriately used the evidence to meet Defendants' theory—first raised in their opening statements—that the PPA work was not lucrative enough to motivate them to commit the corruption and fraud crimes charged in the indictment. Accordingly, there was no variance at all, much less one that affected Defendants' substantial rights. *See United States v. Robinson*, 99 F.4th 344, 366 (6th Cir. 2024) (holding that, even assuming there was a variance, the introduction of inculpatory emails did not affect the defendant's substantial rights, given that "each side had the same opportunity to examine the messages, to decide whether to use them or call witnesses based on them at trial, or to use them on cross examination").

For the reasons set forth above, the Court's admission of the campaign-and-caucus-work evidence was not error. So whether alone or in combination with other purported errors, admitting the evidence was not "so prejudicial cumulatively as to render this trial fundamentally unfair." (*Contra*  D.E. #377, at 46.)

**E.    The Court Did Not Violate Cothren's Sixth Amendment Rights**

Cothren next argues that the Court violated his Sixth Amendment rights when it sustained objections to his cross-examinations. But "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "Where a trial court has limited but not totally precluded cross-examination . . . the issue is whether the jury was otherwise in possession of sufficient information concerning formative events to make a discriminating appraisal of a witness' motives and bias." *United States v. Turner*, 22 F. App'x 404, 412 (6th Cir. 2001) (unpublished) (omission in original) (quoting *United States v. Touchstone*, 726 F.2d 1116, 1123 (6th Cir. 1984)).

Cothren principally complains that he was not allowed to question Cameron Sexton or "to cross-examine other government witnesses . . . about matters bearing directly on Mr. Sexton's credibility." (D.E. #377, at 42.)[14] As an initial matter, the Court did nothing to prevent Cothren

---

[14]    Cothren also complains that the Court admitted only redacted versions of Defense Exhibit 252, which were text communications between himself and Sexton. (D.E. #377, at 42.) In contrast to the Confrontation Clause arguments he raises in this section of his Rule 33 motion, this argument is subject to the Court's "broad discretion on evidentiary rulings." *See Hart*, 70 F.3d at 858.

Notably, Cothren never articulates the Court's actual ruling on Defense Exhibit 252, much less argue why it was erroneous. In light of the defense's belated identification of the exhibit— which it purportedly was going to use only for impeachment—the Court gave the defense a choice: Defense Exhibit 252 could be admitted either unredacted, conditioned on the government's being able to reopen its evidence on the issue it raised, or as redacted. Cothren elected the latter. Because Cothren does not engage with the Court's reasons for admitting redacted versions of the communications, he has not shown that the Court erred at all, much less that it abused its discretion. *Cf. United States v. Sims*, No. 23-4034, 2025 WL 692346, at *7 (6th Cir. Mar. 4, 2025) (rejecting Confrontation Clause challenge because "the court did not tell [the defendant] he could not ask his question. It merely warned him that probing the circumstances of the pre-search-warrant investigation would allow the government to present its own, hitherto excluded evidence regarding

43

from questioning Sexton under oath. Indeed, Cothren had also subpoenaed Sexton to testify at trial but declined to call him as a witness. The Court cannot be blamed for Cothren's trial strategy. And because Sexton did not testify and none of his hearsay statements were introduced for their truth, there was no error in limiting Cothren's cross-examination of other witnesses on matters relating to Sexton's credibility. *See United States v. Regan*, 103 F.3d 1072, 1083 (2d Cir. 1997) ("[A] district court need not allow impeachment of even a 'central figure' whose out-of-court statements were not admitted for their truth."); *see also* 5 WEINSTEIN'S FEDERAL EVIDENCE § 806.03[3] (2025) (noting that Rule 806 does not "permit impeachment of someone who neither takes the stand nor is quoted in a hearsay declaration"). Because the jury was not called upon to evaluate any testimony by Sexton, introduction of evidence that would purportedly impeach him would not make any fact of consequence more likely to be true. *See* FED. R. EVID. 401. It would have only confused the issues. *See* FED. R. EVID. 403.

Finally, Cothren protests that he was not permitted to explore federal agents' understanding of the elements of the crimes charged or supposed ulterior motivations for search warrants. (D.E. #377, at 43.) The Court acted well within its discretion in precluding him from asking about those topics. Evidence about the supposed alternative motives for the search warrants would not have made any element of the charged crimes more or less likely to be true and would have instead confused the jury. *See United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998) ("Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation."); *United States v. Veal*, 23 F.3d 985, 989 (6th

---

that investigation"). Furthermore, Cothren cannot credibly claim prejudice: his counsel stated she never intended to use Defense Exhibit 252 as substantive evidence anyway.

Cir. 1994) (affirming district court's exclusion of evidence relating to the quality of the government's investigation because "the jury would not be called upon to determine whether the government's investigation had been good or bad"). Furthermore, fact-witness testimony about the elements of the charged crime is plainly improper. *See United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984) ("It is the function of the trial judge to determine the law of the case. It is impermissible to delegate that function to a jury through the submission of testimony on controlling legal principles.").

## F.     The Court Properly Instructed the Jury

Even without accounting for responses to jury notes, the parties argued jury instructions for more than ten hours. Notwithstanding this exceptionally deliberative process, Cothren contends that the Court failed to instruct the jury accurately on any count whatsoever. (D.E. #377, at 24.)

Under Rule 33, erroneous or insufficient jury instructions warrant a new trial only if the instructions, "taken as a whole, are misleading or give an inadequate understanding of the law." *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 579 (6th Cir. 2013) (quoting *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 966 (6th Cir. 1998)). The court cannot consider allegedly insufficient instructions "in isolation" but must instead "consider the charge as a whole." *Id.* (quoting *United States v. Prince*, 214 F.3d 740, 760–61 (6th Cir. 2000)). A district court abuses its discretion by rejecting a defendant's proposed jury instruction when: "(1) the denied instruction correctly stated the law; (2) the actual instruction did not substantially cover the denied instruction; and (3) the denied instruction concerned such an important point in the trial that its absence substantially impaired the defense." *Henderson*, 2 F.4th at 597. Importantly, "the court's refusal to give an instruction does not substantially impair the defense when the jury was

45

already 'well aware' of that defense theory." *Id.* (quoting *United States v. Godofsky*, 943 F.3d 1011, 1027 (6th Cir. 2019)).

1.   *Obtaining Property by Fraud (Count 2)*

Cothren argues that the Court erred in its Count 2 instructions because it failed to define "materiality" as he wished. (D.E. #377, at 25–26.) But failure to further define the term "material"—a commonly known word—did not render the jury instructions as a whole misleading or inadequate. *See United States v. Robinson*, 435 F.3d 1244, 1249 (10th Cir. 2006) ("A significant line of cases holds that it is not error—plain or otherwise—to fail to define a statutory term or phrase that carries its natural meaning."); *United States v. Blasini-Lluberas*, 169 F.3d 57, 67 (1st Cir. 1999) ("'[M]ateriality' is not such a technical concept outside of the jurors' experience that failure to define it rises to the level of plain error."). In fact, Cothren's proposed definition of "materiality"—which would have "required . . . the jury to find an intent to cause economic loss," (D.E. #377, at 28)—would have been error, as even the common-law definition of fraud does not include such an element. *See Kousisis*, 145 S. Ct. at 1394 ("[I]t was the deception-induced deprivation of property—not economic loss—that common-law courts generally deemed injurious.").

Cothren also claims that the Court erred in its supplemental instruction regarding materiality. (D.E. #377, at 31.) The propriety of a supplemental instruction is judged by "whether it fairly responds to the jury's inquiry without creating a prejudice which Rule 30 was designed to avoid." *United States v. Giacalone*, 588 F.2d 1158, 1166 (6th Cir. 1978). A trial court's supplemental instruction is reviewed for abuse of discretion, "taking into account the sensitive nature of the judge's responsibility at this stage of the trial and the duty of the trial judge to provide impartial and effective guidance on the law for the jury to follow in its deliberations." *Id.*

46

Cothren complains that he was prejudiced within the meaning of Rule 30 because he did not have notice that the jurors would apply their own definition of "materiality." But it is difficult to see what definition they would have used otherwise when the jury instructions did not define the term. Furthermore, when the jury requested further definition, Cothren's counsel stated, "I think this is a term that they can use their common sense with." That is substantively similar—if not identical—to the instruction the Court ultimately gave. *Cf. United States v. Montgomery*, 998 F.3d 693, 698 (6th Cir. 2021) ("A litigant invites error when he contributes in some way to the district court's error without intentionally relinquishing his rights.").

Finally, Cothren contends that he did not have sufficient notice of the Court's definition of "obtain by fraud," because "the Court's position or thinking on this issue . . . apparently evolved during the charge conference." (D.E. #377, at 28.) Cothren cites no authority for the proposition that the Court could not edit its draft jury instructions during or before a charge conference. And such a rule would defy logic.

2.    *Section 666(c)'s Safe Harbor Provision*

Both Defendants complain that the Court's Section 666(c) safe harbor instruction was erroneous. (D.E. #372, at 28–29; D.E. #377, at 27.) The Court instructed the jury as follows: "In determining whether the $5,000 threshold is met, you must exclude any amounts received as bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business. Bona fide means without fraud or deceit." That was an accurate statement of the law. *See United States v. George*, 841 F.3d 55, 62 (1st Cir. 2016) ("'[B]ona fide salary' means salary actually earned in good faith for work done for the employer."); *United States v. Walsh*, 156 F. Supp. 3d 374, 384–85 (E.D.N.Y. 2016) (finding that "'bona fide salary . . . in the ordinary course

of business,' is fixed compensation for services obtained without fraud or deceit and in the normal routine of a business" (omission in original)).

According to Defendants, however, the Court was required to also instruct the jury: "You may not consider any acts Defendants took in securing the work in determining whether the payments Defendant Casada received were bona fide compensation paid in the usual course of business. You must focus solely on whether Defendant Casada performed the services for which he was paid." (*E.g.* D.E. #295, at 38.) They claim that their proposed instruction "came directly from, (D.E. #377, at 27), and fell "squarely within," (D.E. #372, at 28), two Sixth Circuit cases: *United States v. Mills*, 140 F.3d 630 (6th Cir. 1998), and *United States v. Mann*, 172 F.3d 50, 1999 WL 17647 (6th Cir. 1999) (unpublished). But the Court will struggle to find the language of Defendants' proposed instruction in *Mills* or *Mann*. Neither case held that a jury "could not consider any acts" that a defendant took to corruptly procure state business. Nor did either case hold that a jury "must focus solely on whether [the defendant] performed the services for which he was paid."

As the government explained in its response to Defendants' motions to dismiss, *Mills* and *Mann* are distinguishable from this case. (*See* D.E. #75, at 16–24.) Neither of those cases involved an ongoing kickback and fraud scheme like the one Defendants perpetuated. In *Mann*, there was no kickback or dishonesty at all. *See* 1999 WL 17647, at *1. And *Mills* dealt with one-off instances of wrongdoing to secure full-time jobs (with presumably indefinite tenures), so the court declined to find that the wrongdoing tainted the entirety of the employees' salaries. *See* 140 F.3d at 633–34. By contrast, the conspirators' scheme here was fueled by bribery and fraud throughout its life—from the well-defined kickback arrangement to the use of shell companies and the Matthew

48

Phoenix pseudonym to conduct business. As the *Mills* court might put it, the conspirators engaged in "clearly . . . unacceptable business practice[s]." *See id.* at 633 n.1.

Defendants have simply gestured at *Mills* and *Mann* in an attempt to shoehorn one of their main trial theories—that they could not have committed bribery if they performed the work they obtained through bribery—into a jury instruction. But again, that theory runs contrary to the law and common sense. *See United States v. Burke*, No. 19-CR-322, 2022 WL 1970189, at *31 (N.D. Ill. June 6, 2022) ("Effectively, [the defendant's] position is that he can cleanse the tainted procurement process if he receives *some* non-sham services. That view of § 666(c) is untenable. Congress would not craft an exception that swallows the rule."); *Walsh*, 156 F. Supp. 3d at 386 (describing as "absurd" a reading of Section 666(c) that "would potentially permit local and state government agents to steal or misappropriate federal money so long as it had the indicia of wages and salary"); *United States v. O'Brien*, 994 F. Supp. 2d 167, 185 (D. Mass. 2014) (rejecting as "counterintuitive" a reading of Section 666(c) that would immunize "a $10,000 bribe paid to obtain a $10 million consulting contract . . . if the contract involved the payment of legitimate salaries for legitimate work."). The Court thus appropriately rejected Defendants' proposed jury instruction on Section 666(c).

### 3. The "Private Capacity" Theory

The Court's jury instructions were also not misleading or inadequate merely because the Court did not instruct the jury that the government was required to prove that Reps. Casada and Smith acted in their "official capacities." As Cothren concedes, "the underlying statutes do not, on their face, require the government to prove a defendant was acting as a public official and not a private individual with respect to the charged conduct." (D.E. #372, at 30.) Rather than parsing whether one of the legislators was wearing a particular "hat" at any given moment, the Court's

jury instructions on both Section 666 bribery and honest services wire fraud appropriately focused on whether Defendants solicited, received, offered, or paid a bribe in exchange for an official act. *See Snyder v. United States*, 603 U.S. 1, 10 (2024) ("Section 666(a)(1)(B) makes it a crime for state and local officials to 'corruptly' accept a payment 'intending to be influenced or rewarded' for an official act."); *United States v. Lee*, 919 F.3d 340, 350 (6th Cir. 2019) (stating that an honest services fraud conviction "requires either an 'official act' in furtherance of the corrupt relationship or an agreement to perform an official act"). Because the "private capacity" instruction sought by Defendants was not supported by the law, the Court was not required to give it. *See United States v. Mack*, 159 F.3d 208, 218 (6th Cir. 1998) (holding that failure to give defense instruction was not error because the requested instruction was not a correct statement of law).

And contrary to Cothren's argument, the Court's instructions did not leave the jury "free to conclude . . . that a public official can be held criminally liable under Section 666 for *anything* he does so long as he holds public office." (D.E. #377, at 30.) The Court clearly instructed the jury that, to convict Defendants of any of the bribery-related counts, they had to find a quid pro quo agreement that included the promise of an official act.

Finally, the jury was "well aware" of the defense's private capacity theory. *See Henderson*, 2 F.4th at 597. Defendants repeatedly elicited testimony on the subject, including statements from Rep. Smith that she used her Rivers Edge Alliance email for communications with Ridley. And just as in *Henderson*, "[c]losing arguments crystalized the issue for the jury." *Id.* at 598. Defendants emphasized in their closings that Reps. Casada and Smith took no official acts because they were acting in their private capacities. Also as in *Henderson*, "nothing in the jury instruction kept [Defendants'] counsel from arguing at length in [their] response[s] that [Reps. Casada and Smith's conduct] did not fit within the statutory definition of an official act." *Id.* Defendants thus

had ample opportunity to present their private capacity theory. "The jury just rejected that theory." *Id.* Accordingly, the Court's denial of Defendant's private-capacity instruction did not "substantially impair the defense." *Id.* at 597.

4. *Undisclosed Self-Dealing*

Casada contends that the Court erred by failing to instruct the jury that "[i]t is not a violation of federal law for a public official to engage in undisclosed self-dealing" and that Tennessee state law permitted him to provide services to the State. (D.E. #372, at 29– 30.) But neither the government's evidence nor its theory of the case showed "self-dealing." And the government did not argue that the mere provision of services to the State by a State legislator constituted bribery. Rather, the government proved and argued to the jury that Cothren paid kickbacks to Reps. Casada and Smith in exchange for official acts. Casada's proposed jury instructions on undisclosed self-dealing and Tennessee state law would have therefore misled the jury, so the Court did not err by rejecting them.

5. *Supplemental Instruction on Jury Question No. 3*

In response to the third jury question, the Court instructed the jury that a scrivener's error on government exhibits did "not affect . . . the validity of any charge against the defendants." (D.E. #346.) The instruction then reminded the jurors that they "alone are the judges of the facts" and could "accord particular evidence whatever weight you believe it deserves." (*Id.*) Cothren complains that the Court's instruction "disabused any juror from adopting or maintaining" a belief that the mistake "undermined the credibility of the government's case." (D.E. #377, at 32–33.)

The plain language of the instruction permitted the jurors to conclude that scrivener's errors could affect the credibility of a witness or undermine the persuasiveness of an exhibit while accurately advising the jury that the typographical error did not create a legal defect in the charge.

51

*See, e.g.*, *United States v. Baldwin*, 774 F.3d 711, 724 (11th Cir. 2014) (affirming response to jury note that discrepancies between account numbers listed in the indictment and evidence presented at trial constituted "scrivener's errors that d[id] not affect the validity of the Superseding Indictment"); *United States v. Neill*, 166 F.3d 943, 948 (9th Cir. 1999) (permitting amendment of indictment to correct scrivener's error after case was submitted to jury). Consequently, the Court did not err in providing the instruction.

### G.     The Statutes in Counts One Through Eleven Are Not Void for Vagueness

Finally, Cothren argues that the statutes underlying each of his bribery and fraud convictions are void for vagueness.[15] As the Court noted in its oral order denying Defendants' motions to dismiss, however, the Supreme Court has held that the honest services fraud statute is not unconstitutionally vague. (D.E. #129)*. See Skilling v. United States*, 561 U.S. 358, 412 (2010) ("Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague."). And no court of appeals has agreed with a vagueness challenge to Section 666. *See*

---

[15]     Cothren takes a shotgun approach to his due process argument. In a single paragraph, he argues that eight terms and three additional concepts are so vague that they render three different statutes unconstitutional. (D.E. #377, at 45–46.) Other than by incorporating his jury instruction arguments, however, he does not meaningfully develop arguments as to any of these terms or concepts, so the Court should deem them forfeited. *See United States v. Fekete*, 535 F.3d 471, 482 (6th Cir. 2008) (holding that argument in a single paragraph without citation was forfeited).

Nonetheless, the government endeavors to address some of them here. Many of the terms about which Cothren complains have "common meanings" which provide adequate notice of the prohibited conduct. *See United States v. Hollern*, 366 F. App'x 609, 612 (6th Cir. 2010). For example, a person of ordinary intelligence would know that the term "property" includes money, and that "misrepresentation and concealment" mean deception. As set forth above, regardless of the definition of "material," Cothren would lose, and so the statute is not void as applied to him. Insofar as he complains that "corruptly" is vague, the inclusion of that element actually cuts the other way: it and similar scienter requirements in Sections 1342 and 1343 "alleviate vagueness concerns." *McFadden v. United States*, 576 U.S. 186, 197 (2015).

*United States v. Donagher*, 520 F. Supp. 3d 1034, 1054 (N.D. Ill. 2021) ("Every circuit court to have addressed this issue has held that § 666 is not void for vagueness.").

More generally, a statute violates due process only if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). And while Defendants disagree with how some terms were defined in the jury instructions, that is insufficient to demonstrate that the statutes are unconstitutionally vague—even disagreements among courts of appeals do not necessarily do that. *United States v. Parrish*, 942 F.3d 289, 295 (6th Cir. 2019). In addition, the only fact that Cothren raises in his Rule 33 motion that was not present during the motion-to-dismiss briefing is that the charge conference was lengthy. (*See* D.E. #377, at 44–45.) But taking the time to provide thoughtful jury instructions cannot change a constitutional charge into an unconstitutional one. Among other things, accepting that argument would incentivize trial courts to be *less* deliberative, lest the duration of the charge conference cross some unspecified threshold mandating a new trial after weeks of testimony.

Ultimately, however, the relevant questions are whether a person of ordinary intelligence would understand that:

    (1)    Section 666(a)(1)(A) prohibited using deception to get funds from the State of Tennessee;

    (2)    Sections 666(a)(1)(B), 666(a)(2), 1343, and 1346 prohibited bribing State officials to obtain State money; and

    (3)    Section 1342 prohibited using a fictious name while committing those crimes.

The answer to each of these questions is plainly "yes." *See Skilling*, 561 U.S. at 412 ("As to fair notice, whatever the school of thought concerning the scope and meaning of § 1346, it has always

been as plain as a pikestaff that bribes and kickbacks constitute honest-services fraud." (cleaned up)).

<u>**CONCLUSION**</u>

For the reasons set forth above, Defendants' motions under Rules 29 and 33 should be denied.

Respectfully submitted,

ROBERT E. McGUIRE
Acting United States Attorney for the
Middle District of Tennessee

*/s/ Taylor J. Phillips*
TAYLOR J. PHILLIPS
Assistant United States Attorney
719 Church Street, Ste 3300
Nashville, Tennessee 37203
Telephone: 615-736-5151

*/s/ Blake J. Ellison*
JOHN P. TADDEI
BLAKE J. ELLISON
Trial Attorneys
Public Integrity Section, Criminal Division
United States Department of Justice

54