UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 3:22-cr-00282 |
| | ) JUDGE RICHARDSON |
| GLEN CASADA | ) |

## DEFENDANT GLEN CASADA'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE

Defendant Glen Casada, through undersigned counsel, files this sentencing memorandum based on the Title 18 U.S.C. § 3553(a) sentencing factors. Specifically, Mr. Casada requests that this Honorable Court consider several factors supporting departures and/or variances and requests a noncustodial sentence.

### Procedural History

On August 22, 2022, the Grand Jury returned the above referenced Indictment. (DE 3, PSR 1). Casada was arrested on August 23, 2022, whereupon he pleaded Not Guilty and was released. (DE 10). Casada has remained in compliance with his release conditions throughout the pendency of this matter. (PSR 9).

On April 22, 2025, jury trial began. The trial consisted of 2 days of jury selection, approximately 3 weeks of proof, and 4 days of deliberations. (PSR 6-7). At the conclusion of the trial, the jury found Casada Guilty of Counts 1-4, 6-9, and 11-19. (DE 344). At the close of the Government's proof and again at the close of all proof, Casada moved for a Rule 29 Judgment of Acquittal. (DE 370). On June 30, 2025, Casada also made a Rule 33 Motion for a New Trial. (DE 372).

On September 9, 2025, the Court Granted Mr. Casada's Rule 29 Motion for Judgment of Acquittal as to Counts 2-4 – all of the §666 counts – but Denied the Motion as to the remaining counts of conviction. (DE 420). On September 10, 2025, the Court denied Mr. Casada's Rule 33 Motion for a New Trial. (DE 423).

As such, Mr. Casada currently stands convicted of Counts 1, 5-9, and 11-19. He has not been convicted of accepting or soliciting bribes, or theft – these allegations are the core of the criminal conduct alleged against Casada.

## The U.S. Sentencing Guidelines

Undisputed guidelines

The parties agree that the following guidelines are applicable:

- Base Offense Level - 2C1.1(a)(1) - +14
- Elected Public Official – 2C1.1(b)(3) - +4
- Money Laundering – 2S1.1(b)(2)(B) - +2
- Zero-point offender – 4C1.1(a)(1-10) – (-2)

Disputed guidelines

The PSR contemplates the following guideline enhancements, which are disputed:

- Multiple "kickbacks" – 2C1.1(b)(1) - +2
- Loss – 2C1.1(b)(2) - +10
- "Sophisticated" Money Laundering – 2S1.1(b)(3) - +2
- Minimal or minor role – 3B1.2 (-2 to -4)[1]

---

[1] Counsel did not raise this adjustment in his initial Position with Respect to the PSR. Counsel notified the Government and the PSR writer of his intention to raise this issue on September 9, 2025, and the PSR writer's position has been included in the Final PSR. Counsel did raise this issue in his Supplemental Position with Respect to the PSR.

## 18 USCA §3553(a)

A court shall "impose a sentence sufficient, but not greater than necessary" to fulfill four primary objectives:

(A) Retribution (to reflect the seriousness of the offense, to promote respect for the law and to provide "just punishment");

(B) Deterrence;

(C) Incapacitation ("to protect from further crimes"); and

(D) Rehabilitation ("to provide the defendant with needed educational training or vocational training, medical care, or other correctional treatment in the most effective manner").

18 U.S.C. § 3553(a)(2); *see United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005) (rendering the Sentencing Guidelines "effectively advisory"); *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006) ("[A] district court's job is not to impose a 'reasonable' sentence. Rather a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of § 3553(a)").

The United States Sentencing Guidelines are merely one of many factors a court must consider when sentencing a defendant. The additional sentencing factors that a court shall consider are as follows:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

3

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentences and the sentencing ranges established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

(5) any pertinent policy statement issued by the sentencing commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *United States v. Barnett*, 398 F.3d 516, 528 (6th Cir. 2005) ("Under the new post-Booker framework, the district court is empowered with greater discretion to consider the factors provided in 18 U.S.C § 3553(a) in determining a proper sentence").

The United States Supreme Court, in *Rita v. United States*, stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. 127 S.Ct. 2456 (2007). The Guidelines, however, are not the only consideration for the Court when determining an appropriate sentence for a defendant. The Court must also consider all of the Title 18 U.S.C. § 3553(a) factors and make an individualized assessment based on the facts presented. *See Gall v. United States*, 128 S.Ct. 586 (2007). It is clear, as indicated by the Supreme Court in *Gall*, that a district court judge should use his/her own discretion in determining the appropriate sentence for each individual defendant based upon all of the facts and circumstances of each case and of each individual defendant.

4

Considering all the sentencing factors, Mr. Casada respectfully submits that a variance resulting in a non-custodial sentence of either probation or time-served followed by a period of supervision is appropriate and results in a sentence that is "sufficient but not greater than necessary" to further this Court's sentencing objectives.

**The History and Characteristics of the Defendant**

Glen Casada is a 66-year-old man whose life and career has been marked by service to others. He continues on that path today in semi-retirement. His impact on the community, his family, and his friends is evidenced in part by the letters of support he has received. **Exhibit A** to this filing is letters of support written by 45 people, ranging from family members to friends to work colleagues to members of the community.

Community

Casada's service to his community is nothing short of remarkable, and includes the following:

- provides volunteer "handyman" services to elderly people,
- delivers food from local restaurants to the homeless,
- delivers food to sick or elderly church members,
- teaches a 12-week course at Trauma Reboot Recovery,
- serves on the hospitality committee for his Sunday School class,
- provides meal service at Mt. Carmel Baptist Church,
- volunteers and supports Fellowship of Christian Athletes,
- volunteers at TN Baptist Children's House,
- host the fundraiser for Care Kitchen Outreach,

5

- Picks up and delivers food to various ministries/rescue mission through Care Kitchen Outreach, and
- hosts retreats for Hope Center Ministries.

Casada has always felt it was his responsibility to give back to his community and to support his community however possible. Notably, since his retirement from the legislature he has devoted the great majority of his "work" time to volunteer service of others. His life reflects that he is a good citizen and has a caring and generous nature.

The letters of support corroborate Casada's "servant's heart." Some examples include James Brett McFarland, who references Mr. Casada's "*generous, servant spirit*;" Scott and Nancy Weaver write that Mr. Casada "*has helped some downtrodden people*;" Steve and Karen Robinson cite Mr. Casada's "*servant's heart*;" Tim Stillings describes Mr. Casada teaching him the concept of "*service above self*;" Greg and Holly Andress state that Mr. Casada's "*service to the community has always been marked by dedication, humility, and a genuine concern for others.*" while John Leeth references Mr. Casada's "*steadfast commitment to service and integrity.*"

Mr. Casada has made an impression on his community beyond service – as the letters of support reflect, Mr. Casada is and has always been a man of high character. John Leeth discusses Mr. Casada's "*genuine desire to support and uplift those around him*;" Harold and Fay Royer admire Mr. Casada's "*character and integrity*;" Tim Stillings remarks that Mr. Casada is a man of "*integrity, honesty and highly respected*;" while David Baldwin describes Mr. Casada as "*a man of integrity and high principles.*"

Notably, his primary career and a significant part of his legacy – the 20+ years he spent as a State Legislator – also reflects Mr. Casada's commitment to service. Mr. Casada did not enter politics for the money. While the work took up massive amounts of time, the most he ever earned

as a State Representative was $28,000 annually. Instead, Mr. Casada got into politics for the simplest of reasons – he wanted to open a park in the community he lived in. Throughout his career, he worked diligently on matters important to him and his constituents. These included matters related to limiting taxation, strengthening both the quality of and access to education and health care, protection of individuals and businesses from infringement, and other issues important to conservative voters. While he certainly didn't get rich from politics, Mr. Casada was successful in that he helped a lot of people lead better lives through his work, and he helped other politicians along the way as well. State legislative service is not glamorous or financially enriching. Mr. Casada entered and remained in politics for the right reasons - service.

Today, Mr. Casada is not involved in politics whatsoever. He did not seek reelection in 2022 and has remained separated from politics since. He does not lobby, consult, or participate in the political process at all. Instead, his time is devoted to service and family and assisting his wife with the family's VRBO rental business.

Family

Mr. Casada was born in rural Indiana and spent most of his childhood in Kentucky. His parents, Richard and Karen Casada, taught him to work hard and to be honest and accountable. They provided him with the foundation and tools to lead a meaningful and productive life. His parents are both in their mid-80s and remain married. Mr. Casada has been close to his parents his entire life, up to and including today. His elderly parents attended the trial, and both have written letters of support (Mrs. Casada's letter is signed as "Mom."). Mr. Casada is the oldest of two siblings and has had strong bonds with his siblings throughout his life. He speaks to his brother Ryan regularly and was close to his sister Risa until her untimely death in 2023. His brother Ryan

Casada and Risa's widower Phillip Cox have both written letters of support on Mr. Casada's behalf, and both describe him, his character, and his commitment to family in glowing terms.

For 34 years of his life, Mr. Casada was married to Jill Sholar[2]. From this union, Mr. Casada has four (4) adult children, from whom he has six (6) grandchildren. Each of his children has written a letter of support, and each are profuse in their admiration and respect for their father, his influence on their childhood, and his dedication to the family as a whole. Clark Casada writes of his admiration and respect for his father, stating that he is the "*motivation and inspiration to endure and achieve a greater standard for myself."* Richard Casada III has similar sentiments, describing his father as wonderful and stating that he "*instilled kindness, discipline and grace*" and is a "*man of service*" who taught him the "*importance of giving back and serving others*." Richard Casada III also notes that his father consistently travels across the country to the State of Washington to visit with his son and grandchildren and describes the wonderful relationship Mr. Casada has with his grandchildren. His daughters are equally generous in expressing their admiration for their father and his importance in their lives. Sara Hoos provides that her father taught her "*honesty is not negotiable*." She goes on to say that his love and commitment "*has always been steady and unconditional*" and that he is "*deeply involved in (her) children's lives*," including babysitting, taking them on walks, teaching them to ride bicycles, and sharing grandfatherly wisdom. Emma Fondaw in discussing her father references "*his work ethic, his resilience, and his ability to endure.*" Needless to say, Mr. Casada is and always has been an integral part of the lives of his children and his grandchildren. These relationships reflect Glen Casada's characteristics.

---

[2] Mr. Casada was married to Jill Sholar from 1983 to 2017, when they divorced.

In February 2024, after an approximately two (2) year courtship, Mr. Casada married Michelle Greene. Their relationship is very strong, loving and supportive. Michelle describes her husband as "*steadfast, kind, considerate and loving*." She discusses Mr. Casada working daily to ease the burdens of others and provides specific examples including the above-referenced widow's program and food delivery efforts. Notably, Mrs. Greene also describes the necessity of Mr. Casada's presence at home. She is scheduled to undergo a medical procedure that will result in her requiring his assistance afterwards and confirms that her husband is a necessary ingredient in the care of the entire family. Like Mr. Casada's parents and so many others, Mrs. Greene has remained supportive and steadfast throughout this process. The PSR writer inquired as to Mrs. Greene whether she intended to remain with Mr. Casada in light of the trial verdict. Mrs. Greene replied that she is "committed for life" and plans to remain married to Mr. Casada regardless of any criminal issues, including potential incarceration. (PSR 104). She attended every minute of the trial in support of her husband.

Like Mr. Casada, Mrs. Greene also has adult children from her prior marriage. And because Mr. Casada's relationship with Mrs. Greene began after the much-publicized Indictment in this matter, her daughters were initially skeptical of the relationship and protective of their mother. But Mr. Casada, through his character and commitment, has won them over. Jessica Plunkett wrote a letter on Mr. Casada's behalf and gave glowing praise of her stepfather. Mrs. Plunkett writes that Mr. Casada's "*life and career demonstrated a longstanding pattern of service, restraint and respect.*" Her observation is that Mr. Casada "*has shown integrity, humility and accountability*" and that he "*prioritizes time with his family and values meaningful relationships over material possessions.*" Mrs. Greene's other daughter, Jana Brown, agrees with her sister,

writing that Mr. Casada has a "*servant's heart*" and is "*humble, grounded and committed to doing what is right. His character is not performative, it is authentic.*"

Expectedly, Mr. Casada's criminal history guideline is category I. Indeed, other than the present matter, he has had no interactions with law enforcement whatsoever beyond his duties as a State Legislator. The PSR correctly notes that he qualified for the zero-point offender 2-level guideline reduction. However, Mr. Casada respectfully submits that his history and characteristics, as referenced above, deserve more weight in determining a sentence "sufficient but not greater than necessary" than the left-hand side of the sentencing table and a 2-point reduction.

Everything in Mr. Casada's "history and characteristics" supports his request for a variance and non-custodial sentence. Mr. Casada has not only lived a law-abiding and productive life contributing to society, he has also led a life of service. His entire life is marked by his service to others. Mr. Casada is not the typical defendant who appears in Federal Court in any way at all.

### The 'nature and circumstances of the offense'

As Mr. Casada intends to appeal the jury's verdict, it is fair to say that he agrees with very little in the PSR regarding the offense conduct. That said, there are some facts that do not seem to be reasonably in dispute.

First, several trial witnesses described the product produced by Phoenix Solutions – mailers – as excellent, effective, well-done, or some version thereof. No witness testified that the mailers themselves were anything but high quality, and the undersigned counsel is not aware of any individual telling the government otherwise regardless of whether they testified at trial. Similarly, the unanimous view is that Phoenix Solutions, Rightway Consulting and REA charged a fair price. There is no allegation of financial loss to any individual or to the State. And while the prosecution elicited testimony that some of the State Representatives and Mrs. Ridley feared some sort of

10

intangible "reputational damage," there was no evidence that anyone actually suffered reputational damage[3]. Simply put, nobody was harmed because of this "conspiracy."

Second, the dollar amounts at issue are not particularly significant. The State paid approximately $52,000 for work done from the PPA accounts. And from that sum, Casada personally made $4,643.64 – hardly a king's ransom. Post-trial, it appears the prosecution will argue that, despite never saying so, the campaign/caucus funded mailers are also criminal and should be counted. But even in adding those dollars to get to an approximately $211,000 gross revenue for Phoenix Solutions, Casada himself only collected another $2500, and this was paying Phoenix for work on his own election campaign. The reality that Casada made such a small amount of money from Phoenix Solutions simply cannot be ignored or discounted.

Third, the substantive work of Phoenix Solutions is also relevant here. There is no allegation that Phoenix Solutions, Mr. Casada or Robin Smith were influencing policy decisions or important, weighty government matters. They were not appointing people to decision-making roles, sponsoring or voting on legislation, getting people sensitive jobs, awarding contested high dollar contracts to a particular bidder, influencing where construction work would be done, leaking information about confidential government matters, or anything like that. They were producing "junk mailers," or constituent surveys and legislative updates.

Fourth, of the "legislator conspirators," Robin Smith was unquestionably and self-admittedly the driver behind the entire operation. She sang chapter and verse about all of the steps she took to move Phoenix Solutions forward. She also made the most money, which is

---

[3] State Rep. Jay Reedy testified about his concern with being associated in any way with Casada due to the text scandal, but was impeached with evidence that he had hired Casada to help with his campaign months after the text scandal was revealed.

understandable because she did all the work that the prosecution complains about. This is clearly a case of the government using a cooperator to "cooperate down."

Finally, and perhaps most importantly, Mr. Casada's role was very limited. Certainly, there was evidence that supports that Mr. Casada *knew* some of the details that the government presented at trial regarding Matthew Phoenix's identity and so forth, and that he received some amount of money from Phoenix Solutions' operations. But as far as his actual role in Phoenix Solutions' creation and operations, he did very little. There is no proof that anyone other than Cade Cothren created the "fake W-9" for Phoenix Solutions – certainly no proof that Mr. Casada participated in that act or submitted the W-9. Similarly, there is no proof that Mr. Casada participated in the "internal Phoenix email exchanges" that were forwarded to the Speaker's office. In his statement to law enforcement, Mr. Cothren stressed that Mr. Casada had done very little with Phoenix. Robin Smith, who clearly was not intending to do Mr. Casada any favors, testified that Mr. Casada had to be cordoned off because he was radioactive and couldn't keep a secret. She and Cade Cothren kept information from Mr. Casada, particularly as to campaign/caucus work. There was no testimony that Mr. Casada created any of the mailers or that he interacted with anyone on behalf of Phoenix Solutions. Instead, the testimony was that Robin Smith had to be the face for Phoenix because of Mr. Casada's "toxicity." It was Robin Smith (sometimes alone, sometimes with Cade Cothren) who introduced individuals to Matthew Phoenix regarding mailer work, who interfaced with Connie Ridley, who created the "cover story" for Phoenix Solutions, and so forth. And it was Robin Smith who interfaced with individuals regarding campaign/caucus work, not Glen Casada.

Notably, both Casada and Cothren were acquitted of the §666 offenses – theft, soliciting bribes/kickbacks and accepting bribes/kickbacks. These are not simply one of several counts of conviction – they are the lynchpin of the prosecution. To be clear, what Casada is alleged to have

12

Case 3:22-cr-00282   Document 440   Filed 09/12/25   Page 12 of 19 PageID #: 6725

"done wrong" all stems from the accusation that he stole from the government and/or accepted bribes, counts for which he was acquitted. It is further notable that the acquittal was based upon insufficient proof that Casada acted on behalf of the State of Tennessee. This is significant in analyzing his actions at issue, because acting on behalf of the State of Tennessee as opposed to personally in transacting allegedly inappropriate business is at least potentially an aggravating factor. And while Casada is unlikely to relieve any relief from the guidelines calculation for this reality, it certainly affects the view of his conduct or behavior at issue.

## Deterrence

Individual/Specific deterrence

In his 66 years, Mr. Casada has never faced the weight of any criminal prosecution, much less federal prosecution. To state that Mr. Casada is already adequately deterred from even venturing into a gray area would be a gross understatement.

The federal indictment and subsequent verdict, both of which were widely publicized to the community via the media, have had significant effects. Unlike most federal defendants, Mr. Casada's case has been broadcast via media to his family, friends, neighbors, and the community at large. Obviously, this caused shame and humiliation.

Mr. Casada faces the possibility that he will forever be a federal felon, a reality that is devastating to him in light of his years of service to the Government.

Perhaps most significantly, as noted above Mr. Casada is a semi-retired man whose sole "job" is helping his wife with a VRBO business – a business that has one property to rent. He spends his days with his family or doing volunteer service primarily through his Church. He is and will continue to be completely finished with politics.

A custodial sentence is not required to deter Mr. Casada from future misconduct.

13

General Deterrence

In considering general deterrence related to these specific facts, it is important to note the nature of the underlying conduct to which the jury voted to convict.

As noted above, these "conspirators" were not influencing policy decisions or important, weighty government matters. They were not voting on or sponsoring legislation, appointing people to decision-making roles, getting people sensitive jobs, awarding contested high dollar contracts to a particular bidder, influencing where construction work would be done, leaking information about confidential government matters, or anything like that. Instead, they were producing mailers to send to constituents. Just as important, the dollar amounts at issue were small by the standards of any federal prosecution.

The fact of the prosecution and conviction itself is general deterrence. Under the facts of this case, federal agents and prosecutors embarked on a highly publicized investigation and prosecution all the way through a 4-week trial. The negative effects of enduring such a trial – financially, reputationally, mentally, physically – is general deterrence enough without a custodial sentence to Mr. Casada.

The position that "it is the likelihood of being caught, not the length of punishment that deters crime" is well established research. The U.S. Department of Justice's own National Institute of Justice concurs with this ideology, providing "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." https://nij.ojp.gov/topics/articles/five-things-about-deterrence (last visited September 11, 2025).

There is no need for a custodial sentence to satisfy the sentencing goal of general deterrence.

### Rehabilitation

There is also no need to "rehabilitate" Mr. Casada. As has been outlined extensively above, Mr. Casada had a stable upbringing that blossomed into a productive and meaningful life. He has an exceptional and stable family along with ample community support. He does not struggle with addiction or with mental health concerns. Finally, he has not led a life of wrongdoing, as evidenced by his zero-point offender status and the lack of any 404(b) evidence of unrelated misconduct directed at him.

At 66 years old, semi-retired and completely out of politics, Mr. Casada does not need rehabilitation.

### Protect the public from further crimes of the defendant

As with the Rehabilitation section above, and for the same reasons, there is no sentencing need to protect the public from future acts of Mr. Casada.

### The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

Due to the wide gap between the PSR's proposed guidelines range and Mr. Casada's proposed guidelines range, counsel is unable to meaningfully predict the guidelines so as to apply them to JSIN.

That said, individuals sentenced under the 2C1.1 guideline can and frequently do receive noncustodial sentences. Indeed, per JSIN the defendants with the following offense levels have received a noncustodial sentence: 31 (14%), 29 (9%), 25 (10%), 23 (3%), 21 (14%), 20 (17%), 19 (12%), 18 (20%), 17 (21%), 16 (10%), 15 (20%) and 14 (33%)[4]. If *any* public official is deserving of a non-custodial sentence, it is difficult to articulate one more deserving than Mr. Casada, considering his history, current status, and the facts of this case. Further, for virtually every offense

---

[4] Counsel did not review Zone C or below JSIN data.

15

Case 3:22-cr-00282    Document 440    Filed 09/12/25    Page 15 of 19 PageID #: 6728

level from 14 – 32, JSIN reveals that defendants received a downward departure or variance much more frequently than a within-guidelines sentence.

Additionally, and perhaps more notably, this conduct – *particularly as to Casada* – is unique to more "standard" public corruption issues. Indeed, the "standard" public corruption case involves meatier, weightier acts as compared to the conduct surrounding mailers at issue here. And in "standard" public corruption cases, the convicted elected official plays a major role, or at least a much more substantive role, than Casada played here.

The typical public corruption case as analyzed by the JSIN data is not "similar conduct" just because it stems from the same guideline.

## Just Punishment

Mr. Casada respectfully submits that a non-custodial sentence is just punishment for his individualized criminal conduct. As outlined above, should he receive no post-trial relief, the consequences for him are serious and lasting. He is currently a convicted federal felon, his hard-earned reputation will forever be tarnished, and he has suffered through not only embarrassment and shame but also the stress and toll of federal prosecution and conviction. In considering his role in the offense conduct, a term of supervision is sufficient punishment.

## Other Guidelines Issues

Guidelines overstate the offense

U.S.S.G. 5C1.1(B) Comment 10(b) provides:

Departure for Cases Where the Applicable Guideline Range Overstates the Gravity of the Offense.—A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense. See 28 U.S.C. § 994(j).

The guidelines contemplated by the PSR and approved by the prosecution overstate the gravity of the offense. As noted above, there is little dispute that there was no economic harm, nor did any witness testify as to reputational harm. The amount of money at issue was relatively small under any calculation, and the amount of money earned by Casada was much smaller. Casada's personal role in the offense was not significant. And from this, the PSR contemplates, with government approval, a level 32 guidelines range. It is difficult to articulate a better application for this departure.

Notably, the acquittal of every single bribery/§666 count will likely have exactly zero effect on the sentencing guidelines, illustrating their arbitrary nature. These §666 counts are not one-off or collateral charges; they are the core conduct at issue in the Indictment. It simply cannot be that a person can be acquitted of core conduct and at the same time gain no sentencing benefit at all. Yet this is exactly what the guidelines computation reveals in the revised PSR.

Home confinement, probation, or other noncustodial sentences are serious punishments

The Supreme Court has outlined the significance of a non-custodial punishment. In <u>Gall v. United States</u>, 552 U.S. 38, 48, 128 S. Ct. 586, 595–96, 169 L. Ed. 2d 445 (2007), the Supreme Court stated:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); internal quotation marks omitted)).[4] Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3.

17

Mr. Casada anticipates that the prosecution will likely argue that a non-custodial sentence is not severe enough. But as the Supreme Court has provided, a non-custodial sentence is indeed an onerous punishment that restricts one's freedom and liberty. For a defendant like Mr. Casada, who is 66 years old and has never faced criminal trouble before, a noncustodial sentence is sufficient.

## Conclusion

Following the United States Supreme Court decision in *United States v. Booker, supra*, an array of sentencing options is available to this Court; the mandate is that a sentence must be "sufficient, but not greater than necessary", to further the sentencing objectives, objectives which include punishment, deterrence, and rehabilitation. A non-custodial sentence achieves this result.

Respectfully submitted:

*/s/ Jonathan Farmer*
Ed Yarbrough (BPR #004097)
Jonathan P. Farmer (BPR #020749)
Chase Fann (BPR #036794)
511 Union St, Suite 1000
Nashville, TN 37219
(P) 615-238-6300
eyarbrough@spencerfane.com
jfarmer@spencerfane.com
cfann@spencerfane.com
*Counsel for Glen Casada*

**CERTIFICATE OF SERVICE**

       I hereby certify that on September 12, 2025, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following:

Taylor J. Phillips
Assistant US Attorney
U.S. Attorney's Office - Middle District
719 Church St. Suite 3300
Nashville, TN 37203
taylor.phillips@usdoj.gov

John P. Taddei
Blake J. Ellison
Trial Attorneys
Public Integrity Section, Criminal Division
U.S. Department of Justice
1301 New York Ave., NW
Washington, DC 20530
john.taddei@usdoj.gov
blake.ellison@usdoj.gov

                                                  */s/ Jonathan Farmer*
                                                  Jonathan Farmer