| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:22-cr-00282 |
| | ) | JUDGE RICHARDSON |
| | ) | |
| GLEN CASADA | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## GLEN CASADA'S MOTION FOR RELEASE PENDING APPEAL PURSUANT TO 18 USC §3143(b)

Glen Casada, through counsel, requests bail pending appeal pursuant to 18 U.S.C. §3143(b) for the reasons outlined below.

## INTRODUCTION

Glen Casada is entitled to bail pending appeal because i) he is not a flight risk; ii) he is not a danger to the community; iii) his appeal is not for the purpose of delay; and iv) his appeal will raise substantial questions of law or fact that, if ruled in his favor, will likely result in either a reversal, an Order for a new trial, or a sentence reduction less than the total time he will already have served after the duration of the expected appeal process.

Throughout the litigation of this matter, including the Motion to Dismiss the Indictment (DE 59), the contemporaneous objections to trial testimony, the jury instructions, the charge conference (DE 338-39), the Motion for a New Trial (DE 372), the Motion for a Judgment of Acquittal (DE 370), and the sentencing hearing/guidelines objections (DE 416, 431, 440), Casada raised several substantial questions of law or fact that, if correct, would alter the convictions and/or sentence in a meaningful way. The Court has remarked on multiple occasions, most recently at Casada's sentencing hearing

on September 23, 2025, that this case had several "close calls" and included questions that could be viewed very differently by an appellate court.

## LEGAL STANDARD

The statute governing bail pending appeal, 18 U.S.C. § 3143(b)(1), provides:

**(b) Release or detention pending appeal by the defendant.**

(1) Except as provided in paragraph (2)[1], the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—

(A)      by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B)      that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

(i)      reversal,

(ii)      an order for a new trial,

(iii)      a sentence that does not include a term of imprisonment, or

(iv)      a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1).

Regarding the "substantial question of law or fact" standard, Courts have long held that 18 U.S.C. §1343(b) does **not** require a district court to find that it committed error in the litigation of the matter. *United States v. Pollard*, 778 F.2d 1177, 1181-82 (6th Cir. 1985) (citing *United States v. Miller*, 753 F.2d 19 (3d Cir. 1985) ("[I]t would have been capricious of Congress to have conditioned bail only on the willingness of a trial judge to certify his or her own error.")). The 6th Circuit has confirmed that a trial court can be confident that

---

[1] 18 USC 1343 (b)(2) references scenarios where the conviction is a crime of violence, carries a maximum sentence of life imprisonment, or stems from a Controlled Substances Offense that has a 10-year or more maximum term of imprisonment. None of these scenarios is applicable to the present matter.

NSH 3292714.2

its challenged decision was correct yet still find that a defendant raises a substantial question of law or fact. *See id.* In order to satisfy §3143(b), the appeal must raise "a 'close' question or one that could go either way." *Id* at 1182.

Similarly, the "likely to result in reversal" language does not relate to the likelihood that the appeal will succeed. Rather, it "must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal." *United States v. Sutherlin*, 84 F. App'x 630, 631 (6th Cir. 2003), *Miller*, 753 F.2d at 23. This requirement is thus met when a contrary appellate holding is likely to require reversal of the conviction or a new trial. *Id.*

The 6th Circuit recently confirmed the §1343(b) standard. In *United States v. Sittenfield*, No. 23-3840, 2024 WL 3025509, at *1 (6th Cir. May 15, 2024), the Court held:

> The district court found that Sittenfeld failed to show that the court would likely be overturned on appeal. *See* R. 302, p. 117, PageID 7507. But section 3143(b) does not require a court to think reversal is probable or likely. *See Pollard*, 778 F.2d at 1181-82. Rather, it must be likely that success on appeal, on the substantial question that the defendant raises, would result in reversal or a new trial. *Id.* at 1182. As to the substantial question, the appeal has to present "a close question or one that could go either way."

(internal citations omitted).

## ANALYSIS

### A. Casada is not a Flight Risk/Danger to the Community – 18 USC §3143(b)(1)(A)

Casada is not a flight risk or a danger to the community. As noted in the PSR, Casada is 66 years old and had never been arrested prior to the instant offense. He was indicted for non-violent charges. Upon his arrest, he was granted pretrial release and remained strictly compliant through the trial of this matter up to today (DE 12). After the jury verdict on May 16, 2025, and again after the sentencing hearing on September 23,

3

2025, the Court granted Casada's request to remain on release pending future proceedings, pursuant to 18 U.S.C. §3143(a), necessarily finding by clear and convincing evidence that "that the person [Casada] is not likely to flee or pose a danger to the safety of any other person or the community if released." 18 USC §3143(a).

There is no legitimate argument that Casada is a flight risk or a danger to the community, and there is ample support in the record to make such a finding by clear and convincing evidence.

**B. The Appeal is Not for the Purpose of Delay, and Raises a Substantial Question of Law or Fact – 18 U.S.C. §3143(b)(1)(B)**

Casada has consistently and specifically challenged every aspect of the prosecution of this matter, both legally and factually throughout the entirety of the case. The Court has correctly described these issues as complex, dense, and close calls. Certainly, Casada's appeal is not for the purpose of delay. Instead, Casada has raised multiple arguments that are "substantial questions of law or fact" related to significant, dispositive issues of material facts and unsettled law. If found, any of these issues would satisfy the §3143(b) standard and entitle Casada to bail pending appeal.

### i. *The Motion to Dismiss the Indictment (DE 59)*

On July 24, 2023, Casada moved to dismiss the Indictment (DE 59). The Government Responded on August 18, 2023 (DE 75), to which Casada Replied on August 30, 2023 (DE 84). Due at least in part to the complexity of the issues and the evolving state of the law, the Court ordered additional briefing (DE 88). The parties complied with the Court Order and submitted supplemental briefs on October 27, 2023 (DE 94, 95). On November 28, 2023, the Court scheduled a hearing to discuss the Motions to Dismiss, citing that it expected the discussions to be "fairly lengthy and wide-ranging" (DE 97, 98).

4

On November 29, 2023, the Court conducted a 3.5-hour hearing on the issues raised in the Motion to Dismiss (DE 101). On February 8, 2024, the Court denied the Motion to Dismiss (DE 128). In its ruling denying the Motion to Dismiss, the Court provided that Casada (and co-defendant Cade Cothren) "may get traction at trial or on appeal…" (DE 133, PageID 914).

The Motion to Dismiss was thoroughly briefed by all sides and closely examined by the Court. In the interest of judicial economy and efficiency, Casada will not recite his entire Motion to Dismiss, Reply, and Supplement Pleading here but instead will incorporate it by reference.[2] While the Court decided the Motion to Dismiss under the Fed. R. Crim. P. 12 framework, the issues raised in the Motion to Dismiss constitute close questions as contemplated by §3143(b). These issues include:

- The Indictment fails to allege materiality. In order to properly allege an "Honest Services wire fraud", the Indictment must set out facts and allege that the alleged misrepresentation or concealment was material to the State of Tennessee and/or individual members of the General Assembly. It fails to do so. The Indictment references only the expectations *of the Defendants* that either the State and/or the members of the General Assembly would balk at approving or hiring Phoenix Solutions had they knew of the alleged conspirators' respective involvement. But materiality does not focus on the mindset of the Defendants. Instead it "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," *Universal Health Servs., Inc. v. United States*, 579 U.S. 176,

---

[2] For each "substantial question of law or fact," Casada incorporates by reference the argument already advanced that give rise to the substantial questions instead of copying the argument into the body of this motion. While the prior arguments were made under different contexts – i.e. through the lens of a Rule 12 motion or a ruling on a Motion for New Trial – the point under the §3143(b) analysis is not that the Court should reverse itself. The point is that the issues presented a "close question" that would likely result in meaningful appellate relief.

NSH 3292714.2

192–93 (2016), in this case the State of Tennessee and/or the individual members of the General Assembly.[3]

- The Indictment fails to allege "official acts." Regarding the approval from the Speaker's Office to be a PPA vendor, the Indictment must allege that the approval process is sufficiently significant under the *McDonnell* standard ("question, matter, cause, suit, proceeding or controversy" that involves a "formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."). The Indictment is silent as to whether obtaining this "approval" rises to the level of a question or controversy akin to a formal exercise of Government power similar in nature to a lawsuit. Similarly, the Indictment is silent regarding the "official act" undertaken by legislators in using Phoenix Solutions and/or the Defendant's companies to create mailers. The Indictment offers no statement or allegation that the simple act of hiring Phoenix Solutions to perform mailer services is of sufficient weight to constitute an "official act." Finally, the allegation regarding payment of invoices for services rendered is a purely administrative and ministerial task which cannot constitute an "official act" under United States Supreme Court precedent.

- The Indictment's allegations of Honest Services Fraud are unconstitutionally vague. As noted in Casada's supplemental filing regarding the Motion to Dismiss, "For thirteen (13) years, the language of §1346 has left the leading legal minds in the country to state: 'What is the criterion of guilt?' *Skilling*, 561 U.S. at 422 (Scalia, J. concurring in part and concurring in judgment) and '[t]o this day, no one knows what 'honest-services fraud' encompasses." *Percoco*, 598 U.S. at 333 (Gorsuch, J.

---

[3] As discussed in more depth below, this issue is ripe for resolution through the federal appeals of this case.

and Thomas, J., concurring in judgment)." The only way Honest Services Fraud allegations are constitutional is to construe them with narrow precision to criminalize "core bribery or kickbacks," not acts of dishonesty. The Indictment in this case failed to do that. Instead, the present Indictment only alleges undisclosed, immaterial, unofficial, and harmless self-dealing.

Regarding the §3143(b) analysis, the Motion to Dismiss the Indictment certainly clears the "close question" hurdle. This was not a "check-the-box" filing but instead was a fiercely litigated motion involving dense, uncertain issues and sub-issues of law and fact. The Court and the parties clearly wrestled with the issues presented, as evidenced by the lengthy filings and the necessity of supplemental briefings. It can hardly be argued that the law is clear or settled as to what encompasses bribery, kickback, or honest services fraud, which are the very heart of the allegations in this case. As noted in the filings, a portion (albeit a minority) of the U.S. Supreme Court finds the Honest Services Fraud statute to be unconstitutionally vague in its entirety.

Should the Court of Appeals find the Motion to Dismiss should have been granted, it would result in reversal of the convictions in their entirety. It is not feasible to assert that the denial of a Motion to Dismiss would be harmless error or not prejudicial.

ii.    _Contemporaneous objections to trial testimony_

Throughout the trial, Casada and/or Cothren made dozens of objections to the proof presented by the prosecution about key legal and factual issues that could be decided differently on appeal to change the entire case. Several of these objections satisfy the two-prong test of being both a "close question" and that error would result in meaningful relief.

First, Casada moved for a mistrial based upon due process concerns after the prosecutor entered a recording of Casada's statement into evidence without making the agreed-upon redactions. As argued at trial, Casada specifically bargained for the redaction of his statement to FBI agents. The parties entered a heavily negotiated document titled "Joint Stipulations Regarding Authenticity, Admissibility and Order of Some of the Proof to be Presented at Trial." (D.E. 320 and 320-1). The agreement included 22 separate "evidentiary" stipulations (D.E. 320) and 3 stipulations to required elements of the charged offenses (D.E. 320-1). The "evidentiary" stipulations included agreements about the authenticity of documents (D.E. 320 at ¶¶ 1-8, 11-20), hearsay issues (D.E. 320 at ¶¶ 2, 8, 11,14-19), the admissibility of documents (D.E. 320 at ¶¶ 4-5, 7,13), and other miscellaneous issues. The "elemental" stipulations included agreements about facts that are necessary for the prosecution to establish as an element for every count of the Indictment. Notably, paragraph 10 of the stipulation provided that "the Government shall redact" specific portions of Casada's recorded interview with FBI agents. The redacted portions were inculpatory and incriminating as to Casada. Casada specifically bargained for, and made concessions to obtain, the exclusion of the pertinent clips of his FBI interview. Throughout the trial, both before and after the prosecution's error, the government made ample use of both the evidentiary and elemental stipulations.

While the Court ultimately ruled that the mistrial was not warranted, it did find that the Government erred in allowing the admission of this evidence. The granting of this motion would have resulted in a mistrial, due to the jury having heard extremely prejudicial evidence that it should not have heard. Should the Court of Appeals find the mistrial should have been granted, it would result in a new trial at minimum.

NSH 3292714.2

Further, Casada made multiple objections regarding the introduction of evidence related to campaign/caucus funds as opposed to the indicted PPA funds. This was perhaps the heaviest litigated issue during the trial of this matter. The Defendants filed motions *in limine* regarding this issue and made multiple contemporaneous objections to the introduction of evidence regarding campaign/caucus work at the trial of this matter. Casada objected to the introduction of the campaign/caucus funds based on 404(b) grounds – the prosecution responded that the proposed evidence was res gestae. Even if evidence is res gestae, the district court must also conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice pursuant to Federal Rule of Evidence 403. *United States v. Joseph*, 270 Fed. Appx. 399, 406 (6th Cir. 2008) (per curiam); *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015).

However, the evidence adduced at trial regarding campaign/caucus work was not properly res gestae evidence, but was 404(b) evidence that should have been excluded in full. This evidence was clearly about the conspirators misrepresenting the ownership of Phoenix Solutions and the identity of the person "doing the work" in order to gain money – the *exact* theory that the prosecution used to indict and convict Casada. The evidence was purportedly elicited to show motive – a classic 404(b) purpose. Because the Court specifically and correctly ruled that the prosecution could not submit campaign/caucus evidence via Rule 404(b), it should have excluded the work altogether. Instead, this ruling opened the floodgates to an onslaught of evidence of campaign/caucus work to the unfair prejudice of Casada.

While the Court ultimately sided with the prosecution, it described the analysis as a close call. (DE 393, Page ID 3095). The Court was correct that it was (at least) a close call, satisfying the first prong of the 3143(b) substantial question analysis. The

introduction of this evidence was significant.  A majority of the funds paid to Phoenix Solutions were paid via campaign/caucus funds.  Most of the prejudicial actions taken by Robin Smith and/or Cothren occurred in the context of the campaign/caucus funds.  It is unlikely that the Court of Appeals would find this error harmless.

### iii.   *Sufficiency of the Proof*

In his arguments to the jury and his Motion for Judgment of Acquittal, Casada questioned whether the proof was sufficient to sustain a conviction.  Similarly, in his Motion for a New Trial, Casada argued that the manifest weight of the evidence was against the verdict.  Prevailing on any of these issues would result in appellate relief, likely a new trial, reversal, acquittal, or at least re-sentencing.  Among the several issues relevant to this consideration are:

### A.  *Official Act*

Casada has consistently asserted that the prosecution failed to prove that he committed an official act, and failed to prove that the alleged co-conspirators committed an official act.  The qualification of "official act" was hotly contested at trial and in jury instructions, resulting in multiple instances of extended argument and research into the contours of this precise legal issue as applied to these facts, which is ripe for appeal on multiple grounds.  It is not in dispute that the government is required to prove that the money was paid to Mr. Casada in return for an "official act." *United States v. Hills*, 27 F.4th 1180, 1185 (6th Cir. 2022).  The matter on which Mr. Casada acts must be a specific and focused formal exercise of governmental power. *McDonnell*, 579 U.S. 550, 568 (2016).  Then the action taken by Casada must have been, or intended to be, using his official position to exert pressure on another to perform an official act. *Id.* at 574.  An official act

NSH 3292714.2

is not "any action taken or to be taken under color of official authority," every action a part-time official takes in its public or private capacity, nor mere access to a public official.

The evidence established that Smith and Casada were able to obtain work as political consultants performing mail services for state legislators because of their successes—both as people who had previously helped others in fundraising and community engagement and who had a proven track record of raising money, constituent support, and winning their own races—not through any exerted pressure or coercion as public officials. Further, each individual representatives' choice for a PPA vendor would not involve the formal exercise of governmental power, as the proof established that PPA funds were allocated to the individual representative irrespective of their vendor, then those representatives were free to select and contract with their vendors at their own discretion with no "vendor approval process." The evidence did not establish any official act in securing the work—instead, it showed that the way the work was secured and performed was a legitimate business where a qualified consultant (Casada or Smith) brought in the clients (Hazelwood, Helton, Reedy) who had funds, a need, and wanted to work with a consultant who would give them a high quality at a fair price, regardless of those consultants being part-time representatives who would make money from the deal. Simply put, there was no official act here.

If his argument succeeds, every count would be reversed because each Count of conviction is (directly or indirectly) dependent upon an official act as a matter of law.

### B. "Misrepresentation."

Similarly, Casada has consistently argued that he made no misrepresentation to anyone. Like "official acts," misrepresentation is essential to honest services wire fraud, and thereby all Counts that this finding hinges upon.

NSH 3292714.2

Honest services fraud jurisprudence (and the jury instruction) narrowed the misrepresentations/concealments that have to be proven to satisfy this prong. Honest services fraud convictions cannot be based on an undisclosed self-dealing or a purported conflict of interest; instead, the finding can only be a misrepresentation or concealment "of a bribery or kickback scheme." *Skilling v. United States*, 561 U.S. 358, 409 (2010). Therefore, the misrepresentation/concealment required for the second element cannot be because of a nondisclosure of Mr. Cothren's involvement or Mr. Casada's or Ms. Smith's personal financial gain, but instead only on the scheme that public officials were being paid in an unlawful exchange for official acts. But that isn't what the proof showed. The weight of the evidence from the testimony of witnesses and documents went to alleged misrepresentations/concealments about Mr. Cothren's involvement, Mr. Cothren's fictitious name, and Mr. Casada or Ms. Smith's financial gain—not the fact that the payments from Cothren to Casada and Smith were for money earned in performing consulting services.

If his argument succeeds on appeal, every Count would be reversed because each Count is dependent on honest services wire fraud which requires a misrepresentation.

### C. *Materiality.*

Another essential element of honest services wire fraud is materiality. The materiality of the acts at issue – shielding the identity of a subcontractor - was hotly disputed in this case. This is particularly important in the wake of *United States v. Kousisis*, 605 U.S. \_\_\_\_ (2025), which specifically left the issue of materiality in the bribery context open.[4]

_____

[4] "Before us, the parties debate the details of the materiality standard for purposes of § 1343. For their part, Alpha and Kousisis direct us to the common-law test just described—what they call "the traditional

NSH 3292714.2

Casada has consistently argued that the identity of a subcontractor performing work on junk mailers is simply insufficient to establish the element of materiality. Should Casada prevail in his argument regarding a lack of materiality—which is central to the legal analysis on these facts and could be a dispositive issue for this appeal—every count would be reversed.

> ## D. *"Concealment Money Laundering."*

Casada has and continues to object to the sufficiency of the convictions of counts 13-18 (concealment money laundering) and count 19 (use money laundering).

Regarding *"concealment"* money laundering, the 6th Circuit in *United States v. Faulkenberry,* 614 F.3d 573, 586 (6th Cir. 2010) described the standard for concealment. The government simply did not meet the standard. FBI forensic accountant Alexandria Hunter testified that the transactions at issue – payments from the State of Tennessee "mailer program fund" to either RightWay Consulting or REA, then on to Phoenix Solutions - were simple to trace. None of the hallmarks of concealment money laundering were present. There were no offshore bank accounts, rapid withdrawal of funds, unexplained sources of funds, payments to third parties that could not be identified, and so forth. Hunter was easily able to trace the funds at issue and testified that she felt that "nobody was trying to mislead anyone" as to certain checks. The memo line of several of the checks even identified the State Representatives for whom services were rendered. (Gov. Tr. Ex. 405, 408-9) RightWay Consulting and Rivers Edge Alliance were either

---

materiality test." … The Government, by contrast, proposes an essence-of-the-bargain test, under which a misrepresentation is material only if it goes " 'to the very essence' " of the parties' " 'bargain.' " … We need not settle the debate here, however, because Alpha and Kousisis have not contested that their misrepresentations were material. For now, it is enough to reiterate "that materiality of falsehood is an element of "—and thus a limit on—the federal fraud statutes…A conviction premised on the fraudulent-inducement theory cannot be sustained without it." *Kousisis v. United States*, 145 S. Ct. 1382, 1396, 221 L. Ed. 2d 781 (2025) (citations omitted).

properly registered with the State or otherwise well known to be affiliated with Mr. Casada and Ms. Smith, respectively. (Gov. Tr. Ex. 368, 374)  Each check that Mr. Casada wrote to Cade Cothren was addressed directly to Cade Cothren (See eg. Gov. Tr. Ex. 381-384).  The proof elicited at trial did not even sufficiently show concealment, much less that the "animating purpose" of the transactions was to conceal. *See* Motion for New Trial, (DE 372 Page ID 2570-72), Motion for Judgment of Acquittal (DE 370).

### E.  Use Money Laundering

As for "*Use*" Money Laundering, Casada has consistently submitted that this guilty verdict cannot stand because he simply had no role in its commission. *Id.* Count 19 of the Indictment alleged that on March 8, 2020, Phoenix Solutions transferred $10,969.12 of unlawfully obtained funds to REA's bank account. There was no evidence that Mr. Casada played any role whatsoever in this conduct. Phoenix Solutions' bank accounts were controlled by Cade Cothren. (Gov. Tr. Ex. 363) The testimony at trial was that Cothren's role in Phoenix Solutions included performing administrative and accounting functions, whereas Mr. Casada's role was limited primarily to recruiting business. No proof was elicited that Mr. Casada controlled, or could control, Phoenix Solutions' bank accounts. Similarly, Robin Smith operated REA as a "d/b/a." All the proof at trial pointed to the fact that Ms. Smith operated REA separate from Mr. Casada. She did not allow Casada access to her accounts, client information, and so forth (See eg. Gov. Tr. Ex. 61, 374).

If this issue is resolved in his favor, the money laundering convictions (Counts 12-19)[5] would be reversed.  At minimum, this would result in a lower sentencing guidelines

---

[5] Count 12 alleged conspiracy to commit money laundering, whereas Counts 13-18 alleged "concealment" money laundering and Count 19 alleged "use" money laundering.

NSH 3292714.2

range and a new sentencing hearing, due to the guidelines enhancement for money laundering. Likely, it would result in a new trial because the money laundering evidence had a prejudicial spillover effect onto the remaining counts.

### iv. _The jury instructions and charge conference (DE 338-39)_

On April 8, 2025, Mr. Casada (jointly with Mr. Cothren) submitted his proposed jury instructions, wherein he provided the Court the instructions he specifically requested to be included in the jury charge. (DE 295). During trial, the parties engaged in lengthy discussions about the jury charge. The Court ultimately charged the jury on May 13, 2025. (DE 341). Several of Mr. Casada's proposed instructions were correct statements of the law,[6] not substantially covered by the final charge, and important for the jury to navigate the complex legal and factual issues of this trial (and jurisprudence), and the failure to charge them impaired Mr. Casada's defense.

The jury instructions in this matter were unusually complex. The charge conference lasted two (2) full days, and the parties agreed on very little. The Court repeatedly mentioned the unclear state of the law on these charges, that the Court of Appeals could easily find something different on important legal issues, and that these were close questions, highlighting the true legal complexity and uncertainty on these Counts. (_See e.g._ DE 395, PageID 3668, 3859 3883, 3885, 3886).

Casada's challenges to the jury charges were voluminous, and include the following:

### A. _Skilling_ based instructions

---

[6] Several of these arguments were raised in the Motion for New Trial (DE 372), which is incorporated herein by reference.

The *Skilling* court specifically held that certain acts that were perhaps unethical such as undisclosed self-dealing and conflicts of interest were insufficient bases to support a federal criminal conviction. *Skilling*, 561 U.S. at 409 (2010).

In his proposed jury instructions, Casada requested that the jury be instructed as follows: "It is not a violation of federal law for a public official to engage in undisclosed self-dealing. Undisclosed self-dealing is the taking of official action by a public official that furthers his own undisclosed financial interest while purporting to act in the interests to whom he owes a fiduciary duty." (D.E.295, PageID 2170, 2178, 2204). Casada also requested an instruction regarding conflicts of interest, namely "It is not a violation of federal law for a public official to engage in a transaction in which he may have had a conflict of interest." (Id.) The Court declined to instruct the jury as requested by Casada, in essence determining that the instructions given were sufficient for the jury to conclude that undisclosed self-dealing and conflict of interest transactions were insufficient. However, the requested instructions, taken straight from the holding of *Skilling*, were correct statements of the law, and Casada respectfully disagrees that the Court's instructions appropriately addressed this issue.

### B. *Instructions as to Tennessee State Law*

Casada requested the following instruction: "It was permissible under Tennessee state law for Defendant Casada to own and operate a private consulting company and provide certain services, including the services at issue in this case, to members of the Tennessee General Assembly." (D.E. 295, PageID 2169, 2177, 2201). These instructions were explicitly derived from Tennessee statutory law but were not given.

These instructions were important to Casada's defense. The thrust of the prosecution in this matter was that the Defendants had an interest in Phoenix Solutions that was not disclosed to the Speaker's Office or to individual representatives, and that

16

this failure to disclose/conflict of interest was improper. The trial evidence established that Casada did not make any affirmative misrepresentations to either the Speaker's Office or any representative regarding the mail program funds. Instead, the trial evidence revealed that Casada made $4600 from the mailer program without affirmatively volunteering to Phoenix Solutions' clients or the Speaker's Office of his or Cothren's role in Phoenix Solutions. The trial evidence also adduced that Casada solicited clients through his own consulting company, then sub-contracted the work to Phoenix Solutions— a process that the prosecution framed as illegitimate and designed to conceal. In light of this, the jury likely did find criminal liability based upon either undisclosed self-dealing or conflicts of interest. The jury should have been charged consistently with *Skilling* and instructed that it could not convict based on these debunked theories. The jury should have also been charged that RightWay Consulting was not per se illegitimate or a sham company as implied by the government throughout the trial. In failing to do so, there is a significant likelihood that the jury verdict was tainted by the prosecution's implications that Casada being involved in the consulting business at all, much less not disclosing his involvement, is somehow improper.

### C. *Other requested instructions*

As referenced in DE 295, Casada requested a lengthy list of instructions, many of which the Court did not give to the jury. These proposed instructions include concealment (DE 295, PageID 2154, 2182, 2202), official act/examples of official acts (DE 295, PageID 2170-71, 2178-79, 2192-93, 2204-06), bribery (DE 295, PageID 2189-91), misrepresentation (DE 295, PageID 2154), and materiality (DE 295, PageID 2154).

For the same reasons as above, these instructions were important to Casada's defense. Should Mr. Casada prevail on his challenges to the jury instructions, particularly those related to the honest service fraud and bribery elements, he would be entitled to a

NSH 3292714.2

new trial (at minimum). As the Court noted, these issues were complex without much clear precedent. The challenges to the jury instructions are certainly "close calls" that warrant him remaining out of jail while these complexities are analyzed through the appellate courts.

     v.     *The Motion for a New Trial (DE 372)/ The Motion for a Judgment of Acquittal (DE 370)*

Casada has discussed portions of the Motion for New Trial and Motion for Judgment of Acquittal above and incorporates both that discussion and the respective motions herein. It is the Court's comments while ruling to these Motions that warrants additional mention. In denying the Rule 33 Motion for New Trial and the balance of the Rule 29 Judgment of Acquittal Motion,[7] the Court recognized that the proof at trial and nature of the charges present close questions that could be (and have been, in cases like *Skilling v. United States*, 561 U.S. 358 (2010) and its progeny) viewed and decided very differently on appeal, with the Supreme Court consistently *narrowing* the interpretation of the federal fraud statutes on issues. These touchstone issues include materiality, which was left open after *Kousisis*. This issue potentially could be resolved by this case where materiality of the identity of a subcontractor who designs and delivers political "junk mail" is a dispositive issue.

Some examples of the Court's recognizing the "close questions" while ruling on the Motion for New Trial and Motion for Judgment of Acquittal are as follows:

DE 457 – September 9, 2025 oral ruling:

- Jury Instructions

---

[7] The Court granted the Rule 29 motion as to Counts 2-4 (DE 420). The prosecution has cross-appealed this decision (DE 469).

"One comment I want to note in my decision on Rule 29, the Court is going to treat the jury instructions as proper and is going to assess whether the evidence is sufficient to prove guilt based upon the jury instructions that were given to the jury. And that's because, A, I do think the instructions were correct. *Reasonable minds can make arguments otherwise, and maybe that will come up on appeal in some of these counts.*" (p. 11).

- Official Act

"So, if we start at the first one, the first argument regarding whether anything that the – that Mr. Casada had done was an official act. The first thing to note is the Court*, in an instruction that, of course, defendants are allowed to dispute on appeal – but the Court, after some effort, did its level best to define this properly*." (p.21)

....

"Now, *I certainly understand where the defendants are coming from here...*(p.23) ... And the defendants make an attack on the notion that, A, what Connie Ridley was doing wasn't an official act at all; and, also, an attack on the notion that, you know, anyone -- any of the coconspirators exerted pressure on Connie Ridley or advised public officials to do anything that was illegal. *And without taking hours to sort of unwind the specifics of that, I think that is the general nature of the attacks of the -- the defendants on this official act component. I do find, though -- and understanding the arguments and that the jury, you know, could have gone the other way on this to say, you know what, I don't think this is enough, I get that argument.* But, here, I construe the evidence in favor of the government..."(p. 24).

....

NSH 3292714.2

*"So I think there are a variety of things that the defendants have argued that are pretty good arguments for why a jury should have come out differently*, but don't persuade me that a jury was required to come out differently, rather than being authorized to find the official act component here satisfied beyond a reasonable doubt." (pp. 30-31).

- Misc.

"Okay. I think that that takes care of all the counts. Now, I am out of time for today. I will say -- and I'm -- I'm happy to continue the discussion tomorrow and put on the record the other arguments that are not related to the state of the evidence. *I'm prepared to address and explain, while in each of those I'm rejecting the arguments, I'm certainly respecting them and seeing why there might be grounds for appeal but not finding that they meet a standard for a motion for a new trial."* (pp. 41–42)

DE 460 – September 10, 2025 oral ruling:

- Misc.

"The court was careful in the front end to do its very best to pronounce the best jury instructions and frame the best jury instructions that it could, and is not of the view that it committed error but certainly not clear error. *And, of course, these are matters that can be raised in the Sixth Circuit on appeal*." (p. 13)

- Count 11

"We had a lot of discussion regarding one discrete issue that doesn't make me think there's undue ambiguity, and the discrete issue there was, well, what do we do with the -- *how do we instruct about the concept of an unlawful business that's referred to in the statute. But it wasn't – you know, it wasn't a whole slew of issues. I think it was a discrete issue that I thought the answer -- even took some time to come up with the answer.* I think the

fact that we had to discuss it does not make the statute, though, one that gives inadequate notice of the criminality or is unconstitutionally vague, *but certainly defendants are free to disagree in the court of appeals.*" (p. 16).

*vi.   The sentencing hearing/guidelines objections (DE 416, 431, 440)*

On September 5, 2025 (DE 416)[8], Casada filed his Position Regarding the PSR Calculations, wherein he outlined his objections to the proposed guidelines calculations. On September 12, 2025, Casada filed a supplemental Position Regarding the PSR (431). Casada's guidelines-based objections were as follows:

Application of the 2 level enhancement for "more than one bribe or extortion" per 2C1.1(b)(1) - The common thread in the cases analyzing this enhancement, as articulate in Casada's sentencing filings (DE 416, 431) and the Sentencing Commission's application notes, is that the focus is not on number of payments towards a single incident but instead on number of wrongful acts (or "incident" of bribery or extortion). The proof presented at trial point towards allegations that Cothren – via Phoenix Solutions – paid bribes to Casada for assistance in the operations of Phoenix Solutions, such as shielding Cothren's role in Phoenix and pressuring the State to approve payments to Phoenix[9]. Every payment made in this case was allegedly to advance that singular goal – the day-to-day operations and success of Phoenix Solutions.

the application of the 10 level enhancement for a loss amount greater than $150,000 but less than $250,000 per 2C1.1(b)(2) – The Court correctly concluded that the

---

[8] Casada incorporates his arguments made in DE 416 and DE 431 herein.
[9] Casada disputes that there was proof that he personally did any of these things, as outlined in his Motion for New Trial.

NSH 3292714.2

campaign/caucus dollars were not relevant conduct, and as such that the $51,947 paid by the State to Phoenix Solutions from PPA funds is the correct figure to work from. Per U.S.S.G. §2C1.1(b)(2), in determining loss, Courts must apply the greatest of:

1) the value of the payment,
2) the benefit received or to be received in return for the payment,
3) the value of anything obtained or to be obtained by a public official or others acting with a public official,
4) the loss to the government from the offense.

2C1.1 Application Note 3 provides "Loss, for purposes of subsection (b)(2), shall be determined in accordance with Application Note 3 of the Commentary to § 2B1.1." 2B1.1 Application Note 3(D) provides, in pertinent part: "[l]oss shall be reduced by the following: (i) [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other person acting jointly with the defendant, to the victim before the offense was detected . . ..

The 6th Circuit in *United States v. Kozerski* 969 F.3d 310 (6th Cir. 2020) recognized two general principles that apply to "loss" calculations under § 2B1.1 in the context of offenses involving fully performed, although fraudulently obtained, contracts such as those alleged here. Those principles are that "loss generally refers to the pecuniary harm to the victim" and "loss generally turns on adding up the crime's face value and subtracting any value returned to the victim." *Id.* (citing USSG § 2B1.1, cmt. (n. 3(A), (E))). *United States v. Hills*, 27 F.4th 1155, 1197 (6th Cir. 2022).

Applying 6th Circuit case law and the U.S.S.G. application notes, the loss must be reduced by the fair market value of property served or services rendered, and the focus is squarely on the loss to the victim. It is not reasonably in dispute, and numerous government witnesses acknowledged, that no money or property was lost by either the

State or caucus/constituent mailer customers because i) Phoenix Solutions, Rightway Consulting and REA charged a fair price, ii) Phoenix Solutions produced a quality product, and every customer got what they paid for. There was similarly also no dispute that Phoenix Solutions, Rightway Consulting and REA incurred expenses in providing its services.

As such, the appropriate measure of loss in this case is the "value of the payment" – the $4600 representing the amount Casada received from Phoenix Solutions regarding PPA work. This loss amount would result in no upward adjustment based on loss.

the application of the 2 level enhancement for sophisticated money laundering enhancement per 2S1.1(b)(3) – Per Application Note 5, "sophisticated" laundering typically involves the use of–

(i)     fictitious entities;

(ii)    shell corporations;

(iii)   two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or

(iv)    offshore financial accounts.

In affirming the enhancement proposed by the PSR during Cothren's sentencing hearing, the Court put much stock in the position that RightWay was a "shell company." But during Casada's hearing, Casada presented proof that showed RightWay was far from a "shell company." (DE 455, PageID 7294). This, combined with the lack of concealment as evidenced by Agent Hunter's testimony and described above, show that this enhancement should not have applied.

Refusal to apply the 4 level reduction for mitigating role per 3B1.2 - Mr. Casada's role was very limited. The Court acknowledged that Casada played a lesser role than the others

during the sentencing hearing, albeit the Court did not think Casada's lesser role was enough for the adjustment.

But it is largely undisputed that as far as his actual role in Phoenix Solutions' creation and operations, Casada did very little. There is no proof that he created or submitted the "fake W-9" for Phoenix Solutions. Similarly, there is no proof that Casada participated in the "internal Phoenix email exchanges" that were forwarded to the Speaker's office. In his statement to law enforcement, Cothren stressed that Casada had done very little with Phoenix. Robin Smith testified that Mr. Casada had to be cordoned off because he was radioactive and couldn't keep a secret. She and Cothren kept information from Casada, particularly as to campaign/caucus work. There was no testimony that Casada created any of the mailers or that he interacted with anyone on behalf of Phoenix Solutions. Instead, the testimony was that Robin Smith had to be the face for Phoenix because of Casada's "toxicity." It was Robin Smith (sometimes alone, sometimes with Cade Cothren) who introduced individuals to Matthew Phoenix regarding mailer work, who interfaced with Connie Ridley, who created the "cover story" for Phoenix Solutions, and so forth. And it was Robin Smith who interfaced with individuals regarding campaign/caucus work, not Glen Casada. The mitigating role adjustment should have been applied in this case.

The Court's final guidelines calculations were as follows:

2C1.1(a)(1) – +14 (base offense because "public official")
2C1.1(b)(1) - +2 (multiple bribe)
2C1.1(b)(2) - +6 (loss amount of $51,947)
2C1.1(b)(3) - +4 (elected official)
2S1.1(b)(2)(B) - +2 (money laundering)
2S1.1(b)(3) - +2 (sophisticated money laundering)

NSH 3292714.2

4C1.1 – (-2) (zero point offender reduction)

<u>Total offense level</u> – 28 (advisory sentencing range of 78-97 months)

At the sentencing hearings of both Defendants,[10] the Court correctly commented that the guidelines objections were also close calls, but ultimately ruled as referenced above as to Casada. Had Casada prevailed on his guideline objections, the offense level would have been 14 (15-21 months). Certainly, a guidelines offense level of 14 would have yielded a significantly lower sentence than the sentence that considered the guidelines range offense level of 28. In light of the 36-month sentence imposed when the guidelines offense level was 28, it is reasonable to conclude that the sentence would be significantly lower had Casada prevailed.

To be clear, even with a 36-month sentence, Casada asserts that his sentence would likely expire prior to final appellate review. The U.S. Supreme Court has historically considered several honest services fraud cases. In its most recent case, *United States v. Kousisis*, 605 U.S. ____ (2025), the Court decided the issue of the requirement of economic loss in honest services fraud cases but specifically left open the issue of materiality – a key issue in the present case. Should the case make its way to the U.S. Supreme Court, Casada will have almost certainly served the entirety of his 36-month sentence.

Finally, at the sentencing hearings of both Defendants, the Court commented that this matter was hotly contested, that the issues to be decided both factually and legally were very close, that the jury would have been authorized (but not required) to acquit, and that a reviewing court may see the legal rulings in a different way. This further surpasses the §3143(b) standard that the Court must find to grant bail.

---

[10] Cothern adopted and argued the guidelines enhancements for loss amount and multiple bribes.

NSH 3292714.2

## Conclusion

For the reasons outlined above, Glen Casada requests this Court grant him bail pending appeal.

Respectfully submitted,

*/s/ Jonathan Farmer*
Edward M. Yarbrough (BPR #004097)
Jonathan P. Farmer (BPR #020749)
S. Chase Fann (BPR #036794)
511 Union St, Suite 1000
Nashville, TN 37219
(P) 615-238-6300
eyarbrough@spencerfane.com
jfarmer@spencerfane.com
cfann@spencerfane.com
Counsel for Glen Casada

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2025, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following:

Taylor J. Phillips
Assistant US Attorney
U.S. Attorney's Office - Middle District
719 Church St. Suite 3300
Nashville, TN 37203
taylor.phillips@usdoj.gov

John P. Taddei
Blake J. Ellison
Trial Attorneys
Public Integrity Section, Criminal Division
U.S. Department of Justice
1301 New York Ave., NW
Washington, DC 20530
john.taddei@usdoj.gov
blake.ellison@usdoj.gov

*/s/ Jonathan Farmer*
Jonathan Farmer

26

NSH 3292714.2

27

NSH 3292714.2